UNITED STATES of America,
Plaintiff,

v.

MICROSOFT CORPORATION,
Defendant.

State of New York, ex rel. Attorney General Eliot Spitzer et al., Plaintiffs and Counterclaim–Defendants,

v.

Microsoft Corporation, Defendant and Counterclaim–Plaintiff.

Nos. CIV. A. 98–1232(TPJ),
CIV. A. 98–1233(TPJ).

United States District Court,
District of Columbia.

Nov. 5, 1999.

Dennis C. Vacco, Attorney General of the State of New York, New York, NY, Christopher Crook, U.S. Dept. of Justice, San Francisco, CA, A. Douglas Melamed, U.S. Dept. of Justice, Washington DC, for plaintiff United States in case 1:98cv01232.

Alan R. Kusinitz, Attorney General of the State of New York, New York, NY, for plaintiffs in case 1:98cv01233.

David Paul Murray, Willkie Farr & Gallagher, Washington, DC, for movant Bloomberg News.

Daryl Andrew Libow, Sullivan & Cromwell, Washington, DC, John Lehman Warden, Sullivan & Cromwell, New York, NY, for defendant Microsoft Corp.

Donald Manwell Falk, Mayer, Brown & Platt, Washington, DC for Network Computer Inc.

Joseph Jay Simons, Rogers & Wells, L.L.P., Washington, DC for Sun Microsystems, Inc.

Samuel R. Miller, Folger, Levin & Kahn, L.L.P., San Francisco, CA, and Trisa Jean Thompson, Dell Computer Corporation, Round Rock, TX, for Dell Computer Corporation.

Junius Carlisle McElveen, Jr., Jones, Day, Reavis & Pogue, Washington, DC for IBM.

Allen Roger Snyder, Hogan & Hartson, L.L.P., Washington, DC for movant Netscape Communications Corp.

Lee J. Levine, Levine Sullivan & Koch, LLP, Washington, DC, for movants Seattle Times, ZDTV, ZDNET, The Washington Post Co., Associated Press, Dow Jones & Co., New York Times Co., American Lawyer Media, and USA Today.

Niki Kuckes, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington DC for movant Reuter America, Inc.

Robert A. Gutkin, Pillsbury, Madison & Sutro, L.L.P., Washington, DC for movant San Jose Mercury News, Inc.

Jerry L. Robinett and Roy A. Day, movants pro se.

Richard Joseph Favretto, Mayer, Brown & Platt, Washington, DC for movant Oracle Corp.

William Dean Coston, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC for movant Compaq Computer Corp.

Benjamin S. Sharp, Perkins, Cote, L.L.P., Washington DC for movant Boeing Co.

Jay Ward Brown, Levine Sullivan & Koch, L.L.P., Washington, DC for movant Associated Press.

Carl Richard Schenker, Jr., O'Melveny & Myers, L.L.P., Washingotn, DC for movant Bristol Technology Inc.

Robert Stephen Berry, Berry & Leftwich, Washington, DC for movant Gravity, Inc.

JACKSON, District Judge.

## FINDINGS OF FACT

These consolidated civil antitrust actions alleging violations of the Sherman Act, §§ 1 and 2, and various state statutes by the defendant Microsoft Corporation, were tried to the Court, sitting without a jury, between October 19, 1998, and June 24, 1999. The Court has considered the record evidence submitted by the parties, made determinations as to its relevancy and materiality, assessed the credibility of the testimony of the witnesses, both written and oral, and ascertained for its purposes the probative significance of the documentary and visual evidence presented. Upon the record before the Court as of July 28, 1999, at the close of the admission of evidence, pursuant to Fed.R.Civ.P. 52(a), the Court finds the following facts to have been proved by a preponderance of the evidence. The Court shall state the conclusions of law to be drawn therefrom in a separate Memorandum and Order to be filed in due course.

### I. BACKGROUND

1. A "personal computer" ("PC") is a digital information processing device designed for use by one person at a time. A typical PC consists of central processing components (e.g., a microprocessor and main memory) and mass data storage (such as a hard disk). A typical PC system consists of a PC, certain peripheral input/output devices (including a monitor, a keyboard, a mouse, and a printer), and an operating system. PC systems, which include desktop and laptop models, can be distinguished from more powerful, more expensive computer systems known as "servers," which are designed to provide data, services, and functionality through a digital network to multiple users.

2. An "operating system" is a software program that controls the allocation and use of computer resources (such as central processing unit time, main memory space,

**4**

disk space, and input/output channels). The operating system also supports the functions of software programs, called "applications," that perform specific user-oriented tasks. The operating system supports the functions of applications by exposing interfaces, called "application programming interfaces," or "APIs." These are synapses at which the developer of an application can connect to invoke pre-fabricated blocks of code in the operating system. These blocks of code in turn perform crucial tasks, such as displaying text on the computer screen. Because it supports applications while interacting more closely with the PC system's hardware, the operating system is said to serve as a "platform."

3. An Intel-compatible PC is one designed to function with Intel's 80x86/Pentium families of microprocessors or with compatible microprocessors manufactured by Intel or by other firms.

4. An operating system designed to run on an Intel-compatible PC will not function on a non-Intel-compatible PC, nor will an operating system designed for a non-Intel-compatible PC function on an Intel-compatible one. Similarly, an application that relies on APIs specific to one operating system will not, generally speaking, function on another operating system unless it is first adapted, or "ported," to the APIs of the other operating system.

5. Defendant Microsoft Corporation is organized under the laws of the State of Washington, and its headquarters are situated in Redmond, Washington. Since its inception, Microsoft has focused primarily on developing software and licensing it to various purchasers.

6. In 1981, Microsoft released the first version of its Microsoft Disk Operating System, commonly known as "MS–DOS." The system had a character-based user interface that required the user to type specific instructions at a command prompt in order to perform tasks such as launching applications and copying files. When the International Business Machines Corporation ("IBM") selected MS–DOS for pre-installation on its first generation of PCs, Microsoft's product became the predominant operating system sold for Intel-compatible PCs.

7. In 1985, Microsoft began shipping a software package called Windows. The product included a graphical user interface, which enabled users to perform tasks by selecting icons and words on the screen using a mouse. Although originally just a user-interface, or "shell," sitting on top of MS–DOS, Windows took on more operating-system functionality over time.

8. In 1995, Microsoft introduced a software package called Windows 95, which announced itself as the first operating system for Intel-compatible PCs that exhibited the same sort of integrated features as the Mac OS running PCs manufactured by Apple Computer, Inc. ("Apple"). Windows 95 enjoyed unprecedented popularity with consumers, and in June 1998, Microsoft released its successor, Windows 98.

9. Microsoft is the leading supplier of operating systems for PCs. The company transacts business in all fifty of the United States and in most countries around the world.

10. Microsoft licenses copies of its software programs directly to consumers. The largest part of its MS–DOS and Windows sales, however, consists of licensing the products to manufacturers of PCs (known as "original equipment manufacturers" or "OEMs"), such as the IBM PC Company and the Compaq Computer Corporation ("Compaq"). An OEM typically installs a copy of Windows onto one of its PCs before selling the package to a consumer under a single price.

11. The Internet is a global electronic network, consisting of smaller, interconnected networks, which allows millions of computers to exchange information over telephone wires, dedicated data cables, and wireless links. The Internet links PCs by means of servers, which run specialized

operating systems and applications designed for servicing a network environment.

12. The World Wide Web ("the Web") is a massive collection of digital information resources stored on servers throughout the Internet. These resources are typically provided in the form of hypertext documents, commonly referred to as "Web pages," that may incorporate any combination of text, graphics, audio and video content, software programs, and other data. A user of a computer connected to the Internet can publish a page on the Web simply by copying it into a specially designated, publicly accessible directory on a Web server. Some Web resources are in the form of applications that provide functionality through a user's PC system but actually execute on a server.

13. Internet content providers ("ICPs") are the individuals and organizations that have established a presence, or "site," on the Web by publishing a collection of Web pages. Most Web pages are in the form of "hypertext"; that is, they contain annotated references, or "hyperlinks," to other Web pages. Hyperlinks can be used as cross-references within a single document, between documents on the same site, or between documents on different sites.

14. Typically, one page on each Web site is the "home page," or the first access point to the site. The home page is usually a hypertext document that presents an overview of the site and hyperlinks to the other pages comprising the site.

15. PCs typically connect to the Internet through the services of Internet access providers ("IAPs"), which generally charge subscription fees to their customers in the United States.

There are two types of IAPs. Online services ("OLSs") such as America Online ("AOL"), Prodigy, and the Microsoft Network ("MSN") offer, in addition to Internet access, various services and an array of proprietary content. Internet service providers ("ISPs") such as MindSpring and Netcom, on the other hand, offer few services apart from Internet access and relatively little of their own content.

16. A "Web client" is software that, when running on a computer connected to the Internet, sends information to and receives information from Web servers throughout the Internet. Web clients and servers transfer data using a standard known as the Hypertext Transfer Protocol ("HTTP"). A "Web browser" is a type of Web client that enables a user to select, retrieve, and perceive resources on the Web. In particular, Web browsers provide a way for a user to view hypertext documents and follow the hyperlinks that connect them, typically by moving the cursor over a link and depressing the mouse button.

17. Although certain Web browsers provided graphical user interfaces as far back as 1993, the first widely-popular graphical browser distributed for profit, called Navigator, was brought to market by the Netscape Communications Corporation in December 1994. Microsoft introduced its browser, called Internet Explorer, in July 1995.

## II. THE RELEVANT MARKET

■ 18. Currently there are no products, nor are there likely to be any in the near future, that a significant percentage of consumers world-wide could substitute for Intel-compatible PC operating systems without incurring substantial costs. Furthermore, no firm that does not currently market Intel-compatible PC operating systems could start doing so in a way that would, within a reasonably short period of time, present a significant percentage of consumers with a viable alternative to existing Intel-compatible PC operating systems. It follows that, if one firm controlled the licensing of all Intel-compatible PC operating systems world-wide, it could set the price of a license substantially above that which would be charged in a

competitive market and leave the price there for a significant period of time without losing so many customers as to make the action unprofitable. Therefore, in determining the level of Microsoft's market power, the relevant market is the licensing of all Intel-compatible PC operating systems world-wide.

## A. Demand Substitutability
### 1. Server Operating Systems

19. Consumers could not turn from Intel-compatible PC operating systems to Intel-compatible server operating systems without incurring substantial costs, since the latter type of system is sold at a significantly higher price than the former. A consumer intent on acquiring a server operating system would also have to buy a computer of substantially greater power and price than an Intel-compatible PC, because server operating systems generally cannot function properly on PC hardware. The price of an Intel-compatible PC operating system accounts for only a very small percentage of the price of an Intel-compatible PC system. Thus, even a substantial increase in the price of an Intel-compatible PC operating system above the competitive level would result in only a trivial increase in the price of an Intel-compatible PC system. Very few consumers would purchase expensive servers in response to a trivial increase in the price of an Intel-compatible PC system. Furthermore, a consumer would not obtain a satisfactory substitute for an Intel-compatible PC operating system even if he purchased a server, since server operating systems lack the features—and support for the breadth of applications—that induce users to purchase Intel-compatible PC operating systems.

### 2. Non–Intel–Compatible PC Operating Systems

20. Since only Intel-compatible PC operating systems will work with Intel-compatible PCs, a consumer cannot opt for a non-Intel-compatible PC operating system without obtaining a non-Intel-compatible PC. Thus, for consumers who already own an Intel-compatible PC system, the cost of switching to a non-Intel compatible PC operating system includes the price of not only a new operating system, but also a new PC and new peripheral devices. It also includes the effort of learning to use the new system, the cost of acquiring a new set of compatible applications, and the work of replacing files and documents that were associated with the old applications. Very few consumers would incur these costs in response to the trivial increase in the price of an Intel-compatible PC system that would result from even a substantial increase in the price of an Intel-compatible PC operating system. For example, users of Intel-compatible PC operating systems would not switch in large numbers to the Mac OS in response to even a substantial, sustained increase in the price of an Intel-compatible PC operating system.

21. The response to a price increase would be somewhat greater among consumers buying their first PC system, because they would not have already invested time and money in an Intel-compatible PC system and a set of compatible applications. Apple does not license the Mac OS separately from its PC hardware, however, and the package of hardware and software comprising an Apple PC system is priced substantially higher than the average price of an Intel-compatible PC system. Furthermore, consumer demand for Apple PC systems suffers on account of the relative dearth of applications written to run on the Mac OS. It is unlikely, then, that a firm controlling the licensing of all Intel-compatible PC operating systems would lose so many new PC users to Apple as the result of a substantial, enduring price increase as to make the action unprofitable. It is therefore proper to define a relevant market that excludes the Mac OS. In any event, as Section III of these findings demonstrates, including the Mac OS in the relevant market would not alter the Court's conclusion as to the level of Microsoft's market power.

### 3. Information Appliances

22. No operating system designed for a hand-held computer, a "smart" wireless telephone, a television set-top box, or a game console is capable of performing as an adequate operating system for an Intel-compatible PC. Therefore, in order to adopt a substitute for the Intel-compatible PC operating system from the realm of "information appliances," a consumer must acquire one or more of these devices in lieu of an Intel-compatible PC system.

23. It is possible that, within the next few years, those consumers who otherwise would use an Intel-compatible PC system solely for storing addresses and schedules, for sending and receiving E-mail, for browsing the Web, and for playing video games might be able to choose a complementary set of information appliances over an Intel-compatible PC system without incurring substantial costs. To the extent this substitution occurs, though, it will be the result of innovation by the producers of information appliances, and it will occur even if Intel-compatible PC operating systems are priced at the same level that they would be in a competitive market. More importantly, while some consumers may decide to make do with one or more information appliances in place of an Intel-compatible PC system, the number of these consumers will, for the foreseeable future, remain small in comparison to the number of consumers deciding that they still need an Intel-compatible PC system. One reason for this is the fact that no single type of information appliance, nor even all types in the aggregate, provides all of the features that most consumers have come to rely on in their PC systems and in the applications that run on them. Thus, most of those who buy information appliances will do so in addition to, rather than instead of, buying an Intel-compatible PC system. Not surprisingly, then, sales of PC systems are not expected to suffer on account of the growing consumer interest in information appliances. It follows that, for the foreseeable future, a firm controlling the licensing of all Intel-compatible PC operating systems could set prices substantially above competitive levels without losing an unacceptable amount of business to information appliances.

### 4. Network Computers

24. A network computer system (sometimes called a "thin client") typically contains central processing components with basic capabilities, certain key peripheral devices (such as a monitor, a keyboard, and a mouse), an operating system, and a browser. The system contains no mass storage, however, and it processes little if any data locally. Instead, the system receives processed data and software as needed from a server across a network. A network computer system lacks the hardware resources to support an Intel-compatible PC operating system. It follows that software applications written to run on a specific Intel-compatible PC operating system will not run on a network computer. Network computers can run applications residing on a designated server, however. Moreover, a network computer system typically can run applications residing on other servers, so long as those applications are accessible through Web sites. The ability to run server-based applications is not exclusive to network computer systems, however. Generally speaking, any PC system equipped with a browser and an Internet connection is capable of accessing applications hosted through Web sites.

25. Since the network computing model relies heavily on the processing power and memory of servers, the requirements for the user's hardware (and thus the price of that hardware) are low relative to those of an Intel-compatible PC system. Still, a user who already owns a relatively expensive Intel-compatible PC system is not likely to abandon the investment and acquire less powerful hardware just because one of the least expensive components of his PC system—the operating system—is substantially more expensive than it would be under competitive conditions. Just as

does the Mac OS, the network computing model presents a somewhat more attractive alternative to the first-time computer buyer. But as in the case where a prospective purchaser is considering acquiring the Apple alternative, a new buyer considering the network computing model must choose between types of computer systems. If the consumer opts for the less expensive hardware of the network computer, that hardware will not support an Intel-compatible PC operating system; and if the new buyer opts for the more expensive hardware of an Intel-compatible PC, an Intel-compatible PC operating system will almost certainly come pre-installed (and in any event represent very little additional cost relative to the price of the hardware).

26. Only a few firms currently market network computer systems, and the systems have yet to attract substantial consumer demand. In part, this is because PC systems, which can store and process data locally as well as communicate with a server, have decreased so much in price as to call into question the value proposition of buying a network computer system.

> This fact would not change if the price of an Intel-compatible PC operating system rose significantly, because the resulting change in the price of an Intel-compatible PC system would be very minor. Another reason for the limited demand for network computer systems is the fact that few consumers are in a position to turn from PC systems to network computer systems without making substantial sacrifices; for the network computing option exhibits significant shortcomings for current PC owners and first-time buyers alike. The problems of latency, congestion, asynchrony, and insecurity across a communications network, and contention for limited processing and memory resources at the remote server, can all result in a substantial derogation of computing performance. Moreover, the owner of a network computer is required to enter into long-term dependency upon the owner of a remote server in order to obtain functionality that would reside within his control if he owned a PC system. If network computing becomes a viable alternative to PC-based computing, it will be because innovation by the proponents of the network computing model overcomes these problems, and it will happen even if Intel-compatible PC operating systems are priced at competitive levels. In any case, that day has not arrived, nor does it appear imminent.

## 5. Server–Based Computing Generally

27. As the bandwidth available to the average user increases, "portal" Web sites, which aggregate Web content and provide services such as search engines, E-mail, and travel reservation systems, could begin to host full lines of the server-based, personal-productivity applications that have begun to appear in small numbers on the Web. If so, increasing numbers of computer users equipped with Web browsers and IAP connections could begin to conduct a significant portion of their computing through these portals. To the extent they might do so, users probably would not regard the Mac OS's limited stock of compatible applications as the major drawback to using an Apple PC system that it is today, and they might be increasingly drawn to network computer systems and information appliances. The variety and ease of use of server-based applications accessible through browsers would have to increase a great deal from today's levels, however, before the total costs of dispensing with an Intel-compatible PC operating system would decline sufficiently to impose a significant constraint on the pricing of those systems. Again, that day is not imminent; for at least the next few years, the overwhelming majority of consumers accessing server-based applications will do so using an Intel-compatible PC system and a browser.

### 6. Middleware

28. Operating systems are not the only software programs that expose APIs to application developers. The Netscape Web browser and Sun Microsystems, Inc.'s Java class libraries are examples of non-operating system software that do likewise. Such software is often called "middleware" because it relies on the interfaces provided by the underlying operating system while simultaneously exposing its own APIs to developers. Currently no middleware product exposes enough APIs to allow independent software vendors ("ISVs") profitably to write full-featured personal productivity applications that rely solely on those APIs.

29. Even if middleware deployed enough APIs to support full-featured applications, it would not function on a computer without an operating system to perform tasks such as managing hardware resources and controlling peripheral devices. But to the extent the array of applications relying solely on middleware comes to satisfy all of a user's needs, the user will not care whether there exists a large number of other applications that are directly compatible with the underlying operating system. Thus, the growth of middleware-based applications could lower the costs to users of choosing a non-Intel-compatible PC operating system like the Mac OS. It remains to be seen, though, whether there will ever be a sustained stream of full-featured applications written solely to middleware APIs. In any event, it would take several years for middleware and the applications it supports to evolve from the status quo to a point at which the cost to the average consumer of choosing a non-Intel compatible PC operating system over an Intel-compatible one falls so low as to constrain the pricing of the latter systems.

### B. The Possibility of Supply Responses

30. Firms that do not currently produce Intel-compatible PC operating systems could do so. What is more, once a firm had written the necessary software code, it could produce millions of copies of its operating system at relatively low cost. The ability to meet a large demand is useless, however, if the demand for the product is small, and signs do not indicate large demand for a new Intel-compatible PC operating system. To the contrary, they indicate that the demand for a new Intel-compatible PC operating system would be severely constrained by an intractable "chicken-and-egg" problem: The overwhelming majority of consumers will only use a PC operating system for which there already exists a large and varied set of high-quality, full-featured applications, and for which it seems relatively certain that new types of applications and new versions of existing applications will continue to be marketed at pace with those written for other operating systems. Unfortunately for firms whose products do not fit that bill, the porting of applications from one operating system to another is a costly process. Consequently, software developers generally write applications first, and often exclusively, for the operating system that is already used by a dominant share of all PC users. Users do not want to invest in an operating system until it is clear that the system will support generations of applications that will meet their needs, and developers do not want to invest in writing or quickly porting applications for an operating system until it is clear that there will be a sizeable and stable market for it. What is more, consumers who already use one Intel-compatible PC operating system are even less likely than first-time buyers to choose a newcomer to the field, for switching to a new system would require these users to scrap the investment they have made in applications, training, and certain hardware.

31. The chicken-and-egg problem notwithstanding, a firm might reasonably expect to make a profit by introducing an Intel-compatible PC operating system de-

signed to support a type of application that satisfies the special interests of a particular subset of users. For example, Be, Inc. ("Be") markets an Intel-compatible PC operating system called BeOS that offers superior support for multimedia applications, and the operating system enjoys a certain amount of success with the segment of the consumer population that has a special interest in creating and playing multimedia content with a PC system. Still, while a niche operating system might turn a profit, the chicken-and-egg problem (hereinafter referred to as the "applications barrier to entry") would make it prohibitively expensive for a new Intel-compatible operating system to attract enough developers and consumers to become a viable alternative to a dominant incumbent in less than a few years.

32. To the extent that developers begin writing attractive applications that rely solely on servers or middleware instead of PC operating systems, the applications barrier to entry could erode. As the Court finds above, however, it remains to be seen whether server- or middleware-based development will flourish at all. Even if such development were already flourishing, it would be several years before the applications barrier eroded enough to clear the way for the relatively rapid emergence of a viable alternative to incumbent Intel-compatible PC operating systems. It is highly unlikely, then, that a firm not already marketing an Intel-compatible PC operating system could begin marketing one that would, in less than a few years, present a significant percentage of consumers with a viable alternative to incumbents.

## III. MICROSOFT'S POWER IN THE RELEVANT MARKET

■ 33. Microsoft enjoys so much power in the market for Intel-compatible PC operating systems that if it wished to exercise this power solely in terms of price, it could charge a price for Windows substantially above that which could be charged in a competitive market. Moreover, it could do so for a significant period of time without losing an unacceptable amount of business to competitors. In other words, Microsoft enjoys monopoly power in the relevant market.

34. Viewed together, three main facts indicate that Microsoft enjoys monopoly power. First, Microsoft's share of the market for Intel-compatible PC operating systems is extremely large and stable. Second, Microsoft's dominant market share is protected by a high barrier to entry. Third, and largely as a result of that barrier, Microsoft's customers lack a commercially viable alternative to Windows.

### A. Market Share

35. Microsoft possesses a dominant, persistent, and increasing share of the world-wide market for Intel-compatible PC operating systems. Every year for the last decade, Microsoft's share of the market for Intel-compatible PC operating systems has stood above ninety percent. For the last couple of years the figure has been at least ninety-five percent, and analysts project that the share will climb even higher over the next few years. Even if Apple's Mac OS were included in the relevant market, Microsoft's share would still stand well above eighty percent.

### B. The Applications Barrier to Entry
#### 1. Description of the Applications Barrier to Entry

36. Microsoft's dominant market share is protected by the same barrier that helps define the market for Intel-compatible PC operating systems. As explained above, the applications barrier would prevent an aspiring entrant into the relevant market from drawing a significant number of customers away from a dominant incumbent even if the incumbent priced its products substantially above competitive levels for a significant period of time. Because Microsoft's market share is so dominant, the barrier has a similar effect within the mar-

ket: It prevents Intel-compatible PC operating systems other than Windows from attracting significant consumer demand, and it would continue to do so even if Microsoft held its prices substantially above the competitive level.

37. Consumer interest in a PC operating system derives primarily from the ability of that system to run applications. The consumer wants an operating system that runs not only types of applications that he knows he will want to use, but also those types in which he might develop an interest later. Also, the consumer knows that if he chooses an operating system with enough demand to support multiple applications in each product category, he will be less likely to find himself straitened later by having to use an application whose features disappoint him. Finally, the average user knows that, generally speaking, applications improve through successive versions. He thus wants an operating system for which successive generations of his favorite applications will be released— promptly at that. The fact that a vastly larger number of applications are written for Windows than for other PC operating systems attracts consumers to Windows, because it reassures them that their interests will be met as long as they use Microsoft's product.

38. Software development is characterized by substantial economies of scale. The fixed costs of producing software, including applications, is very high. By contrast, marginal costs are very low. Moreover, the costs of developing software are "sunk"—once expended to develop software, resources so devoted cannot be used for another purpose. The result of economies of scale and sunk costs is that application developers seek to sell as many copies of their applications as possible. An application that is written for one PC operating system will operate on another PC operating system only if it is ported to that system, and porting applications is both time-consuming and expensive. Therefore, application developers tend to write first to the operating system with the most users—Windows. Developers might then port their applications to other operating systems, but only to the extent that the marginal added sales justify the cost of porting. In order to recover that cost, ISVs that do go to the effort of porting frequently set the price of ported applications considerably higher than that of the original versions written for Windows.

39. Consumer demand for Windows enjoys positive network effects. A positive network effect is a phenomenon by which the attractiveness of a product increases with the number of people using it. The fact that there is a multitude of people using Windows makes the product more attractive to consumers. The large installed base attracts corporate customers who want to use an operating system that new employees are already likely to know how to use, and it attracts academic consumers who want to use software that will allow them to share files easily with colleagues at other institutions. The main reason that demand for Windows experiences positive network effects, however, is that the size of Windows' installed base impels ISVs to write applications first and foremost to Windows, thereby ensuring a large body of applications from which consumers can choose. The large body of applications thus reinforces demand for Windows, augmenting Microsoft's dominant position and thereby perpetuating ISV incentives to write applications principally for Windows. This self-reinforcing cycle is often referred to as a "positive feedback loop."

40. What for Microsoft is a positive feedback loop is for would-be competitors a vicious cycle. For just as Microsoft's large market share creates incentives for ISVs to develop applications first and foremost for Windows, the small or non-existent market share of an aspiring competitor makes it prohibitively expensive for the aspirant to develop its PC operating system into an acceptable substitute for Windows. To provide a viable substitute for

Windows, another PC operating system would need a large and varied enough base of compatible applications to reassure consumers that their interests in variety, choice, and currency would be met to more-or-less the same extent as if they chose Windows. Even if the contender attracted several thousand compatible applications, it would still look like a gamble from the consumer's perspective next to Windows, which supports over 70,000 applications. The amount it would cost an operating system vendor to create that many applications is prohibitively large. Therefore, in order to ensure the availability of a set of applications comparable to that available for Windows, a potential rival would need to induce a very large number of ISVs to write to its operating system.

41. In deciding whether to develop an application for a new operating system, an ISV's first consideration is the number of users it expects the operating system to attract. Out of this focus arises a collective-action problem: Each ISV realizes that the new operating system could attract a significant number of users if enough ISVs developed applications for it; but few ISVs want to sink resources into developing for the system until it becomes established. Since everyone is waiting for everyone else to bear the risk of early adoption, the new operating system has difficulty attracting enough applications to generate a positive feedback loop. The vendor of a new operating system cannot effectively solve this problem by paying the necessary number of ISVs to write for its operating system, because the cost of doing so would dwarf the expected return.

42. Counteracting the collective-action phenomenon is another known as the "first-mover incentive." For an ISV interested in attracting users, there may be an advantage to offering the first and, for a while, only application in its category that runs on a new PC operating system. The user base of the new system may be small, but every user of that system who wants

such an application will be compelled to use the ISV's offering. Moreover, if demand for the new operating system suddenly explodes, the first mover will reap large sales before any competitors arrive. An ISV thus might be drawn to a new PC operating system as a "protected harbor." Once first-movers stake claims to the major categories of applications, however, there is a strong chance that the new operating system could stall; it would not support the most familiar applications, nor the variety and number of applications, that attract large numbers of consumers, and there would no longer exist a first-mover incentive to attract additional ISVs to the important application categories. Although the upstart operating system might find itself with enough applications support to hold a fraction of the market, the collective-action phenomenon would still prevent the system from gaining the kind of positive feedback momentum that can turn a fringe entrant into a rival that would put competitive pressure on Windows.

43. The cost to a would-be entrant of inducing ISVs to write applications for its operating system exceeds the cost that Microsoft itself has faced in inducing ISVs to write applications for its operating system products, for Microsoft never confronted a highly penetrated market dominated by a single competitor. Of course, the fact that it is extremely difficult for an efficient would-be rival to accumulate enough applications support to compete with Windows does not mean that sustaining its own applications support is effortless for Microsoft. In fact, if Microsoft stopped investing the hundreds of millions of dollars it spends each year inducing ISVs to write applications for Windows, it might become easier than it currently is for a competitor to develop its own positive feedback loop. But given that Windows today enjoys overwhelmingly more applications support than any other PC operating system, it would still take that competitor years to develop the necessary

momentum. Plus, while Microsoft may spend more on platform "evangelization," even in relative terms, than any other PC operating-system vendor, it is not difficult to understand why it is worthwhile for the principal beneficiary of the applications barrier to devote more resources to augmenting it than aspiring rivals are willing to expend in speculative efforts to erode it.

44. Microsoft continually releases "new and improved" versions of its PC operating system. Each time it does, Microsoft must convince ISVs to write applications that take advantage of new APIs, so that existing Windows users will have incentive to buy an upgrade. Since ISVs are usually still earning substantial revenue from applications written for the last version of Windows, Microsoft must convince them to write for the new version. Even if ISVs are slow to take advantage of the new APIs, though, no applications barrier stands in the way of consumers adopting the new system, for Microsoft ensures that successive versions of Windows retain the ability to run applications developed for earlier versions. In fact, since ISVs know that consumers do not feel locked into their old versions of Windows and that new versions have historically attracted substantial consumer demand, ISVs will generally write to new APIs as long as the interfaces enable attractive, innovative features. Microsoft supplements developers' incentives by extending various 'seals of approval'—visible to consumers, investors, and industry analysts—to those ISVs that promptly develop new versions of their applications adapted to the newest version of Windows. In addition, Microsoft works closely with ISVs to help them adapt their applications to the newest version of the operating system—a process that is in any event far easier than porting an application from one vendor's PC operating system to another's. In sum, despite the substantial resources Microsoft expends inducing ISVs to develop applications for new versions of Windows, the company does not face any obstacles nearly as imposing as the barrier to entry that vendors and would-be vendors of other PC operating systems must overcome.

### 2. Empirical Evidence of the Applications Barrier to Entry

45. The experiences of IBM and Apple, Microsoft's most significant operating system rivals in the mid- and late 1990s, confirm the strength of the applications barrier to entry.

#### a. OS/2 Warp

46. IBM's inability to gain widespread developer support for its OS/2 Warp operating system illustrates how the massive Windows installed base makes it prohibitively costly for a rival operating system to attract enough developer support to challenge Windows. In late 1994, IBM introduced its Intel-compatible OS/2 Warp operating system and spent tens of millions of dollars in an effort to attract ISVs to develop applications for OS/2 and in an attempt to reverse-engineer, or "clone," part of the Windows API set. Despite these efforts, IBM could obtain neither significant market share nor ISV support for OS/2 Warp. Thus, although at its peak OS/2 ran approximately 2,500 applications and had 10% of the market for Intel-compatible PC operating systems, IBM ultimately determined that the applications barrier prevented effective competition against Windows 95. For that reason, in 1996 IBM stopped trying to convince ISVs to write for OS/2 Warp. IBM now targets the product at a market niche, namely enterprise customers (mainly banks) that are interested in particular types of application that run on OS/2 Warp. The fact that IBM no longer tries to compete with Windows is evidenced by the fact that it prices OS/2 Warp at about two-and-one-half times the price of Windows 98.

#### b. The Mac OS

47. The inability of Apple to compete effectively with Windows provides another example of the applications barrier to entry in operation. Although Apple's Mac OS supports more than 12,000 applica-

tions, even an inventory of that magnitude is not sufficient to enable Apple to present a significant percentage of users with a viable substitute for Windows. The absence of a large installed base, in turn, reinforces the disparity between the applications made available for the Mac OS and those made available for Windows, further inhibiting Apple's sales. The applications barrier thus prevents the Mac OS from hindering Microsoft's ability to control price, regardless of whether the Mac OS is regarded as being in the relevant market or not.

### c. Fringe Operating Systems

48. The applications barrier to entry does not prevent non-Microsoft, Intel-compatible PC operating systems from attracting enough consumer demand and ISV support to survive. It does not even prevent vendors of those products from making a profit. The barrier does, however, prevent the products from drawing a significant percentage of consumers away from Windows.

49. As discussed above, Be markets an Intel-compatible PC operating system, called BeOS, that is specially suited to support multimedia functions. The operating system survives on a relatively minuscule number of applications (approximately 1,000) and a user base which, at around 750,000, is trivial compared to the number of Windows users. One of the reasons the BeOS can even attract that many users despite its small base of applications is that it advertises itself as a complement to, rather than as a substitute for, Windows. Although the BeOS could run an Intel-compatible PC system without Windows, it is almost always loaded on a system along with Windows. What is more, when these dual-loaded PC systems are turned on, Windows automatically boots; the user must then take affirmative steps to invoke the BeOS. While this scheme allows the BeOS to occupy a niche in the market, it does not place the product on a trajectory to replace Windows on a significant number of PCs. The special

multimedia support provided by the BeOS may, for a small number of users, outweigh the disadvantages of maintaining two large, complex operating systems on one PC. Of that group, however, it is likely that only a tiny number of users will find that support so attractive that they would be willing to forego Windows, and its huge base of compatible applications, altogether.

50. The experience of the Linux operating system, a version of which runs on Intel-compatible PCs, similarly fails to refute the existence of an applications barrier to entry. Linux is an "open source" operating system that was created, and is continuously updated, by a global network of software developers who contribute their labor for free. Although Linux has between ten and fifteen million users, the majority of them use the operating system to run servers, not PCs. Several ISVs have announced their development of (or plans to develop) Linux versions of their applications. To date, though, legions of ISVs have not followed the lead of these first movers. Similarly, consumers have by and large shown little inclination to abandon Windows, with its reliable developer support, in favor of an operating system whose future in the PC realm is unclear. By itself, Linux's open-source development model shows no signs of liberating that operating system from the cycle of consumer preferences and developer incentives that, when fueled by Windows' enormous reservoir of applications, prevents non-Microsoft operating systems from competing.

### 3. Open–Source Applications Development

51. Since application developers working under an open-source model are not looking to recoup their investment and make a profit by selling copies of their finished products, they are free from the imperative that compels proprietary developers to concentrate their efforts on Windows. In theory, then, open-source developers are at least as likely to develop applications for a non-Microsoft operating

system as they are to write Windows-compatible applications. In fact, they may be disposed ideologically to focus their efforts on open-source platforms like Linux. Fortunately for Microsoft, however, there are only so many developers in the world willing to devote their talents to writing, testing, and debugging software pro bono publico. A small corps may be willing to concentrate its efforts on popular applications, such as browsers and office productivity applications, that are of value to most users. It is unlikely, though, that a sufficient number of open-source developers will commit to developing and continually updating the large variety of applications that an operating system would need to attract in order to present a significant number of users with a viable alternative to Windows. In practice, then, the open-source model of applications development may increase the base of applications that run on non-Microsoft PC operating systems, but it cannot dissolve the barrier that prevents such operating systems from challenging Windows.

### 4. Cloning the 32–Bit Windows APIs

52. Theoretically, the developer of a non-Microsoft, Intel-compatible PC operating system could circumvent the applications barrier to entry by cloning the APIs exposed by the 32–bit versions of Windows (Windows 9x and Windows NT). Applications written for Windows would then also run on the rival system, and consumers could use the rival system confident in that knowledge. Translating this theory into practice is virtually impossible, however. First of all, cloning the thousands of APIs already exposed by Windows would be an enormously expensive undertaking. More daunting is the fact that Microsoft continually adds APIs to Windows through updates and new versions. By the time a rival finished cloning the APIs currently in existence, Windows would have exposed a multitude of new ones. Since the rival would never catch up, it would never be able to assure consumers that its operating system would run all of the applications

written for Windows. IBM discovered this to its dismay in the mid–1990s when it failed, despite a massive investment, to clone a sufficiently large part of the 32–bit Windows APIs. In short, attempting to clone the 32–bit Windows APIs is such an expensive, uncertain undertaking that it fails to present a practical option for a would-be competitor to Windows.

### C. Viable Alternatives to Windows

53. That Microsoft's market share and the applications barrier to entry together endow the company with monopoly power in the market for Intel-compatible PC operating systems is directly evidenced by the sustained absence of realistic commercial alternatives to Microsoft's PC operating-system products.

54. OEMs are the most important direct customers for operating systems for Intel-compatible PCs. Because competition among OEMs is intense, they pay particularly close attention to consumer demand. OEMs are thus not only important customers in their own right, they are also surrogates for consumers in identifying reasonably-available commercial alternatives to Windows. Without significant exception, all OEMs pre-install Windows on the vast majority of PCs that they sell, and they uniformly are of a mind that there exists no commercially viable alternative to which they could switch in response to a substantial and sustained price increase or its equivalent by Microsoft. For example, in 1995, at a time when IBM still placed hope in OS/2's ability to rival Windows, the firm nevertheless calculated that its PC company would lose between seventy and ninety percent of its sales volume if failed to load Windows 95 on its PCs. Although a few OEMs have announced their intention to pre-install Linux on some of the computers they ship, none of them plan to install Linux in lieu of Windows on any appreciable number of PC (as opposed to server) systems. For its part, Be is not even attempting to persuade OEMs to install

the BeOS on PCs to the exclusion of Windows.

55. OEMs believe that the likelihood of a viable alternative to Windows emerging any time in the next few years is too low to constrain Microsoft from raising prices or imposing other burdens on customers and users. The accuracy of this belief is highlighted by the fact that the other vendors of Intel-compatible PC operating systems do not view their own offerings as viable alternatives to Windows. Microsoft knows that OEMs have no choice but to load Windows, both because it has a good understanding of the market in which it operates and because OEMs have told Microsoft as much. Indicative of Microsoft's assessment of the situation is the fact that, in a 1996 presentation to the firm's executive committee, the Microsoft executive in charge of OEM licensing reported that piracy continued to be the main competition to the company's operating system products. Secure in this knowledge, Microsoft did not consider the prices of other Intel-compatible PC operating systems when it set the price of Windows 98.

56. As the Court found above, the growth of server- and middleware-based applications development might eventually weaken the applications barrier to entry. This would not only make it easier for outside firms to enter the market, it could also make it easier for non-Microsoft firms already in the market to present a viable alternative to Windows. But as the Court also found above, it is not clear whether ISVs will ever develop a large, diverse body of full-featured applications that rely solely on APIs exposed by servers and middleware. Furthermore, even assuming that such a movement has already begun in earnest, it will take several years for the applications barrier to erode enough to enable a non-Microsoft, Intel-compatible PC operating system to develop into a viable alternative to Windows.

### D. Price Restraint Posed by Microsoft's Installed Base

57. Software never expires, so consumers who already have a version of Windows with which they are content and who are not shopping for a new PC system are somewhat reluctant to incur the cost of upgrading to a new version of Windows. Fortunately for Microsoft, the pace of innovation in PC hardware is rapid, and the price of that hardware has declined steadily in recent years. As a result, existing PC users buy new PC systems relatively frequently, and OEMs still attract at a healthy rate buyers who have never owned a computer. The license for one of Microsoft's operating system products prohibits the user from transferring the operating system to another machine, so there is no legal secondary market in Microsoft operating systems. This means that any consumer who buys a new Intel-compatible PC and wants Windows must buy a new copy of the operating system. Microsoft takes pains to ensure that the versions of its operating system that OEMs pre-install on new PC systems are the most current. It does this, in part, by increasing the price to OEMs of older versions of Windows when the newer versions are released. Since Microsoft can sell so many copies of each new operating system through the sales of new PC systems, the average price it sets for those systems is little affected by the fact that older versions of Windows never wear out.

### E. Price Restraint Posed by Piracy

58. Although there is no legal secondary market for Microsoft's PC operating systems, there is a thriving illegal one. Software pirates illegally copy software products such as Windows, selling each copy for a fraction of the vendor's usual price. One of the ways Microsoft combats piracy is by advising OEMs that they will be charged a higher price for Windows unless they drastically limit the number of PCs that they sell without an operating system pre-installed. In 1998, all major OEMs agreed to this restriction. Naturally, it is hard to sell a pirated copy of

Windows to a consumer who has already received a legal copy included in the price of his new PC system. Thus, Microsoft is able to effectively contain, if not extinguish, the illegal secondary market for its operating-system products. So even though Microsoft is more concerned about piracy than it is about other firms' operating system products, the company's pricing is not substantially constrained by the need to reduce the incentives for consumers to acquire their copies of Windows illegally.

## F. Price Restraint Posed by Long-Term Threats

59. The software industry in general is characterized by dynamic, vigorous competition. In many cases, one of the early entrants into a new software category quickly captures a lion's share of the sales, while other products in the category are either driven out altogether or relegated to niche positions. What eventually displaces the leader is often not competition from another product within the same software category, but rather a technological advance that renders the boundaries defining the category obsolete. These events, in which categories are redefined and leaders are superseded in the process, are spoken of as "inflection points."

60. The exponential growth of the Internet represents an inflection point born of complementary technological advances in the computer and telecommunications industries. The rise of the Internet in turn has fueled the growth of server-based computing, middleware, and open-source software development. Working together, these nascent paradigms could oust the PC operating system from its position as the primary platform for applications development and the main interface between users and their computers. Microsoft recognizes that new paradigms could arise to depreciate the value of selling PC operating systems; however, the fact that these new paradigms already exist in embryonic or primitive form does not prevent Microsoft

from enjoying monopoly power today. For while consumers might one day turn to network computers, or Linux, or a combination of middleware and some other operating system, as an alternative to Windows, the fact remains that they are not doing so today. Nor are consumers likely to do so in appreciable numbers any time in the next few years. Unless and until that day arrives, no significant percentage of consumers will be able to abandon Windows without incurring substantial costs. Microsoft can therefore set the price of Windows substantially higher than that which would be charged in a competitive market—or impose other burdens on consumers—without losing so much business as to make the action unprofitable. If Microsoft exerted its power solely to raise price, the day when users could turn away from Windows without incurring substantial costs would still be several years distant. Moreover, Microsoft could keep its prices high for a significant period of time and still lower them in time to meet the threat of a new paradigm. Alternatively, Microsoft could delay the arrival of a new paradigm on the scene by expending surplus monopoly power in ways other than the maintenance of high prices.

## G. Significance of Microsoft's Innovation

61. The fact that Microsoft invests heavily in research and development does not evidence a lack of monopoly power. Indeed, Microsoft has incentives to innovate aggressively despite its monopoly power. First, if there are innovations that will make Intel-compatible PC systems attractive to more consumers, and those consumers less sensitive to the price of Windows, the innovations will translate into increased profits for Microsoft. Second, although Microsoft could significantly restrict its investment in innovation and still not face a viable alternative to Windows for several years, it can push the emergence of competition even farther into the future by continuing to innovate aggres-

sively. While Microsoft may not be able to stave off all potential paradigm shifts through innovation, it can thwart some and delay others by improving its own products to the greater satisfaction of consumers.

## H. Microsoft's Pricing Behavior

■ 62. Microsoft's actual pricing behavior is consistent with the proposition that the firm enjoys monopoly power in the market for Intel-compatible PC operating systems. The company's decision not to consider the prices of other vendors' Intel-compatible PC operating systems when setting the price of Windows 98, for example, is probative of monopoly power. One would expect a firm in a competitive market to pay much closer attention to the prices charged by other firms in the market. Another indication of monopoly power is the fact that Microsoft raised the price that it charged OEMs for Windows 95, with trivial exceptions, to the same level as the price it charged for Windows 98 just prior to releasing the newer product. In a competitive market, one would expect the price of an older operating system to stay the same or decrease upon the release of a newer, more attractive version. Microsoft, however, was only concerned with inducing OEMs to ship Windows 98 in favor of the older version. It is unlikely that Microsoft would have imposed this price increase if it were genuinely concerned that OEMs might shift their business to another vendor of operating systems or hasten the development of viable alternatives to Windows.

63. Finally, it is indicative of monopoly power that Microsoft felt that it had substantial discretion in setting the price of its Windows 98 upgrade product (the operating system product it sells to existing users of Windows 95). A Microsoft study from November 1997 reveals that the company could have charged $49 for an upgrade to Windows 98—there is no reason to believe that the $49 price would have been unprofitable—but the study identifies

$89 as the revenue-maximizing price. Microsoft thus opted for the higher price.

64. An aspect of Microsoft's pricing behavior that, while not tending to prove monopoly power, is consistent with it is the fact that the firm charges different OEMs different prices for Windows, depending on the degree to which the individual OEMs comply with Microsoft's wishes. Among the five largest OEMs, Gateway and IBM, which in various ways have resisted Microsoft's efforts to enlist them in its efforts to preserve the applications barrier to entry, pay higher prices than Compaq, Dell, and Hewlett–Packard, which have pursued less contentious relationships with Microsoft.

■ 65. It is not possible with the available data to determine with any level of confidence whether the price that a profit-maximizing firm with monopoly power would charge for Windows 98 comports with the price that Microsoft actually charges. Even if it could be determined that Microsoft charges less than the profit-maximizing monopoly price, though, that would not be probative of a lack of monopoly power, for Microsoft could be charging what seems like a low short-term price in order to maximize its profits in the future for reasons unrelated to underselling any incipient competitors. For instance, Microsoft could be stimulating the growth of the market for Intel-compatible PC operating systems by keeping the price of Windows low today. Given the size and stability of its market share, Microsoft stands to reap almost all of the future rewards if there are yet more consumers of Intel-compatible PC operating systems. By pricing low relative to the short-run profit-maximizing price, thereby focusing on attracting new users to the Windows platform, Microsoft would also intensify the positive network effects that add to the impenetrability of the applications barrier to entry.

66. Furthermore, Microsoft expends a significant portion of its monopoly power, which could otherwise be spent maximizing price, on imposing burdensome restrictions

on its customers—and in inducing them to behave in ways—that augment and prolong that monopoly power. For example, Microsoft attaches to a Windows license conditions that restrict the ability of OEMs to promote software that Microsoft believes could weaken the applications barrier to entry. Microsoft also charges a lower price to OEMs who agree to ensure that all of their Windows machines are powerful enough to run Windows NT for Workstations. To the extent this provision induces OEMs to concentrate their efforts on the development of relatively powerful, expensive PCs, it makes OEMs less likely to pursue simultaneously the opposite path of developing "thin client" systems, which could threaten demand for Microsoft's Intel-compatible PC operating system products. In addition, Microsoft charges a lower price to OEMs who agree to ship all but a minute fraction of their machines with an operating system pre-installed. While this helps combat piracy, it also makes it less likely that consumers will detect increases in the price of Windows and renders operating systems not pre-installed by OEMs in large numbers even less attractive to consumers. After all, a consumer's interest in a non-Windows operating system might not outweigh the burdens on system memory and performance associated with supporting two operating systems on a single PC. Other such restrictions and incentives are described below.

## I. Microsoft's Actions Toward Other Firms

67. Microsoft's monopoly power is also evidenced by the fact that, over the course of several years, Microsoft took actions that could only have been advantageous if they operated to reinforce monopoly power. These actions are described below.

## IV. THE MIDDLEWARE THREATS

68. Middleware technologies, as previously noted, have the potential to weaken the applications barrier to entry. Micro-soft was apprehensive that the APIs exposed by middleware technologies would attract so much developer interest, and would become so numerous and varied, that there would arise a substantial and growing number of full-featured applications that relied largely, or even wholly, on middleware APIs. The applications relying largely on middleware APIs would potentially be relatively easy to port from one operating system to another. The applications relying exclusively on middleware APIs would run, as written, on any operating system hosting the requisite middleware. So the more popular middleware became and the more APIs it exposed, the more the positive feedback loop that sustains the applications barrier to entry would dissipate. Microsoft was concerned with middleware as a category of software; each type of middleware contributed to the threat posed by the entire category. At the same time, Microsoft focused its antipathy on two incarnations of middleware that, working together, had the potential to weaken the applications barrier severely without the assistance of any other middleware. These were Netscape's Web browser and Sun's implementation of the Java technologies.

### A. The Netscape Web browser

69. Netscape Navigator possesses three key middleware attributes that endow it with the potential to diminish the applications barrier to entry. First, in contrast to non-Microsoft, Intel-compatible PC operating systems, which few users would want to use on the same PC systems that carry their copies of Windows, a browser can gain widespread use based on its value as a complement to Windows. Second, because Navigator exposes a set (albeit a limited one) of APIs, it can serve as a platform for other software used by consumers. A browser product is particularly well positioned to serve as a platform for network-centric applications that run in association with Web pages. Finally, Navigator has been ported to more than

fifteen different operating systems. Thus, if a developer writes an application that relies solely on the APIs exposed by Navigator, that application will, without any porting, run on many different operating systems.

70. Adding to Navigator's potential to weaken the applications barrier to entry is the fact that the Internet has become both a major inducement for consumers to buy PCs for the first time and a major occupier of the time and attention of current PCs users. For any firm looking to turn its browser product into an applications platform such to rival Windows, the intense consumer interest in all things Internet-related is a great boon.

71. Microsoft knew in the fall of 1994 that Netscape was developing versions of a Web browser to run on different operating systems. It did not yet know, however, that Netscape would employ Navigator to generate revenue directly, much less that the product would evolve in such a way as to threaten Microsoft. In fact, in late December 1994, Netscape's chairman and chief executive officer ("CEO"), Jim Clark, told a Microsoft executive that the focus of Netscape's business would be applications running on servers and that Netscape did not intend to succeed at Microsoft's expense.

72. As soon as Netscape released Navigator on December 15, 1994, the product began to enjoy dramatic acceptance by the public; shortly after its release, consumers were already using Navigator far more than any other browser product. This alarmed Microsoft, which feared that Navigator's enthusiastic reception could embolden Netscape to develop Navigator into an alternative platform for applications development. In late May 1995, Bill Gates, the chairman and CEO of Microsoft, sent a memorandum entitled "The Internet Tidal Wave" to Microsoft's executives describing Netscape as a "new competitor 'born' on the Internet." He warned his colleagues within Microsoft that Netscape was "pursuing a multi-platform strategy where they move the key API into the client to commoditize the underlying operating system." By the late spring of 1995, the executives responsible for setting Microsoft's corporate strategy were deeply concerned that Netscape was moving its business in a direction that could diminish the applications barrier to entry.

## B. Sun's Implementation of the Java Technologies

73. The term "Java" refers to four interlocking elements. First, there is a Java programming language with which developers can write applications. Second, there is a set of programs written in Java that expose APIs on which developers writing in Java can rely. These programs are called the "Java class libraries." The third element is the Java compiler, which translates the code written by the developer into Java "bytecode." Finally, there are programs called "Java virtual machines," or "JVMs," which translate Java bytecode into instructions comprehensible to the underlying operating system. If the Java class libraries and a JVM are present on a PC system, the system is said to carry a "Java runtime environment."

74. The inventors of Java at Sun Microsystems intended the technology to enable applications written in the Java language to run on a variety of platforms with minimal porting. A program written in Java and relying only on APIs exposed by the Java class libraries will run on any PC system containing a JVM that has itself been ported to the resident operating system. Therefore, Java developers need to port their applications only to the extent that those applications rely directly on the APIs exposed by a particular operating system. The more an application written in Java relies on APIs exposed by the Java class libraries, the less work its developer will need to do to port the application to different operating systems. The easier it is for developers to port their applications to different operating systems, the more applications will be written for operating

systems other than Windows. To date, the Java class libraries do not expose enough APIs to support the development of full-featured applications that will run well on multiple operating systems without the need for porting; however, they do allow relatively simple, network-centric applications to be written cross-platform. It is Sun's ultimate ambition to expand the class libraries to such an extent that many full-featured, end-user-oriented applications will be written cross-platform. The closer Sun gets to this goal of "write once, run anywhere," the more the applications barrier to entry will erode.

75. Sun announced in May 1995 that it had developed the Java programming language. Mid-level executives at Microsoft began to express concern about Sun's Java vision in the fall of that year, and by late spring of 1996, senior Microsoft executives were deeply worried about the potential of Sun's Java technologies to diminish the applications barrier to entry.

76. Sun's strategy could only succeed if a Java runtime environment that complied with Sun's standards found its way onto PC systems running Windows. Sun could not count on Microsoft to ship with Windows an implementation of the Java runtime environment that threatened the applications barrier to entry. Fortunately for Sun, Netscape agreed in May 1995 to include a copy of Sun's Java runtime environment with every copy of Navigator, and Navigator quickly became the principal vehicle by which Sun placed copies of its Java runtime environment on the PC systems of Windows users.

77. The combined efforts of Netscape and Sun threatened to hasten the demise of the applications barrier to entry, opening the way for non-Microsoft operating systems to emerge as acceptable substitutes for Windows. By stimulating the development of network-centric Java applications accessible to users through browser products, the collaboration of Netscape and Sun also heralded the day when vendors of information appliances and network computers could present users with viable alternatives to PCs themselves. Nevertheless, these middleware technologies have a long way to go before they might imperil the applications barrier to entry. Windows 98 exposes nearly ten thousand APIs, whereas the combined APIs of Navigator and the Java class libraries, together representing the greatest hope for proponents of middleware, total less than a thousand. Decision-makers at Microsoft are apprehensive of potential as well as present threats, though, and in 1995 the implications of the symbiosis between Navigator and Sun's Java implementation were not lost on executives at Microsoft, who viewed Netscape's cooperation with Sun as a further reason to dread the increasing use of Navigator.

### C. Other Middleware Threats

78. Although they have been the most prominent, Netscape's Navigator and Sun's Java implementation are not the only manifestations of middleware that Microsoft has perceived as having the potential to weaken the applications barrier to entry. Starting in 1994, Microsoft exhibited considerable concern over the software product Notes, distributed first by Lotus and then by IBM. Microsoft worried about Notes for several reasons: It presented a graphical interface that was common across multiple operating systems; it also exposed a set of APIs to developers; and, like Navigator, it served as a distribution vehicle for Sun's Java runtime environment. Then in 1995, Microsoft reacted with alarm to Intel's Native Signal Processing software, which interacted with the microprocessor independently of the operating system and exposed APIs directly to developers of multimedia content. Finally, in 1997 Microsoft noted the dangers of Apple's and RealNetworks' multimedia playback technologies, which ran on several platforms (including the Mac OS and Windows) and similarly exposed APIs to content developers. Microsoft feared all of these technologies because they facili-

tated the development of user-oriented software that would be indifferent to the identity of the underlying operating system.

## V. MICROSOFT'S RESPONSE TO THE BROWSER THREAT

### A. Microsoft's Attempt to Dissuade Netscape from Developing Navigator as a Platform

79. Microsoft's first response to the threat posed by Navigator was an effort to persuade Netscape to structure its business such that the company would not distribute platform-level browsing software for Windows. Netscape's assent would have ensured that, for the foreseeable future, Microsoft would produce the only platform-level browsing software distributed to run on Windows. This would have eliminated the prospect that non-Microsoft browsing software could weaken the applications barrier to entry.

80. Executives at Microsoft received confirmation in early May 1995 that Netscape was developing a version of Navigator to run on Windows 95, which was due to be released in a couple of months. Microsoft's senior executives understood that if they could prevent this version of Navigator from presenting alternatives to the Internet-related APIs in Windows 95, the technologies branded as Navigator would cease to present an alternative platform to developers. Even if non-Windows versions of Navigator exposed Internet-related APIs, applications written to those APIs would not run on the platform Microsoft executives expected to enjoy the largest installed base, i.e., Windows 95. So, as long as the version of Navigator written for Windows 95 relied on Microsoft's Internet-related APIs instead of exposing its own, developing for Navigator would not mean developing cross-platform. Developers of network-centric applications thus would not be drawn to Navigator's APIs in substantial numbers. Therefore, with the encouragement and support of Gates, a group of Microsoft executives commenced a campaign in the summer of 1995 to convince Netscape to halt its development of platform-level browsing technologies for Windows 95.

81. In a meeting held at Microsoft's headquarters on June 2, 1995, Microsoft executives suggested to Jim Clark's replacement as CEO at Netscape, James Barksdale, that the version of Navigator written for Windows 95 be designed to rely upon the Internet-related APIs in Windows 95 and distinguish itself with "value-added" software components. The Microsoft executives left unsaid the fact that value-added software, by definition, does not present a significant platform for applications development. For his part, Barksdale informed the Microsoft representatives that the browser represented an important part of Netscape's business strategy and that Windows 3.1 and Windows 95 were expected to be the primary platforms for which Navigator would be distributed.

82. At the conclusion of the June 2 meeting, Microsoft still did not know whether or not Netscape intended to preserve Navigator's own platform capabilities and expand the set of APIs that it exposed to developers. In the hope that Netscape could still be persuaded to forswear any platform ambitions and instead rely on the Internet technologies in Windows 95, Microsoft accepted Barksdale's invitation to send a group of representatives to Netscape's headquarters for a technology "brainstorming session" on June 21. Netscape's senior executives saw the meeting as an opportunity to ask Microsoft for access to crucial technical information, including certain APIs, that Netscape needed in order to ensure that Navigator would work well on systems running Windows 95.

83. Early in the June 21 meeting, Microsoft representatives told Barksdale and the other Netscape executives present that they wanted to explore the possibility of building a broader and closer relationship

between the two companies. To this end, the Microsoft representatives wanted to know whether Netscape intended to adopt and build on top of the Internet-related platform that Microsoft planned to include in Windows 95, or rather to expose its own Internet-related APIs, which would compete with Microsoft's. If Netscape was not committed to providing an alternative platform for network-centric applications, Microsoft would assist Netscape in developing server- and (to a limited extent) PC-based software applications that relied on Microsoft's Internet technologies. For one thing, the representatives explained, Microsoft would be content to leave the development of browser products for the Mac OS, UNIX, and Microsoft's 16–bit operating system products to Netscape. Alternatively, Netscape could license to Microsoft the underlying code for a Micro-soft-branded browser to run on those platforms. The Microsoft representatives made it clear, however, that Microsoft would be marketing its own browser for Windows 95, and that this product would rely on Microsoft's platform-level Internet technologies. If Netscape marketed browsing software for Windows 95 based on different technologies, then Microsoft would view Netscape as a competitor, not a partner.

84. When Barksdale brought the discussion back to the particular Windows 95 APIs that Netscape actually wanted to rely on and needed from Microsoft, the representatives from Microsoft explained that if Netscape entered a "special relationship" with Microsoft, the company would treat Netscape as a "preferred ISV." This meant that Netscape would enjoy preferential access to technical information, including APIs. They intimated that Microsoft's internal developers had already created the APIs that Netscape was seeking, and that Microsoft had not yet decided either which ISVs would be privileged to receive them or when access would be granted. The Microsoft representatives made clear that the alacrity with which Netscape would receive the desired Windows 95 APIs and other technical information would depend on whether Netscape entered this "special relationship" with Microsoft.

85. After listening to Microsoft's proposal, Barksdale had two main questions: First, where would the line between platform (Microsoft's exclusive domain) and applications (where Netscape could continue to function) be situated? Second, who would get to decide where the line would lie? After all, the attractiveness of a special relationship with Microsoft depended a great deal on how much room would remain for Netscape to innovate and seek profit. The Microsoft representatives replied that Microsoft would incorporate most of the functionality of the current Netscape browser into the Windows 95 platform, perhaps leaving room for Netscape to distribute a user-interface shell. Where Netscape would have the most scope to innovate would be in the development of software "solutions," which are applications (mainly server-based) focused on meeting the needs of specific types of commercial users. Since such applications are already minutely calibrated to the needs of their users, they do not present platforms for the development of more specific applications. Although the representatives from Microsoft assured Barksdale that the line between platform and solutions was fixed by a collaborative decision-making process between Microsoft and its ISV partners, those representatives had already indicated that the space Netscape would be allowed to occupy between the user and Microsoft's platform domain was a very narrow one. Simply put, if Navigator exposed APIs that competed for developer attention with the Internet-related APIs Microsoft was planning to build into its platform, Microsoft would regard Netscape as a trespasser on its territory.

86. The Microsoft representatives did not insist at the June 21 meeting that Netscape executives accept their proposal

on the spot. For his part, Barksdale said only that he would like more information regarding where Microsoft proposed to place the line between its platform and Netscape's applications. In the ensuing, more technical discussions, the Netscape executives agreed to adopt one component of Microsoft's platform-level Internet technology called Internet Shortcuts. The meeting ended cordially, with both sides promising to keep the lines of communication open.

87. The executive who led Microsoft's contingent on June 21, Daniel Rosen, emerged from the meeting optimistic that Netscape would abandon its platform ambitions in exchange for special help from Microsoft in developing solutions. His sentiments were not shared by another Microsoft participant, Thomas Reardon, who had not failed to notice the Netscape executives grow tense when the Microsoft representatives referred to incorporating Navigator's functionality into Windows. Reardon predicted that Netscape would compete with almost all of Microsoft's platform-level Internet technologies. Once he heard both viewpoints, Gates concluded that Rosen was being a bit naive and that Reardon had assessed the situation more accurately. In the middle of July 1995, Rosen's superiors instructed him to drop the effort to reach a strategic concord with Netscape.

88. Had Netscape accepted Microsoft's proposal, it would have forfeited any prospect of presenting a comprehensive platform for the development of network-centric applications. Even if the versions of Navigator written for the Mac OS, UNIX, and 16–bit Windows had continued to expose APIs controlled by Netscape, the fact that Netscape would not have marketed any platform software for Windows 95, the operating system that was destined to become dominant, would have ensured that, for the foreseeable future, too few developers would rely on Navigator's APIs to create a threat to the applications barrier to entry. In fact, although the discussions ended before Microsoft was compelled to demarcate precisely where the boundary between its platform and Netscape's applications would lie, it is unclear whether Netscape's acceptance of Microsoft's proposal would have left the firm with even the ability to survive as an independent business.

89. At the time Microsoft presented its proposal, Navigator was the only browser product with a significant share of the market and thus the only one with the potential to weaken the applications barrier to entry. Thus, had it convinced Netscape to accept its offer of a "special relationship," Microsoft quickly would have gained such control over the extensions and standards that network-centric applications (including Web sites) employ as to make it all but impossible for any future browser rival to lure appreciable developer interest away from Microsoft's platform.

### B. Withholding Crucial Technical Information

90. Microsoft knew that Netscape needed certain critical technical information and assistance in order to complete its Windows 95 version of Navigator in time for the retail release of Windows 95. Indeed, Netscape executives had made a point of requesting this information, especially the so-called Remote Network Access ("RNA") API, at the June 21 meeting. As was discussed above, the Microsoft representatives at the meeting had responded that the haste with which Netscape received the desired technical information would depend on whether Netscape entered the so-called "special relationship" with Microsoft. Specifically, Microsoft representative J. Allard had told Barksdale that the way in which the two companies concluded the meeting would determine whether Netscape received the RNA API immediately or in three months.

91. Although Netscape declined the special relationship with Microsoft, its executives continued, over the weeks following the June 21 meeting, to plead for the

RNA API. Despite Netscape's persistence, Microsoft did not release the API to Netscape until late October, i.e., as Allard had warned, more than three months later. The delay in turn forced Netscape to postpone the release of its Windows 95 browser until substantially after the release of Windows 95 (and Internet Explorer) in August 1995. As a result, Netscape was excluded from most of the holiday selling season.

92. Microsoft similarly withheld a scripting tool that Netscape needed to make its browser compatible with certain dial-up ISPs. Microsoft had licensed the tool freely to ISPs that wanted it, and in fact had cooperated with Netscape in drafting a license agreement that, by mid-July 1996, needed only to be signed by an authorized Microsoft executive to go into effect. There the process halted, however. In mid-August, a Microsoft representative informed Netscape that senior executives at Microsoft had decided to link the grant of the license to the resolution of all open issues between the companies. Netscape never received a license to the scripting tool, and as a result, was unable to do business with certain ISPs for a time.

### C. The Similar Experiences of Other Firms in Dealing with Microsoft

93. Other firms in the computer industry have had encounters with Microsoft similar to the experiences of Netscape described above. These interactions demonstrate that it is Microsoft's corporate practice to pressure other firms to halt software development that either shows the potential to weaken the applications barrier to entry or competes directly with Microsoft's most cherished software products.

### 1. Intel

94. At the same time that Microsoft was trying to convince Netscape to stop developing cross-platform APIs, it was trying to convince Intel to halt the development of software that presented developers with a set of operating-system-independent interfaces.

95. Although Intel is engaged principally in the design and manufacture of microprocessors, it also develops some software. Intel's software development efforts, which take place at the Intel Architecture Labs ("IAL"), are directed primarily at finding useful ways to consume more microprocessor cycles, thereby stimulating demand for advanced Intel microprocessors. By early 1995, IAL was in the advanced stages of developing software that would enable Intel 80x86 microprocessors to carry out tasks usually performed by separate chips known as "digital signal processors." By enabling this migration, the software, called Native Signal Processing ("NSP") software, would endow Intel microprocessors with substantially enhanced video and graphics performance.

96. Intel was eager for software developers and hardware manufacturers to write software and build peripheral devices that would implement the enhanced capabilities that its microprocessors and its NSP software together offered. Intel did not believe, however, that the set of APIs and device driver interfaces ("DDIs") in Windows had kept pace with the growing ability of Intel's microprocessors to deliver audio/visual content. Consequently, IAL designed its NSP software to expose Intel's own APIs and DDIs that, when invoked by developers and hardware manufacturers, would demonstrate the multimedia capabilities of an Intel microprocessor utilizing NSP.

97. Microsoft reacted to Intel's NSP software with alarm. First of all, the software threatened to offer ISVs and device manufacturers an alternative to waiting for Windows to provide system-level support for products that would take advantage of advances in hardware technology. More troubling was the fact that Intel was developing versions of its NSP software for non-Microsoft operating systems. The different versions of the NSP software exposed the same set of software interfaces

to developers, so the more an application took advantage of interfaces exposed by NSP software, the easier it would be to port that application to non-Microsoft operating systems. In short, Intel's NSP software bore the potential to weaken the barrier protecting Microsoft's monopoly power.

98. Over time, Microsoft developed additional qualms about Intel's NSP software. For instance, Intel initially designed the NSP software to be compatible with only Windows 3.1. At the time, Microsoft was preparing to release Windows 95, and the company did not want anything rekindling the interest of ISVs, equipment manufacturers, and consumers in the soon-to-be obsolescent version of Windows. More acute was Microsoft's concern that users who received NSP software on their Windows 3.1 systems would have difficulty upgrading those systems to Windows 95. By June 1995, Intel had completed a pre-release, or "beta," version of its NSP software for Windows 95, but Microsoft worried that a commercial version would not be ready by the time OEMs began loading Windows 95.

99. Along with its concerns about contemporaneous compatibility, Microsoft also complained that Intel had not subjected its software to sufficient quality-assurance testing. Microsoft was quick to point out that if Windows users detected problems with the software that came pre-installed on their PC systems, they would blame Microsoft or the OEMs, even if fault lay with Intel. Microsoft's concerns with compatibility and quality were genuine. Both pre-dating and over-shadowing these transient and remediable concerns, however, was a more abiding fear at Microsoft that the NSP software would render ISVs, device manufacturers, and (ultimately) consumers less dependent on Windows. Without this fear, Microsoft would not have subjected Intel to the level of pressure that it brought to bear in the summer of 1995.

100. Microsoft began complaining to Intel about its NSP software in inter-company communications sent in the spring of 1995. In May, Microsoft raised the profile of its complaints by sending some of its senior executives to Intel to discuss the latter's incursion into Microsoft's platform territory. Returning from the May meeting, one Microsoft employee urged his superiors to refuse to allow Intel to offer platform-level software, even if it meant that Intel could not innovate as quickly as it would like. If Intel wished to enable a new function, the employee wrote, its only "winning path" would be to convince Microsoft to support the effort in its platform software. At any rate, "[s]ometimes Intel would have to accept the outcome that the time isn't right for [Microsoft]." In the first week of July, Gates himself met with Intel's CEO, Andrew Grove, to discuss, among other things, NSP. In a subsequent memorandum to senior Microsoft executives, Gates reported that he had tried to convince Grove "to basically not ship NSP" and more generally to reduce the number of people working on software at Intel.

101. The development of an alternative platform to challenge Windows was not the primary objective of Intel's NSP efforts. In fact, Intel was interested in providing APIs and DDIs only to the extent the effort was necessary to ensure the development of applications and devices that would spark demand for Intel's most advanced microprocessors. Understanding Intel's limited ambitions, Microsoft hastened to assure Intel that if it would stop promoting NSP's interfaces, Microsoft would accelerate its own work to incorporate the functions of the NSP software into Windows, thereby stimulating the development of applications and devices that relied on the new capabilities of Intel's microprocessors. At the same time, Microsoft pressured the major OEMs to not install NSP software on their PCs until the software ceased to expose APIs. NSP software could not find its way onto PCs without the cooperation of the OEMs, so Intel realized that it had no choice but to

surrender the pace of software innovation to Microsoft. By the end of July 1995, Intel had agreed to stop promoting its NSP software. Microsoft subsequently incorporated some of NSP's components into its operating-system products. Even as late as the end of 1998, though, Microsoft still had not implemented key capabilities that Intel had been poised to offer consumers in 1995.

102. Microsoft was not content to merely quash Intel's NSP software. At a second meeting at Intel's headquarters on August 2, 1995, Gates told Grove that he had a fundamental problem with Intel using revenues from its microprocessor business to fund the development and distribution of free platform-level software. In fact, Gates said, Intel could not count on Microsoft to support Intel's next generation of microprocessors as long as Intel was developing platform-level software that competed with Windows. Intel's senior executives knew full well that Intel would have difficulty selling PC microprocessors if Microsoft stopped cooperating in making them compatible with Windows and if Microsoft stated to OEMs that it did not support Intel's chips. Faced with Gates' threat, Intel agreed to stop developing platform-level interfaces that might draw support away from interfaces exposed by Windows.

103. OEMs represent the primary customers for Intel's microprocessors. Since OEMs are dependent on Microsoft for Windows, Microsoft enjoys continuing leverage over Intel. To illustrate, Gates was able to report to other senior Microsoft executives in October 1995 that "Intel feels we have all the OEMs on hold with our NSP chill." He added:

> This is good news because it means OEMs are listening to us. Andy [Grove] believes Intel is living up to its part of the NSP bargain and that we should let OEMs know that some of the new software work Intel is doing is OK. If Intel is not sticking totally to its part of the deal let me know.

## 2. Apple

104. QuickTime is Apple's software architecture for creating, editing, publishing, and playing back multimedia content (e.g., audio, video, graphics, and 3–D graphics). Apple has created versions of QuickTime to run on both the Mac OS and Windows, enabling developers using the authoring software to create multimedia content that will run on QuickTime implementations for both operating systems. QuickTime competes with Microsoft's own multimedia technologies, including Microsoft's multimedia APIs (called "DirectX") and its media player. Because QuickTime is cross-platform middleware, Microsoft perceives it as a potential threat to the applications barrier to entry.

105. Beginning in the spring of 1997 and continuing into the summer of 1998, Microsoft tried to persuade Apple to stop producing a Windows 95 version of its multimedia playback software, which presented developers of multimedia content with alternatives to Microsoft's multimedia APIs. If Apple acceded to the proposal, Microsoft executives said, Microsoft would not enter the authoring business and would instead assist Apple in developing and selling tools for developers writing multimedia content. Just as Netscape would have been free, had it accepted Microsoft's proposal, to market a browser shell that would run on top of Microsoft's Internet technologies, Apple would have been permitted, without hindrance, to market a media player that would run on top of DirectX. But, like the browser shell that Microsoft contemplated as acceptable for Netscape to develop, Apple's QuickTime shell would not have exposed platform-level APIs to developers. Microsoft executives acknowledged to Apple their doubts that a firm could make a successful business out of marketing such a shell. Apple might find it profitable, though, to continue developing multimedia software for the Mac OS, and that, the executives from Microsoft assured Apple, would not

28

be objectionable. As was the case with the Internet technologies it was prepared to tolerate from Netscape, Microsoft felt secure in the conviction that developers would not be drawn in large numbers to write for non-Microsoft APIs exposed by platforms whose installed bases were inconsequential in comparison with that of Windows.

106. In their discussions with Apple, Microsoft's representatives made it clear that, if Apple continued to market multimedia playback software for Windows 95 that presented a platform for content development, then Microsoft would enter the authoring business to ensure that those writing multimedia content for Windows 95 concentrated on Microsoft's APIs instead of Apple's. The Microsoft representatives further stated that, if Microsoft was compelled to develop and market authoring tools in competition with Apple, the technologies provided in those tools might very well be inconsistent with those provided by Apple's tools. Finally, the Microsoft executives warned, Microsoft would invest whatever resources were necessary to ensure that developers used its tools; its investment would not be constrained by the fact that authoring software generated only modest revenue.

107. If Microsoft implemented technologies in its tools that were different from those implemented in Apple's tools, then multimedia content developed with Microsoft's tools would not run properly on Apple's media player, and content developed with Apple's tools would not run properly on Microsoft's media player. If, as it implied it was willing to do, Microsoft then bundled its media player with Windows and used a variety of tactics to limit the distribution of Apple's media player for Windows, it could succeed in extinguishing developer support for Apple's multimedia technologies. Indeed, as the Court discusses in Section VI of these findings, Microsoft had begun, in 1996, to use just such a strategy against Sun's implementation of the Java technologies.

108. The discussions over multimedia playback software culminated in a meeting between executives from Microsoft and Apple executives, including Apple CEO, Steve Jobs, at Apple's headquarters on June 15, 1998. Microsoft's objective at the meeting was to secure Apple's commitment to abandon the development of multimedia playback software for Windows. At the meeting, one of the Microsoft executives, Eric Engstrom, said that he hoped the two companies could agree on a single configuration of software to play multimedia content on Windows. He added, significantly, that any unified multimedia playback software for Windows would have to be based on DirectX. If Apple would agree to make DirectX the standard, Microsoft would be willing to do several things that Apple might find beneficial. First, Microsoft would adopt Apple's ".MOV" as the universal file format for multimedia playback on Windows. Second, Microsoft would configure the Windows Media Player to display the Quick-Time logo during the playback of ".MOV" files. Third, Microsoft would include support in DirectX for QuickTime APIs used to author multimedia content, and Microsoft would give Apple appropriate credit for the APIs in Microsoft's Software Developer Kit.

109. Jobs reserved comment during the meeting with the Microsoft representatives, but he explicitly rejected Microsoft's proposal a few weeks later. Had Apple accepted Microsoft's proposal, Microsoft would have succeeded in limiting substantially the cross-platform development of multimedia content. In addition, Apple's future success in marketing authoring tools for Windows 95 would have become dependent on Microsoft's ongoing cooperation, for those tools would have relied on the DirectX technologies under Microsoft's control.

110. Apple's surrender of the multimedia playback business might have helped users in the short term by resolving existing incompatibilities in the arena

of multimedia software. In the long run, however, the departure of an experienced, innovative competitor would not have tended to benefit users of multimedia content. At any rate, the primary motivation behind Microsoft's proposal to Apple was not the resolution of incompatibilities that frustrated consumers and stymied content development. Rather, Microsoft's motivation was its desire to limit as much as possible the development of multimedia content that would run cross-platform.

### 3. RealNetworks

111. RealNetworks is the leader, in terms of usage share, in software that supports the "streaming" of audio and video content from the Web. RealNetworks' streaming software presents a set of APIs that competes for developer attention with APIs exposed by the streaming technologies in Microsoft's DirectX. Like Apple, RealNetworks has developed versions of its software for multiple operating systems. In 1997, senior Microsoft executives viewed RealNetworks' streaming software with the same apprehension with which they viewed Apple's playback software—as competitive technology that could develop into part of a middleware layer that could, in turn, become broad and widespread enough to weaken the applications barrier to entry.

112. At the end of May 1997, Gates told a group of Microsoft executives that multimedia streaming represented strategic ground that Microsoft needed to capture. He identified RealNetworks as the adversary and authorized the payment of up to $65 million for a streaming software company in order to accelerate Microsoft's effort to seize control of streaming standards. Two weeks later, Microsoft signed a letter of intent for the acquisition of a streaming media company called VXtreme.

113. Perhaps sensing an impending crisis, executives at RealNetworks contacted Microsoft within days of the VXtreme deal's announcement and proposed that the two companies enter a strategic relationship. The CEO of RealNetworks told a senior vice president at Microsoft that if RealNetworks were presented with a profitable opportunity to move to value-added software, the company would be amenable to abandoning the base streaming business. On July 10, a Microsoft executive, Robert Muglia, told a RealNetworks executive that it would indeed be in the interests of both companies if RealNetworks limited itself to developing value-added software designed to run on top of Microsoft's fundamental multimedia platform. Consequently, on July 18, Microsoft and RealNetworks entered into an agreement whereby Microsoft agreed to distribute a copy of RealNetworks' media player with each copy of Internet Explorer; to make a substantial investment in RealNetworks; to license the source code for certain RealNetworks streaming technologies; and to develop, along with RealNetworks, a common file format for streaming audio and video content. Muglia, who signed the agreement on Microsoft's behalf, believed that RealNetworks had in turn agreed to incorporate Microsoft's streaming media technologies into its products.

114. RealNetworks apparently understood import of the agreement differently, for just a few days after it signed the deal with Microsoft, RealNetworks announced that it planned to continue developing fundamental streaming software. Indeed, RealNetworks continues to do so today. Thus, the mid-summer negotiations did not lead to the result Microsoft had intended. Still, Microsoft's intentions toward RealNetworks in 1997, and its dealings with the company that summer, show that decision-makers at Microsoft were willing to invest a large amount of cash and other resources into securing the agreement of other companies to halt software development that exhibited discernible potential to weaken the applications barrier.

### 4. IBM

115. IBM is both a hardware and a software company. On the hardware side,

IBM manufactures and licenses, among other things, Intel-compatible PCs. On the software side, IBM develops and sells, among other things, Intel-compatible PC operating systems and office productivity applications. The IBM PC Company relies heavily on Microsoft's cooperation to make a profit, for few consumers would buy IBM PC systems if those systems did not work well with Windows and, further, if they did not come with Windows included. IBM's software division, on the other hand, competes directly with Microsoft in other respects. For instance, IBM has in the past marketed OS/2 as an alternative to Windows, and it currently markets the SmartSuite bundle of office productivity applications as an alternative to Microsoft's Office suite. The fact that IBM's software division markets products that compete directly with Microsoft's most profitable products has frustrated the efforts of the IBM PC Company to maintain a cooperative relationship with the firm that controls the product (Windows) without which the PC Company cannot survive.

116. Whereas Microsoft tried to convince Netscape to move its business in a direction that would not facilitate the emergence of products that would compete with Windows, Microsoft tried to convince IBM to move its business away from products that themselves competed directly with Windows and Office. Microsoft leveraged the fact that the PC Company needed to license Windows at a competitive price and on a timely basis, and the fact that the company needed Microsoft's support in many more subtle ways. When IBM refused to abate the promotion of those of its own products that competed with Windows and Office, Microsoft punished the IBM PC Company with higher prices, a late license for Windows 95, and the withholding of technical and marketing support.

117. In the summer of 1994, the IBM PC Company told Microsoft that, with respect to licensing Microsoft's operating-system products, it wanted to be quoted terms just as favorable as those extended to IBM's competitor, Compaq. It was IBM's belief that Compaq paid the lowest rate in the industry for Windows and enjoyed unparalleled marketing and technical support from Microsoft. In response to the IBM PC Company's request, Microsoft proposed that the companies enter into a "Frontline Partnership" similar to the one that existed between Microsoft and Compaq. Pursuant to that proposal, Microsoft and the IBM PC Company would perform joint sales, marketing, and development work, and the PC Company would receive future Microsoft products at the lowest rates in the industry.

118. At the same time that it offered the IBM PC Company the rather general terms in the Frontline Partnership Agreement, Microsoft also offered the PC Company specific reductions in the royalty rate for Windows 95 if the company would focus its marketing and distribution efforts on Microsoft's new operating system. Specifically, the PC Company would receive an $8 reduction in the per-copy royalty for Windows 95 if it mentioned no other operating systems in advertisements for IBM PCs, adopted Windows 95 as the standard operating system for its employees, and ensured that it was shipping Windows 95 pre-installed on at least fifty percent of its PCs two months after the release of Windows 95. Given the volume of IBM's PC shipments, the discount would have amounted to savings of between $40 million and $48 million in one year. Of course, accepting the terms would have required IBM, as a practical matter, to abandon its own operating system, OS/2. After all, IBM would have had difficulty convincing customers to adopt its own OS/2 if the company itself had used Microsoft's Windows 95 and had featured that product to the exclusion of OS/2 in IBM PC advertisements.

119. Representatives from IBM and Microsoft, including Bill Gates, met to discuss the relationship between their companies at an industry conference in Novem-

ber 1994. At that meeting, IBM informed Microsoft that, rather than enter into the Frontline Partnership with Microsoft, IBM was going to pursue an initiative it called "IBM First." Consistent with the title of the initiative, IBM would aggressively promote IBM's software products, would not promote any Microsoft products, and would pre-install OS/2 Warp on all of its PCs, including those on which it would also pre-install Windows. IBM thus rejected the terms that would have resulted in an $8 reduction in the per-copy royalty price of Windows 95.

120. True to its word, IBM began vigorous promotion of its software products. This effort included an advertising campaign, starting in late 1994, that extolled OS/2 Warp and disparaged Windows. IBM's drive to best Microsoft in the PC software venue intensified in June 1995, when IBM reached an agreement with the Lotus Development Corporation for the acquisition of that company. As a consequence of the acquisition, IBM took ownership of the Lotus groupware product, Lotus Notes, and the Lotus SmartSuite bundle of office productivity applications. Microsoft had already identified Notes as a middleware threat, because it presented users with a common interface, and ISVs with a common set of APIs, across multiple platforms. For its part, SmartSuite competed directly with Microsoft Office. In mid-July 1995, IBM announced that it was going to make SmartSuite its primary desktop software offering in the United States.

121. Microsoft did not intend to capitulate. In July, Gates called an executive at the IBM PC Company to berate him about IBM's public statements denigrating Windows. Just a few days later, Microsoft began to retaliate in earnest against the IBM PC Company.

122. The IBM PC Company had begun negotiations with Microsoft for a Windows 95 license in late March 1995. For the first two months, the negotiations had progressed smoothly and at an expected pace.

After IBM announced its intention to acquire Lotus, though, the Microsoft negotiators began canceling meetings with their IBM counterparts, failing to return telephone calls, and delaying the return of marked-up license drafts that they received from IBM. Then, on July 20, 1995, just three days after IBM announced its intention to pre-install SmartSuite on its PCs, a Microsoft executive informed his counterpart at the IBM PC Company that Microsoft was terminating further negotiations with IBM for a license to Windows 95. Microsoft also refused to release to the PC Company the Windows 95 "golden master" code. The PC Company needed the code for its product planning and development, and IBM executives knew that Microsoft had released it to IBM's OEM competitors on July 17. Microsoft's purported reason for halting the negotiations was that it wanted first to resolve an ongoing audit of IBM's past royalty payments to Microsoft for several different operating systems.

123. Prior to the call on July 20, neither company's management had ever linked the ongoing audit to IBM's negotiations for a license to Windows 95. IBM was dismayed by the abrupt halt in the license negotiations and the prospect that it might not get a license for Windows 95 until the audit process concluded. IBM's executives executives surmised that all of its major competitors had already signed licenses for Windows 95. The PC Company would lose a great deal of business to those competitors during the crucial back-to-school season if it could not begin pre-installing Windows 95 on its PCs immediately. The conclusion of the audit appeared to be weeks, if not months, away. The PC Company thus faced the prospect of missing the holiday selling season as well. IBM executives pleaded with Microsoft to uncouple the license negotiations from the ongoing audit and offered Microsoft a $10 million bond that Microsoft could use to indemnify itself against any discrepancies that the audit might ulti-

mately reveal. IBM also offered to add a term to any Windows 95 license agreement whereby IBM would pay penalties and interest if any future audit disclosed underreporting of royalties by IBM.

124. On August 9, 1995, a senior executive at the IBM PC Company went to Redmond to meet with Joachim Kempin, the Microsoft executive in charge of the firm's sales to OEMs. At the meeting, Kempin offered to accept a single, lump-sum payment from IBM that would close all outstanding audits. The amount of this payment would be reduced if IBM offered a concession that Kempin could take back to Gates. As one possibility, Kempin suggested that IBM agree to not bundle SmartSuite with its PCs for a period of six months to one year. He explained that the prospect of IBM bundling SmartSuite with its PCs threatened the profit margins that Microsoft derived from Office and constituted a core issue in the relationship between the two companies. The IBM executive rejected Kempin's suggestion. In a follow-up letter, Kempin stated that Microsoft would require approximately $25 million from IBM in order to settle all outstanding audits. Kempin reiterated that,

> If you believe that the amount I am asking for is too much, I would be willing to trade certain relationship improving measures for the settlement charges and/or convert some of the amounts into marketing funds if IBM too agrees to promote Microsoft's software products together with their hardware offerings.

The message was clear: IBM could resolve the impasse ostensibly blocking the issuance of a Windows 95 license—the royalties audit—by de-emphasizing those products of its own that competed with Microsoft and instead promoting Microsoft's products.

125. IBM never agreed to renounce SmartSuite or to increase its support for Microsoft software, and in the end, Microsoft did not grant IBM a license to pre-install Windows 95 until fifteen minutes before the start of Microsoft's official launch event on August 24, 1995. That same day, the firms brought the audit issue to a close with a settlement agreement under which IBM ultimately paid Microsoft $31 million. The release of Windows 95 had been postponed more than once, and many consumers apparently had been postponing buying PC systems until the new operating system arrived. The pent-up demand caused an initial surge in the sales of PCs loaded with Windows 95. IBM's OEM competitors reaped the fruits of this surge, but because of the delay in obtaining a license, the IBM PC Company did not. The PC Company also missed the back-to-school market. These lost opportunities cost IBM substantial revenue.

126. Even once the companies had resolved the audit dispute, Microsoft continued to treat the IBM PC Company less favorably than it did the other major OEMs, and Microsoft executives continued to tell PC Company executives that the treatment would improve only if IBM refrained from competing with Microsoft's software offerings. On January 5, 1996, Kempin sent a letter to a counterpart at the IBM PC Company. In it, Kempin expressed his belief that the PC Company would enjoy a closer, more cooperative relationship with Microsoft if only IBM's software arm did not compete as aggressively with the products that comprised the core of Microsoft's business:

> As long as IBM is working first on their competitive offerings and prefers to fiercely compete with us in critical areas, we should just be honest with each other and admit that such priorities will not lead to a most exciting relationship and might not even make IBM feel good when selling solutions based on Microsoft products.... You are a valued OEM customer of Microsoft, with whom we will cooperate as much as your self-imposed restraints allow us to do. Please understand that this is neither my choice or preferred way of doing business with an important company like

IBM. In addition, we would like to see the IBM PC company being more actively involved in assisting Microsoft to bring key products to market.... To date the IBM PC company has not always been an active participant in these areas—understandable given your own internal product priorities. I hope you can help me to change this.

In closing, Kempin wrote, "You get measured in selling more hardware and I firmly believe if you had less conflict with IBM's software directions you actually could sell more of it."

127. When Kempin spoke to the same executive at the end of the month, he repeated a message he had delivered more than once before: The fact that the IBM PC Company pre-installed SmartSuite on its PC systems made Microsoft reluctant to help IBM sell more PC systems. After all, the more PC systems IBM sold with SmartSuite, the fewer copies of Office Microsoft could sell. For this reason, as Kempin explained to a group of IBM PC Company representatives in August 1996, Microsoft refused to provide IBM press releases with quotes endorsing any PC system that IBM shipped with SmartSuite. Microsoft later expanded that rule to cover any IBM PCs shipped with the World Book electronic encyclopedia instead of Microsoft's Encarta. IBM might have been less concerned about Microsoft's refusal to offer endorsements if such quotes did not appear frequently and prominently in press releases announcing new PC systems from other OEMs such as Compaq. Microsoft's conspicuous silence with respect to IBM PCs sent the message to customers that IBM's PCs did not support Windows as well as PCs manufactured by other OEMs did.

128. Microsoft also denied the IBM PC Company access to the so-called "enabling programs" that Microsoft ran for the benefit of OEMs such as Compaq, Hewlett–Packard, and DEC, even though IBM met the prescribed objective criteria for admission. Like the absence of public endorsements, IBM's exclusion from Microsoft's enabling programs led customers to question whether the Microsoft software they needed would work optimally with IBM's PCs. IBM learned through surveys it conducted that the firm had lost between seven and ten large accounts, representing about $180 million in revenue for IBM, because the tension between Microsoft and IBM led customers to doubt that Windows would not work as well with IBM PCs as with PCs produced by firms with which Microsoft was on cordial terms. Microsoft justified its exclusion of the PC Company from the enabling programs with its suspicion that IBM might use the programs to gain entr,e with customers and then attempt to sell those customers IBM software instead of Microsoft products. At the same time, a Microsoft executive told a counterpart at IBM that the PC Company would be admitted to the programs when IBM's CEO repaired his relationship with Bill Gates.

129. Microsoft's executives were persistent despite IBM's repeated refusals to sacrifice its own software ambitions to improve its relations with Microsoft. In February 1997, one executive from Microsoft told a group of IBM PC Company executives that Gates might relent in his reluctance to cooperate with their company if IBM moderated its support for Notes and SmartSuite. In a meeting held the next month, Microsoft representatives conditioned fulfillment of two objects of IBM's desires on the company's willingness to pre-install Microsoft's products in the place of competing applications, such as SmartSuite, and objectionable middleware, such as Notes. The first inducement that the Microsoft representatives blandished before the PC Company was early access to Windows source code, which Compaq and a handful of other OEMs enjoyed. IBM wanted this early access in order to ensure its hardware's contemporaneous compatibility with Microsoft's operating system products. Next, Microsoft offered IBM permission to certify itself as being

compliant with certain hardware requirements that Microsoft imposed (and that customers had come to look for as a sign of an OEM's ability to support Windows). Self-certification would have decreased the time it took IBM PCs to reach the market, and IBM knew that the privilege was already being extended to some of its main OEM competitors. With respect to both benefits, the representatives from Microsoft explained that Microsoft would extend them to the PC Company on the condition that it stop loading its PC systems with software that threatened Microsoft's interests.

130. The discriminatory treatment that the IBM PC Company received from Microsoft on account of the "software directions" of its parent company also manifested itself in the royalty price that IBM paid for Windows. In the latter half of the 1990s, IBM (along with Gateway) paid significantly more for Windows than other major OEMs (like Compaq, Dell, and Hewlett–Packard) that were more compliant with Microsoft's wishes.

131. Finally, Microsoft made its frustration known to IBM by reducing, from three to one, the number of Microsoft OEM account managers handling Microsoft's operational relationship with the IBM PC Company. This reduced support impaired still further IBM's ability to test, manufacture, and ship its PCs on schedule, further delaying IBM's efforts to bring its PC products to market against the competition in a timely manner.

132. In sum, from 1994 to 1997 Microsoft consistently pressured IBM to reduce its support for software products that competed with Microsoft's offerings, and it used its monopoly power in the market for Intel-compatible PC operating systems to punish IBM for its refusal to cooperate. Whereas, in the case of Netscape, Microsoft tried to induce a company to move its business away from offering software that could weaken the applications barrier to entry, Microsoft's primary concern with IBM was to reduce the firm's support for software products that competed directly with Microsoft's most profitable products, namely Windows and Office. That being said, it must be noted that one of the IBM products to which Microsoft objected, Notes, was like Navigator in that it exposed middleware APIs. In any event, Microsoft's interactions with Netscape, IBM, Intel, Apple, and RealNetworks all reveal Microsoft's business strategy of directing its monopoly power toward inducing other companies to abandon projects that threaten Microsoft and toward punishing those companies that resist.

## D. Developing Competitive Web Browsing Software

133. Once it became clear to senior executives at Microsoft that Netscape would not abandon its efforts to develop Navigator into a platform, Microsoft focused its efforts on ensuring that few developers would write their applications to rely on the APIs that Navigator exposed. Developers would only write to the APIs exposed by Navigator in numbers large enough to threaten the applications barrier if they believed that Navigator would emerge as the standard software employed to browse the Web. If Microsoft could demonstrate that Navigator would not become the standard, because Microsoft's own browser would attract just as much if not more usage, then developers would continue to focus their efforts on a platform that enjoyed enduring ubiquity: the 32–bit Windows API set. Microsoft thus set out to maximize Internet Explorer's share of browser usage at Navigator's expense.

134. Microsoft's management believed that, no matter what the firm did, Internet Explorer would not capture a large share of browser usage as long as it remained markedly inferior to Navigator in the estimation of consumers. The task of technical personnel at Microsoft, then, was to make Internet Explorer's features at least as attractive to consumers as Navigator's. Microsoft did not believe that improved

quality alone would depose Navigator, for millions of users appeared to be satisfied with Netscape's product, and Netscape was known as 'the Internet company.' As Gates wrote to Microsoft's executive staff in his May 1995 "Internet Tidal Wave" memorandum, "First we need to offer a decent client," but "this alone won't get people to switch away from Netscape." Still, once Microsoft ensured that the average consumer would be just as comfortable browsing with Internet Explorer as with Navigator, Microsoft could employ other devices to induce consumers to use its browser instead of Netscape's.

135. From 1995 onward, Microsoft spent more than $100 million each year developing Internet Explorer. The firm's management gradually increased the number of developers working on Internet Explorer from five or six in early 1995 to more than one thousand in 1999. Although the first version of Internet Explorer was demonstrably inferior to Netscape's then-current browser product when the former was released in July 1995, Microsoft's investment eventually started to pay technological dividends. When Microsoft released Internet Explorer 3.0 in late 1996, reviewers praised its vastly improved quality, and some even rated it as favorably as they did Navigator. After the arrival of Internet Explorer 4.0 in late 1997, the number of reviewers who regarded it as the superior product was roughly equal to those who preferred Navigator.

### E. Giving Internet Explorer Away and Rewarding Firms that Helped Build Its Usage Share

136. In addition to improving the quality of Internet Explorer, Microsoft sought to increase the product's share of browser usage by giving it away for free. In many cases, Microsoft also gave other firms things of value (at substantial cost to Microsoft) in exchange for their commitment to distribute and promote Internet Explorer, sometimes explicitly at Navigator's expense. While Microsoft might have bundled Internet Explorer with Windows at no additional charge even absent its determination to preserve the applications barrier to entry, that determination was the main force driving its decision to price the product at zero. Furthermore, Microsoft would not have given Internet Explorer away to IAPs, ISVs, and Apple, nor would it have taken on the high cost of enlisting firms in its campaign to maximize Internet Explorer's usage share and limit Navigator's, had it not been focused on protecting the applications barrier.

137. In early 1995, personnel developing Internet Explorer at Microsoft contemplated charging OEMs and others for the product when it was released. Internet Explorer would have been included in a bundle of software that would have been sold as an add-on, or "frosting," to Windows 95. Indeed, Microsoft knew by the middle of 1995, if not earlier, that Netscape charged customers to license Navigator, and that Netscape derived a significant portion of its revenue from selling browser licenses. Despite the opportunity to make a substantial amount of revenue from the sale of Internet Explorer, and with the knowledge that the dominant browser product on the market, Navigator, was being licensed at a price, senior executives at Microsoft decided that Microsoft needed to give its browser away in furtherance of the larger strategic goal of accelerating Internet Explorer's acquisition of browser usage share. Consequently, Microsoft decided not to charge an increment in price when it included Internet Explorer in Windows for the first time, and it has continued this policy ever since. In addition, Microsoft has never charged for an Internet Explorer license when it is distributed separately from Windows.

138. Over the months and years that followed the release of Internet Explorer 1.0 in July 1995, senior executives at Microsoft remained engrossed with maximizing Internet Explorer's share of browser usage. Whenever competing priorities

threatened to intervene, decision-makers at Microsoft reminded those reporting to them that browser usage share remained, as Microsoft senior vice president Paul Maritz put it, "job # 1." For example, in the summer of 1997, some mid-level employees began to urge that Microsoft charge a price for at least some of the components of Internet Explorer 4.0. This would have shifted some anticipatory demand to Windows 98 (which was due to be released somewhat later than Internet Explorer 4.0), since Windows 98 would include all of the browser at no extra charge. Senior executives at Microsoft rejected the proposal, because while the move might have increased demand for Windows 98 and generated substantial revenue, it would have done so at the unacceptable cost of retarding the dissemination of Internet Explorer 4.0. Maritz reminded those who had advocated the proposal that "getting browser share up to 50% (or more) is still the major goal."

139. The transcendent importance of browser usage share to Microsoft is evident in what the firm expended, as well as in what it relinquished, in order to maximize usage share for Internet Explorer and to diminish it for Navigator. Not only was Microsoft willing to forego an opportunity to attract substantial revenue while enhancing (albeit temporarily) consumer demand for Windows 98, but the company also paid huge sums of money, and sacrificed many millions more in lost revenue every year, in order to induce firms to take actions that would help increase Internet Explorer's share of browser usage at Navigator's expense. First, even though Microsoft could have charged IAPs, ISVs, and Apple for licenses to distribute Internet Explorer separately from Windows, Microsoft priced those licenses, along with related technology and technical support, at zero in order to induce those companies to distribute and promote Internet Explorer over Navigator. Second, although Microsoft could have charged IAPs and ICPs substantial sums of money in exchange for promoting their services and content with-

in Windows, Microsoft instead bartered Windows' valuable desktop "real estate" for a commitment from those firms to promote and distribute Internet Explorer, to inhibit promotion and distribution of Navigator, and to employ technologies that would inspire developers to write Web sites that relied on Microsoft's Internet technologies rather than those provided by Navigator. Microsoft was willing to offer such prominent placement even to AOL, which was the principal competitor to Microsoft's MSN service. If an IAP was already under contract to pay Netscape a certain amount for browser licenses, Microsoft offered to compensate the IAP the amount it owed Netscape. Third, Microsoft also reduced the referral fees that IAPs paid when users signed up for their services using the Internet Referral Server in Windows in exchange for the IAPs' efforts to convert their installed bases of subscribers from Navigator to Internet Explorer. For example, Microsoft entered a contract with AOL whereby Microsoft actually paid AOL a bounty for every subscriber that it converted to access software that included Internet Explorer instead of Navigator. Finally, with respect to OEMs, Microsoft extended co-marketing funds and reductions in the Windows royalty price to those agreeing to promote Internet Explorer and, in some cases, to abstain from promoting Navigator.

140. Even absent the strategic imperative to maximize its browser usage share at Netscape's expense, Microsoft might still have set the price of an Internet Explorer consumer license at zero. It might also have spent something approaching the $100 million it has devoted each year to developing Internet Explorer and some part of the $30 million it has spent annually marketing it. After all, consumers in 1995 were already demanding software that enabled them to use the Web with ease, and IBM had announced in September 1994 its plan to include browsing capability in OS/2 Warp at no extra charge. Microsoft had reason to believe that other

operating-system vendors would do the same.

141. Still, had Microsoft not viewed browser usage share as the key to preserving the applications barrier to entry, the company would not have taken its efforts beyond developing a competitive browser product, including it with Windows at no additional cost to consumers, and promoting it with advertising. Microsoft would not have absorbed the considerable additional costs associated with enlisting other firms in its campaign to increase Internet Explorer's usage share at Navigator's expense. This investment was only profitable to the extent that it protected the applications barrier to entry. Neither the desire to bolster demand for Windows, nor the prospect of ancillary revenues, explains the lengths to which Microsoft has gone. For one thing, loading Navigator makes Windows just as Internet-ready as including Internet Explorer does. Therefore, Microsoft's costly efforts to limit the use of Navigator on Windows could not have stemmed from a desire to bolster consumer demand for Windows. Furthermore, there is no conceivable way that Microsoft's costly efforts to induce Apple to preinstall Internet Explorer on Apple's own PC systems could have increased consumer demand for Windows.

142. In pursuing its goal of maximizing Internet Explorer's usage share, Microsoft actually has limited rather severely the number of profit centers from which it could otherwise derive income via Internet Explorer. For example, Microsoft allows the developers of browser shells built on Internet Explorer to collect ancillary revenues such as advertising fees; for another, Microsoft permits its browser licensees to change the browser's start page, thus limiting the fees that advertisers are willing to pay for placement on that page by Microsoft. Even if Microsoft maximized its ancillary revenue, the amount of revenue realized would not come close to recouping the cost of its campaign to maximize Internet Explorer's usage share at

Navigator's expense. The countless communications that Microsoft's executives dispatched to each other about the company's need to capture browser usage share indicate that the purpose of the effort had little to do with attracting ancillary revenues and everything to do with protecting the applications barrier from the threat posed by Netscape's Navigator and Sun's implementation of Java. For example, Microsoft vice president Brad Chase told the company's assembled sales and marketing executives in April 1996 that they should "worry about your browser share[ ] as much as BillG" even though Internet Explorer was "a no revenue product," because "we will lose [sic] the Internet platform battle if we do not have a significant user installed base." He told them that "if you let your customers deploy Netscape Navigator, you will loose [sic] leadership on the desktop."

### F. Excluding Navigator from Important Distribution Channels

143. Decision-makers at Microsoft worried that simply developing its own attractive browser product, pricing it at zero, and promoting it vigorously would not divert enough browser usage from Navigator to neutralize it as a platform. They believed that a comparable browser product offered at no charge would still not be compelling enough to consumers to detract substantially from Navigator's existing share of browser usage. This belief was due, at least in part, to the fact that Navigator already enjoyed a very large installed base and had become nearly synonymous with the Web in the public's consciousness. If Microsoft was going to raise Internet Explorer's share of browser usage and lower Navigator's share, executives at Microsoft believed they needed to constrict Netscape's access to the distribution channels that led most efficiently to browser usage.

#### 1. The Importance of the OEM and IAP Channels

144. Very soon after it recognized the need to gain browser usage share at Navi-

gator's expense, Microsoft identified pre-installation by OEMs and bundling with the proprietary client software of IAPs as the two distribution channels that lead most efficiently to browser usage. Two main reasons explain why these channels are so efficient. First, users must acquire a computer and connect to the Internet before they can browse the Web. Thus, the OEM and IAP channels lead directly to virtually every user of browsing software. Second, both OEMs and IAPs are able to place browsing software at the immediate disposal of a user without any effort on the part of the user. If an OEM pre-installs a browser onto its PCs and places an icon for that browser on the default screen, or "desktop," of the operating system, purchasers of those PCs will be confronted with the icon as soon as the operating system finishes loading into random access memory ("RAM"). If an IAP bundles a browser with its own proprietary software, its subscribers will, by default, use the browser whenever they connect to the Web. In its internal decision-making, Microsoft has placed considerable reliance on studies showing that consumers tend strongly to use whatever browsing software is placed most readily at their disposal, and that once they have acquired, found, and used one browser product, most are reluctant—and indeed have little reason—to expend the effort to switch to another. Microsoft has also relied on studies showing that a very large majority of those who browse the Web obtain their browsing software with either their PCs or their IAP subscriptions.

145. Indeed, no other distribution channel for browsing software even approaches the efficiency of OEM pre-installation and IAP bundling. The primary reason is that the other channels require users to expend effort before they can start browsing. The traditional retail channel, for example, requires the consumer to make contact with a retailer, and retailers generally do not distribute products without charging a price for them. Naturally, once Microsoft and Netscape began offering browsing software for free, consumers for the most part lost all incentive to pay for it.

146. The relatively few users who already have a browser but would prefer another can avoid the retail channel by using the Internet to download new browsing software electronically, but they must wait for the software to transmit to their PCs. This process takes a moderate degree of sophistication and substantial amount of time, and as the average bandwidth of PC connections has grown, so has the average size of browser products. The longer it takes for the software to download, the more likely it is that the user's connection to the Internet will be interrupted. As a vanguard of the "Internet Age," Navigator generated a tremendous amount of excitement in its early days among technical sophisticates, who were willing to devote time and effort to downloading the software. Today, however, the average Web user is more of a neophyte, and is far more likely to be intimidated by the process of downloading. It is not surprising, then, that downloaded browsers now make up only a small and decreasing percentage of the new browsers (as opposed to upgrades) that consumers obtain and use.

147. The consumer who receives a CD–ROM containing a free browser in the mail or as a magazine insert is at least spared the time and effort it would take to obtain browsing software from a retail vendor or to download it from the Web. But, just as the consumer who obtains a browser at retail or off the Web, the consumer who receives the software unsolicited at home must first install it on a PC system in order to use it, and merely installing a browser product takes time and can be confusing for novice users. Plus, a large percentage of the unsolicited disks distributed through "carpet bombing" reach individuals who do not have PCs, who already have pre-installed browsing software, or who have no interest in browsing the Web.

In practice, less than two percent of CD–ROM disks disseminated in mass-distribution campaigns are used in the way the distributor intended. As a result, this form of distribution is rarely profitable, and then only when undertaken by on-line subscription services for whom a sale translates into a stream of revenues lasting into the future. The fact that an OLS may find it worthwhile to "carpet bomb" consumers with free disks obviously only helps the vendor of browsing software whose product the OLS has chosen to bundle with its proprietary software. So, while there are other means of distributing browsers, the fact remains that to a firm interested in browser usage, there simply are no channels that compare in efficiency to OEM pre-installation and IAP bundling.

148. Knowing that OEMs and IAPs represented the most efficient distribution channels of browsing software, Microsoft sought to ensure that, to as great an extent as possible, OEMs and IAPs bundled and promoted Internet Explorer to the exclusion of Navigator.

### 2. Excluding Navigator from the OEM Channel

### a. Binding Internet Explorer to Windows

### i. The Status of Web Browsers as Separate Products

149. Consumers determine their software requirements by identifying the functionalities they desire. While consumers routinely evaluate software products on the basis of the functionalities the products deliver, they generally lack sufficient information to make judgments based on the designs and implementations of those products. Accordingly, consumers generally choose which software products to license, install, and use on the basis of the products' functionalities, not their designs and implementations.

150. While the meaning of the term "Web browser" is not precise in all respects, there is a consensus in the software industry as to the functionalities that a Web browser offers a user. Specifically, a Web browser provides the ability for the end user to select, retrieve, and perceive resources on the Web. There is also a consensus in the software industry that these functionalities are distinct from the set of functionalities provided by an operating system.

151. Many consumers desire to separate their choice of a Web browser from their choice of an operating system. Some consumers, particularly corporate consumers, demand browsers and operating systems separately because they prefer to standardize on the same browser across different operating systems. For such consumers, standardizing on the browser of their choice results in increased productivity and lower training and support costs, and permits the establishment of consistent security and privacy policies governing Web access.

152. Moreover, many consumers who need an operating system, including a substantial percentage of corporate consumers, do not want a browser at all. For example, if a consumer has no desire to browse the Web, he may not want a browser taking up memory on his hard disk and slowing his system's performance. Also, for businesses desiring to inhibit employees' access to the Internet while minimizing system support costs, the most efficient solution is often using PC systems without browsers.

153. Because of the separate demand for browsers and operating systems, firms have found it efficient to supply the products separately. A number of operating system vendors offer consumers the choice of licensing their operating systems without a browser. Others bundle a browser with their operating system products but allow OEMs, value-added resellers, and consumers either to not install it or, if the browser has been pre-installed, to uninstall it. While Microsoft no longer affords this flexibility (it is the only operating system vendor that does not), it has always mar-

keted and distributed Internet Explorer separately from Windows in several channels. These include retail sales, service kits for ISVs, free downloads over the Internet, and bundling with other products produced both by Microsoft and by third-party ISVs. In order to compete with Navigator for browser share, as well as to satisfy corporate consumers who want their diverse PC platforms to present a common browser interface to employees, Microsoft has also created stand-alone versions of Internet Explorer that run on operating systems other than 32-bit Windows, including the Mac OS and Windows 3.x.

154. In conclusion, the preferences of consumers and the responsive behavior of software firms demonstrate that Web browsers and operating systems are separate products.

### ii. Microsoft's Actions

■ 155. In contrast to other operating system vendors, Microsoft both refused to license its operating system without a browser and imposed restrictions—at first contractual and later technical—on OEMs' and end users' ability to remove its browser from its operating system. As its internal contemporaneous documents and licensing practices reveal, Microsoft decided to bind Internet Explorer to Windows in order to prevent Navigator from weakening the applications barrier to entry, rather than for any pro-competitive purpose.

156. Before it decided to blunt the threat that Navigator posed to the applications barrier to entry, Microsoft did not plan to make it difficult or impossible for OEMs or consumers to obtain Windows without obtaining Internet Explorer. In fact, the company's internal correspondence and external communications indicate that, as late as the fall of 1994, Microsoft was planning to include low-level Internet "plumbing," such as a TCP/IP stack, but not a browser, with Windows 95.

157. Microsoft subsequently decided to develop a browser to run on Windows 95. As late as June 1995, however, Microsoft had not decided to bundle that browser with the operating system. The plan at that point, rather, was to ship the browser in a separate "frosting" package, for which Microsoft intended to charge. By April or May of that year, however, Microsoft's top executives had identified Netscape's browser as a potential threat to the applications barrier to entry. Throughout the spring, more and more key executives came to the conclusion that Microsoft's best prospect of quashing that threat lay in maximizing the usage share of Microsoft's browser at Navigator's expense. The executives believed that the most effective way of carrying out this strategy was to ensure that every copy of Windows 95 carried with it a copy of Microsoft's browser, then code-named "O'Hare." For example, two days after the June 21, 1995 meeting between Microsoft and Netscape executives, Microsoft's John Ludwig sent an E-mail to Paul Maritz and the other senior executives involved in Microsoft's browser effort. "[O]bviously netscape does see us as a client competitor," Ludwig wrote. "[W]e have to work extra hard to get ohare on the oem disks."

158. Microsoft did manage to bundle Internet Explorer 1.0 with the first version of Windows 95 licensed to OEMs in July 1995. It also included a term in its OEM licenses that prohibited the OEMs from modifying or deleting any part of Windows 95, including Internet Explorer, prior to shipment. The OEMs accepted this restriction despite their interest in meeting consumer demand for PC operating systems without Internet Explorer. After all, Microsoft made the restriction a non-negotiable term in its Windows 95 license, and the OEMs felt they had no commercially viable alternative to pre-installing Windows 95 on their PCs. Apart from a few months in the fall of 1997, when Microsoft provided OEMs with Internet Explorer 4.0 on a separate disk from Windows 95 and permitted them to ship the latter without

the former, Microsoft has never allowed OEMs to ship Windows 95 to consumers without Internet Explorer. This policy has guaranteed the presence of Internet Explorer on every new Windows PC system.

159. Microsoft knew that the inability to remove Internet Explorer made OEMs less disposed to pre-install Navigator onto Windows 95. OEMs bear essentially all of the consumer support costs for the Windows PC systems they sell. These include the cost of handling consumer complaints and questions generated by Microsoft's software. Pre-installing more than one product in a given category, such as word processors or browsers, onto its PC systems can significantly increase an OEM's support costs, for the redundancy can lead to confusion among novice users. In addition, pre-installing a second product in a given software category can increase an OEM's product testing costs. Finally, many OEMs see pre-installing a second application in a given software category as a questionable use of the scarce and valuable space on a PC's hard drive.

160. Microsoft's executives believed that the incentives that its contractual restrictions placed on OEMs would not be sufficient in themselves to reverse the direction of Navigator's usage share. Consequently, in late 1995 or early 1996, Microsoft set out to bind Internet Explorer more tightly to Windows 95 as a technical matter. The intent was to make it more difficult for anyone, including systems administrators and users, to remove Internet Explorer from Windows 95 and to simultaneously complicate the experience of using Navigator with Windows 95. As Brad Chase wrote to his superiors near the end of 1995, "We will bind the shell to the Internet Explorer, so that running any other browser is a jolting experience."

161. Microsoft bound Internet Explorer to Windows 95 by placing code specific to Web browsing in the same files as code that provided operating system functions. Starting with the release of Internet Ex-

plorer 3.0 and "OEM Service Release 2.0" ("OSR 2") of Windows 95 in August 1996, Microsoft offered only a version of Windows 95 in which browsing-specific code shared files with code upon which non-browsing features of the operating system relied.

162. The software code necessary to supply the functionality of a modem application or operating system can be extremely long and complex. To make that complexity manageable, developers usually write long programs as a series of individual "routines," each ranging from a few dozen to a few hundred lines of code, that can be used to perform specific functions. Large programs are created by "knitting" together many such routines in layers, where the lower layers are used to provide fundamental functionality relied upon by higher, more focused layers. Some preliminary aspects of this "knitting" are performed by the software developer. The user who launches a program, however, is ultimately responsible for causing routines to be loaded into memory and executed together to produce the program's overall functionality.

163. Routines can be packaged together into files in almost any way the designer chooses. Routines need not reside in the same file to function together in a seamless fashion. Also, a developer can move routines into new or different files from one version of a program to another without changing the functionalities of those routines or the ability to combine them to provide integrated functionality.

164. Starting with Windows 95 OSR 2, Microsoft placed many of the routines that are used by Internet Explorer, including browsing-specific routines, into the same files that support the 32–bit Windows APIs. Microsoft's primary motivation for this action was to ensure that the deletion of any file containing browsing-specific routines would also delete vital operating system routines and thus cripple Windows 95. Although some of the code that pro-

vided Web browsing could still be removed, without disabling the operating system, by entering individual files and selectively deleting routines used only for Web browsing, licensees of Microsoft software were, and are, contractually prohibited from reverse engineering, decompiling, or disassembling any software files. Even if this were not so, it is prohibitively difficult for anyone who does not have access to the original, human-readable source code to change the placement of routines into files, or otherwise to alter the internal configuration of software files, while still preserving the software's overall functionality.

165. Although users were not able to remove all of the routines that provided Web browsing from OSR 2 and successive versions of Windows 95, Microsoft still provided them with the ability to uninstall Internet Explorer by using the "Add/Remove" panel, which was accessible from the Windows 95 desktop. The Add/Remove function did not delete all of the files that contain browsing specific code, nor did it remove browsing-specific code that is used by other programs. The Add/Remove function did, however, remove the functionalities that were provided to the user by Internet Explorer, including the means of launching the Web browser. Accordingly, from the user's perspective, uninstalling Internet Explorer in this way was equivalent to removing the Internet Explorer program from Windows 95.

166. In late 1996, senior executives within Microsoft, led by James Allchin, began to argue that Microsoft was not binding Internet Explorer tightly enough to Windows and as such was missing an opportunity to maximize the usage of Internet Explorer at Navigator's expense. Allchin first made his case to Paul Maritz in late December 1996. He wrote:

I don't understand how IE is going to win. The current path is simply to copy everything that Netscape does packaging and product wise. Let's [suppose] IE is as good as Navigator/Communica-

tor. Who wins? The one with 80% market share. Maybe being free helps us, but once people are used to a product it is hard to change them. Consider Office. We are more expensive today and we're still winning. My conclusion is that we must leverage Windows more. Treating IE as just an add-on to Windows which is cross-platform [means] losing our biggest advantage—Windows marketshare. We should dedicate a cross group team to come up with ways to leverage Windows technically more.... We should think about an integrated solution—that is our strength.

Allchin followed up with another message to Maritz on January 2, 1997:

You see browser share as job 1.... I do not feel we are going to win on our current path. We are not leveraging Windows from a marketing perspective and we are trying to copy Netscape and make IE into a platform. We do not use our strength—which is that we have an installed base of Windows and we have a strong OEM shipment channel for Windows. Pitting browser against browser is hard since Netscape has 80% marketshare and we have <20%.... I am convinced we have to use Windows—this is the one thing they don't have.... We have to be competitive with features, but we need something more—Windows integration.

If you agree that Windows is a huge asset, then it follows quickly that we are not investing sufficiently in finding ways to tie IE and Windows together. This must come from you.... Memphis [Microsoft's code-name for Windows 98] must be a simple upgrade, but most importantly it must be killer on OEM shipments so that Netscape never gets a chance on these systems.

167. Maritz responded to Allchin's second message by agreeing "that we have to make Windows integration our basic strategy" and that this justified delaying the release of Windows 98 until Internet Ex-

plorer 4.0 was ready to be included with that product. Maritz recognized that the delay would disappoint OEMs for two reasons. First, while OEMs were eager to sell new hardware technologies to Windows users, they could not do this until Microsoft released Windows 98, which included software support for the new technologies. Second, OEMs wanted Windows 98 to be released in time to drive sales of PC systems during the back-to-school and holiday selling seasons. Nevertheless, Maritz agreed with Allchin's point that synchronizing the release of Windows 98 with Internet Explorer was "the only thing that makes sense even if OEMs suffer."

168. Once Maritz had decided that Allchin was right, he needed to instruct the relevant Microsoft employees to delay the release of Windows 98 long enough so that it could be shipped with Internet Explorer 4.0 tightly bound to it. When one executive asked on January 7, 1997 for confirmation that "memphis is going to hold for IE4, even if it puts memphis out of the xmas oem window," Maritz responded affirmatively and explained,

> The major reason for this is ... to combat Nscp, we have to [ ] position the browser as "going away" and do deeper integration on Windows. The stronger way to communicate this is to have a 'new release' of Windows and make a big deal out of it. ... IE integration will be [the] most compelling feature of Memphis.

Thus, Microsoft delayed the debut of numerous features, including support for new hardware devices, that Microsoft believed consumers would find beneficial, simply in order to protect the applications barrier to entry.

169. Allchin and Maritz gained support for their initiative within Microsoft in the early spring of 1997, when a series of market studies confirmed that binding Internet Explorer tightly to Windows was the way to get consumers to use Internet Explorer instead of Navigator. Reporting on one study in late February, Microsoft's Christian Wildfeuer wrote:

> The stunning insight is this: To make [users] switch away from Netscape, we need to make them upgrade to Memphis. ... It seems clear to me that it will be very hard to increase browser market share on the merits of IE 4 alone. It will be more important to leverage the OS asset to make people use IE instead of Navigator.

Microsoft's survey expert, Kumar Mehta, agreed. In March he shared with a colleague his "feeling, based on all the IE research we have done, [that] it is a mistake to release memphis without bundling IE with it."

170. Microsoft's technical personnel implemented Allchin's "Windows integration" strategy in two ways. First, they did not provide users with the ability to uninstall Internet Explorer from Windows 98. The omission of a browser removal function was particularly conspicuous given that Windows 98 did give users the ability to uninstall numerous features other than Internet Explorer—features that Microsoft also held out as being integrated into Windows 98. Microsoft took this action despite specific requests from Gateway that Microsoft provide a way to uninstall Internet Explorer 4.0 from Windows 98.

171. The second way in which Microsoft's engineers implemented Allchin's strategy was to make Windows 98 override the user's choice of default browser in certain circumstances. As shipped to users, Windows 98 has Internet Explorer configured as the default browser. While Windows 98 does provide the user with the ability to choose a different default browser, it does not treat this choice as the "default browser" within the ordinary meaning of the term. Specifically, when a user chooses a browser other than Internet Explorer as the default, Windows 98 nevertheless requires the user to employ Internet Explorer in numerous situations that, from the user's perspective, are en-

tirely unexpected. As a consequence, users who choose a browser other than Internet Explorer as their default face considerable uncertainty and confusion in the ordinary course of using Windows 98.

172. Microsoft's refusal to respect the user's choice of default browser fulfilled Brad Chase's 1995 promise to make the use of any browser other than Internet Explorer on Windows "a jolting experience." By increasing the likelihood that using Navigator on Windows 98 would have unpleasant consequences for users, Microsoft further diminished the inclination of OEMs to pre-install Navigator onto Windows. The decision to override the user's selection of non-Microsoft software as the default browser also directly disinclined Windows 98 consumers to use Navigator as their default browser, and it harmed those Windows 98 consumers who nevertheless used Navigator. In particular, Microsoft exposed those using Navigator on Windows 98 to security and privacy risks that are specific to Internet Explorer and to ActiveX controls..

173. Microsoft's actions have inflicted collateral harm on consumers who have no interest in using a Web browser at all. If these consumers want the non-browsing features available only in Windows 98, they must content themselves with an operating system that runs more slowly than if Microsoft had not interspersed browsing-specific routines throughout various files containing routines relied upon by the operating system. More generally, Microsoft has forced Windows 98 users uninterested in browsing to carry software that, while providing them with no benefits, brings with it all the costs associated with carrying additional software on a system. These include performance degradation, increased risk of incompatibilities, and the introduction of bugs. Corporate consumers who need the hardware support and other non-browsing features not available in earlier versions of Windows, but who do not want Web browsing at all, are further burdened in that they are denied a simple and effective means of preventing employees from attempting to browse the Web.

174. Microsoft has harmed even those consumers who desire to use Internet Explorer, and no other browser, with Windows 98. To the extent that browsing-specific routines have been commingled with operating system routines to a greater degree than is necessary to provide any consumer benefit, Microsoft has unjustifiably jeopardized the stability and security of the operating system. Specifically, it has increased the likelihood that a browser crash will cause the entire system to crash and made it easier for malicious viruses that penetrate the system via Internet Explorer to infect non-browsing parts of the system.

### iii. Lack of Justification

175. No technical reason can explain Microsoft's refusal to license Windows 95 without Internet Explorer 1.0 and 2.0. The version of Internet Explorer (1.0) that Microsoft included with the original OEM version of Windows 95 was a separable, executable program file supplied on a separate disk. Web browsing thus could be installed or removed without affecting the rest of Windows 95's functionality in any way. The same was true of Internet Explorer 2.0. Microsoft, moreover, created an easy way to remove Internet Explorer 1.0 and 2.0 from Windows 95 after they had been installed, via the "Add/Remove" panel. This demonstrates the absence of any technical reason for Microsoft's refusal to supply Windows 95 without Internet Explorer 1.0 and 2.0.

176. Similarly, there is no technical justification for Microsoft's refusal to license Windows 95 to OEMs with Internet Explorer 3.0 or 4.0 uninstalled, or for its refusal to permit OEMs to uninstall Internet Explorer 3.0 or 4.0. Microsoft's decision to provide users with an "uninstall" procedure for Internet Explorer 3.0 and 4.0 and its decision to promote Internet Explorer on the basis of that feature demonstrate that there was no technical or quality-related reason for refusing to per-

mit OEMs to use this same feature. Microsoft would not have permitted users to uninstall Internet Explorer, nor would consumers have demanded such an option, if the process would have fragmented or degraded the other functionality of the operating system.

177. As with Windows 95, there is no technical justification for Microsoft's refusal to meet consumer demand for a browserless version of Windows 98. Microsoft could easily supply a version of Windows 98 that does not provide the ability to browse the Web, and to which users could add the browser of their choice. Indicative of this is the fact that it remains possible to remove Web browsing functionality from Windows 98 without adversely affecting non-Web browsing features of Windows 98 or the functionality of applications running on the operating system. In fact, the revised version of Professor Felten's prototype removal program produces precisely this result when run on a computer with Windows 98 installed.

178. In his direct testimony, Felten provides a full technical description of what his prototype removal program does. This description includes a list of the twenty-one methods of initiating Web browsing in Windows 98 that were known to Felten when he developed his program. When the revised version of Felten's program is run on a computer with Windows 98 and no other software installed, Web browsing is not initiated in response to any of these methods.

179. James Allchin tried to show at trial, by way of a videotaped demonstration, that the functionality of Internet Explorer could still be enabled, even after the prototype removal program had been run, by manually adding a new entry to the Windows Registry database. During Felten's rebuttal testimony, one of Microsoft's attorneys directed Felten to perform a second demonstration intended to show that the functionality of Internet Explorer could still be enabled, even after the prototype removal program had been run, by hitting the "control" and "N" keys simultaneously after running the Windows Update feature. Neither of these methods of initiating Web browsing was among the twenty-one documented methods known to Felten when he developed his program. Furthermore, the latter demonstration was hardly a reliable test of Felten's program, because the Encompass shell browser and other applications had been installed on the Windows 98 PC system used in the demonstration. At most, the two demonstrations indicate that Felten did not know all of the methods of initiating Web browsing in Windows 98 when he developed his program, and that he did not include steps in his program to prevent the invocation of Internet Explorer's functionality in response to methods of which he was unaware. Microsoft has special knowledge of its own products, and it alone chooses which functionalities in its products are to be documented and which are to be left undocumented. Felten was aware of this fact, and he himself noted that his own documentation of initiation methods was not exhaustive.

180. Allchin also attempted to show that Felten's program causes performance degradations in Windows 98, as well as malfunctions in certain Windows 98 applications and the Windows Update feature of Windows 98. Those demonstrations, however, were performed on a PC on which several third-party software programs had been installed in addition to Windows 98, and which had been connected to the Internet via a dial-up connection. Felten's program was not intended to be definitive and had not been verified under preconditions other than those for which it was designed. Thus, there was no reason to expect that his program would operate flawlessly during Allchin's demonstrations, and nothing can be inferred from any failure to do so.

181. In fact, the revised version of Felten's program does not degrade the performance or stability of Windows 98 in any way. To the contrary, according to sever-

al standard programs used by Microsoft to measure system performance, the removal of Internet Explorer by the prototype program slightly improves the overall speed of Windows 98.

182. Given Microsoft's special knowledge of its own products, the company is readily able to produce an improved implementation of the concept illustrated by Felten's prototype removal program. In particular, Microsoft can easily identify browsing-specific code that could be removed from shared files, thereby reducing the operating system's memory and hard disk requirements and obtaining performance improvements even beyond those achieved by Felten.

183. Microsoft contends that Felten's prototype removal program does not remove Internet Explorer's Web browsing functionalities, but rather "hides" those functionalities from the perspective of the user. In support of that contention, Microsoft points out that Felten's program removes only a small fraction of the code in Windows 98, so that the hard drive still contains almost all of the code that had been executed in the course of providing Internet Explorer's Web browsing functionalities. Some of that code is left on the hard drive because it also supports Windows 98's operating system functionalities. Microsoft did not offer any analytical basis, however, for distinguishing this sharing of code from the code sharing that exists between all Windows applications and the operating system functionalities in Windows 98.

184. While Microsoft's observation suggests that Felten's program does not greatly reduce Windows 98's "footprint" on the hard disk, that point is irrelevant to the question of whether Felten's program removes Internet Explorer's functionalities from Windows 98. This is because the functionalities of a software product are not provided by the mere presence of code on a computer's hard drive. For software code to provide any functionalities at all the code must be loaded into the computer's dynamic memory and executed. To uninstall a software program or to remove a set of functionalities from a software program, it is not necessary to delete all of the software code that is executed in the course of providing those functionalities. It is sufficient to delete and/or modify enough of the program so as to prevent the code in question from being executed.

185. This deletion and modification is precisely what Felten's program does to Windows 98. After Felten's program has been run, the software code that formerly had been executed in the course of providing Web browsing functionalities is no longer executed. Web browsing functionalities are not merely "hidden" from the user. To the contrary, Felten's program deletes and modifies enough of Windows 98 so as to prevent the necessary code from being executed altogether. Since code that is not to be executed does not need to be loaded into memory, Felten's program is able to reduce the memory allocated to Windows 98 by approximately twenty percent.

186. As an abstract and general proposition, many—if not most—consumers can be said to benefit from Microsoft's provision of Web browsing functionality with its Windows operating system at no additional charge. No consumer benefit can be ascribed, however, to Microsoft's refusal to offer a version of Windows 95 or Windows 98 without Internet Explorer, or to Microsoft's refusal to provide a method for uninstalling Internet Explorer from Windows 98. In particular, Microsoft's decision to force users to take the browser in order to get the non-Web browsing features of Windows 98, including support for new Internet protocols and data formats is, as Allchin put it, simply a choice about "distribution."

187. As Felten's program demonstrated, it is feasible for Microsoft to supply a version of Windows 98 that does not provide the ability to browse the Web, to which users could add a browser of their

choice. Microsoft could then readily offer "integrated" Internet Explorer Web browsing functionality as well, either as an option that could be selected by the end user or the OEM during the Windows 98 setup procedure, or as a "service pack upgrade."

188. Unlike a "pocket part" supplement to a book, a software upgrade need not consist only of new material. A service pack upgrade may install a combination of new software files and/or replacements for existing software files. The use of such service packs to distribute new functionality is a standard feature of Windows applications generally. Microsoft could offer "integrated" Internet Explorer Web browsing functionality as a service pack upgrade that would locate the relevant software and replace it with the current Windows 98 software. In this way, any consumer who wished to do so could easily acquire all of the functionality, features, and performance of the current version of Windows 98 by obtaining the browserless operating system package and the service pack upgrade and then installing them together.

189. Microsoft contends that a service pack must necessarily be deemed part of the operating system when it replaces and adds a large number of core operating system files in the process of upgrading the operating system to a higher level of functionality. This contention is false. Both Microsoft Word, an application program, and Norton Utilities, a suite of utility and application programs, replace and add files to Windows without thereby becoming part of the operating system.

190. Microsoft's actual use of a service pack upgrade to offer integrated Internet Explorer Web browsing functionality (Internet Explorer 4.0) separately from the Windows 95 operating system illustrates the feasibility of this approach. In fact, it produces results remarkably similar to those that could be achieved by offering integrated Internet Explorer Web browsing functionality as a separate service pack upgrade to a browserless Windows 98 operating system. When installed together by the end user, the combined software provides nearly all of the features that Microsoft attributes to the "integrated" design of Windows 98. Of the missing features, all but WebTV for Windows can be obtained by thereafter installing a separately obtained copy of Internet Explorer 5.0. Microsoft has presented no evidence that the WebTV functionality could not easily be included in the stand-alone version of Internet Explorer 5.0.

191. Therefore, Microsoft could offer consumers all the benefits of the current Windows 98 package by distributing the products separately and allowing OEMs or consumers themselves to combine the products if they wished. In fact, operating system vendors other than Microsoft currently succeed in offering "integrated" features similar to those that Microsoft advertises in Windows 98 while still permitting the removal of the browser from the operating system. If consumers genuinely prefer a version of Windows bundled with Internet Explorer, they do not have to be forced to take it; they can choose it in the market.

192. Windows 98 offers some benefits unrelated to browsing that a consumer cannot obtain by combining Internet Explorer with Windows 95. For example, Windows 98 includes support for new hardware technologies and data formats that consumers may desire. While nevertheless preferring to do without Web browsing, Microsoft has forced Windows users who do not want Internet Explorer to nevertheless license, install, and use Internet Explorer to obtain the unrelated benefits. Although some consumers might be inclined to go without Windows 98's new non-browsing features in order to avoid Internet Explorer, OEMs are unlikely to facilitate that choice, because they want consumers to use an operating system that supports the new hardware technologies they seek to sell.

193. Microsoft's argument that binding the browser to the operating system is reasonably necessary to preserve the "integrity" of the Windows platform is likewise specious. First, concern with the integrity of the platform cannot explain Microsoft's original decision to bind Internet Explorer to Windows 95, because Internet Explorer 1.0 and 2.0 did not contain APIs. Second, concern with the integrity of the platform cannot explain Microsoft's refusal to offer OEMs the option of uninstalling Internet Explorer from Windows 95 and Windows 98 because APIs, like all other shared files, are left on the system when Internet Explorer in uninstalled. Third, Microsoft's contention that offering OEMs the choice of whether or not to install certain browser-related APIs would fragment the Windows platform is unpersuasive because OEMs operate in a competitive market and thus have ample incentive to include APIs (including non-Microsoft APIs) required by the applications that their customers demand. Fourth, even if there were some potential benefit associated with the forced licensing of a single set of APIs to all OEMs, such justification could not apply in this case, because Microsoft itself precipitates fragmentation of its platform by continually updating various portions of the Windows installed base with new APIs. ISVs have adapted to this reality by redistributing needed APIs with their applications in order to ensure that the necessary APIs are present when the programs are launched. To the same end, Microsoft makes the APIs it ships with Internet Explorer available to third-party developers for distribution with their own products. Moreover, Microsoft itself bundles APIs—including those distributed with Internet Explorer—with a number of the applications that it distributes separately from Windows.

194. Microsoft also contends that by providing "best of breed" implementations of various functionalities, a vendor of a popular operating system can benefit consumers and improve the efficiency of the software market generally, because the resulting standardization allows ISVs to concentrate their efforts on developing complementary technologies for the industry leaders. Microsoft's refusal to offer a version of Windows 98 in which its Web browser is either absent or removable, however, had no such purpose. Rather, it had the purpose and effect of quashing innovation that exhibited the potential to facilitate the emergence of competition in the market for Intel-compatible PC operating systems.

195. Furthermore, there is only equivocal support for the proposition that Microsoft will ultimately prove to be the source of a "best of breed" Web browser. In fact, there is considerable evidence to the contrary. Both Microsoft and the plaintiffs have used product evaluations to support their claims about the relationship between innovations in Web browser technology and consumer choices regarding the use of Web browsers. These product evaluations generally compare Internet Explorer with Navigator by identifying the beneficial and detrimental features of each. Because the evaluations disagree as to which features are most important, there is no consensus as to which is the best browser overall. When read together, the evaluations also do not identify any existing Web browser as being "best of breed" in the sense of being at least as good as all others in all significant respects. Moreover, there is nothing in the evaluations, nor anywhere else in the evidence, to suggest that further innovation efforts by vendors other than Microsoft in the field of Web browser technology are no longer necessary or desirable. To the contrary, many of the product reviews suggest further innovations in both Microsoft and non-Microsoft Web browsers that would benefit consumers.

196. Despite differences in emphasis, the product evaluations do generally concur as to which browser features are beneficial, which browser features are detri-

mental, and why. Thus, the evaluations provide extensive detailed information about consumer preferences that can be used to predict likely directions in the evolution of Web browser technology.

197. First, the evaluations suggest that, although most Web publishers charge nothing for access to their sites, consumers recognize that there are search and communication costs associated with Web transactions. Accordingly, consumers prefer, and benefit from, innovations in Web browser technology that reduce these costs. Second, consumers recognize that the Web contains a vast and growing range of digital information resources, many of which contain viruses that are capable of causing devastating and irreversible harm to their security and privacy interests. Accordingly, consumers prefer, and benefit from, innovations in Web browser technology that help them identify and avoid harmful Web resources. Third, consumers recognize that they frequently lack adequate information to enable them to assess accurately the costs, risks, and benefits of performing a particular Web transaction. Accordingly, consumers prefer, and benefit from, innovations in Web browser technology that help them assess these costs, risks, and benefits prior to performing the transaction.

198. The reduction of search and communication costs, the identification and avoidance of harmful Web resources, and the provision of more accurate information as to the costs, risks, and benefits of performing Web transactions are just three of the many possible areas of innovation in the field of Web browser technology. Far from demonstrating that Internet Explorer is currently a "best of breed" Web browser, the evidence reveals Microsoft's awareness of the need for continuous improvement of its products. For example, Microsoft frequently releases "patches" to address security and privacy vulnerabilities in Internet Explorer as they are discovered. In sum, there is no indication that Microsoft is destined to provide a "best of breed" Web browser that makes continuing, competitively driven innovations unproductive.

#### iv. The Market for Web Browsing Functionality

199. Since the World Wide Web was introduced to the public in 1991, the resources available on the Web have multiplied at a near-exponential rate. The Internet is becoming a true mass medium. Every day Web resources are published, combined, modified, moved, and deleted. Millions of individuals and organizations have published Web sites, and Web site addresses are pervasive in advertising, promotion, and corporate identification.

200. The economics of the Internet, along with the flexible structure of Web pages, have made the Web the leading trajectory for the ongoing convergence of mass communications media. Many television and radio stations make some or all of their transmissions available on the Web in the form of static multimedia files or streaming media. Many newspapers, magazines, books, journals, public documents, and software programs are also published on the Web. Multimedia files on the Web have emerged as viable substitutes for many pre-recorded audio and video entertainment products. Web-based E-mail, discussion lists, news groups, "chat rooms," paging, instant messaging, and telephony are all in common use. In addition to subsuming all other digital media, the Web also offers popular interactive and collaborative modes of communication that are not available through other media.

201. The use of Web browsers to conduct Web transactions has grown at pace with the growth of the Web, reflecting the immense value that subsists in the digital information resources that have become available on the Web. Consumer demand for software functionality that facilitates Web transactions, and the response by browser vendors to that demand, creates a market for Web browsing functionality. Although Web browsers are now generally not licensed at a positive price, all Web

transactions impose significant costs on consumers, and all browser vendors, including Microsoft, have significant economic interests in maximizing usage of the browsing functionality they control.

### b. Preventing OEMs from Removing the Ready Means of Accessing Internet Explorer and from Promoting Navigator in the Boot Sequence

202. Since the release of Internet Explorer 1.0 in July 1995, Microsoft has distributed every version of Windows with Internet Explorer included. Consequently, no OEM has ever (with the exception of a few months in late 1997) been able to license a copy of Windows 95 or Windows 98 that has not come with Internet Explorer. Refusing to offer OEMs a browserless (and appropriately discounted) version of Windows forces OEMs to take (and pay for) Internet Explorer, but it does not prevent a determined OEM from nevertheless offering its consumers a different Web browser. Even Microsoft's additional refusal to allow OEMs to uninstall (without completely removing) Internet Explorer from Windows does not completely foreclose a resourceful OEM from offering consumers another browser. For example, an OEM with sufficient technical expertise (which all the larger OEMs certainly possess) could offer its customers a choice of browsers while still minimizing user confusion if the OEM were left free to configure its systems to present this choice the first time a user turned on a new PC system. If the user chose Navigator, the system would automatically remove the most prominent means of accessing Internet Explorer from Windows (without actually uninstalling, i.e., removing all means of accessing, Internet Explorer) before the desktop screen appeared for the first time.

203. If OEMs removed the most visible means of invoking Internet Explorer, and pre-installed Navigator with facile methods of access, Microsoft's purpose in forcing OEMs to take Internet Explorer—capturing browser usage share from Netscape—would be subverted. The same would be true if OEMs simply configured their machines to promote Navigator before Windows had a chance to promote Internet Explorer, Decision-makers at Microsoft believed that as Internet Explorer caught up with Navigator in quality, OEMs would ultimately conclude that the costs of pre-installing and promoting Navigator, and removing easy access to Internet Explorer, outweighed the benefits. Still, those decision-makers did not believe that Microsoft could afford to wait for the several large OEMs that represented virtually all Windows PCs shipped to come to this desired conclusion on their own. Therefore, in order to bring the behavior of OEMs into line with its strategic goals quickly, Microsoft threatened to terminate the Windows license of any OEM that removed Microsoft's chosen icons and program entries from the Windows desktop or the "Start" menu. It threatened similar punishment for OEMs who added programs that promoted third-party software to the Windows "boot" sequence. These inhibitions soured Microsoft's relations with OEMs and stymied innovation that might have made Windows PC systems more satisfying to users. Microsoft would not have paid this price had it not been convinced that its actions were necessary to ostracize Navigator from the vital OEM distribution channel.

204. Although Microsoft's original Windows 95 licenses withheld from OEMs permission to implement any modifications to the Windows product not expressly authorized by Microsoft's "OEM Pre–Installation Kit," or "OPK," it had always been Microsoft's practice to grant certain OEMs requesting it some latitude to make modifications not specified in the OPK. But when OEMs began, in the summer of 1995, to request permission to remove the Internet Explorer icon from the Windows desktop prior to shipping their PCs, Microsoft consistently and steadfastly refused. As Compaq learned in the first half of 1996, Microsoft was prepared to enforce this

prohibition against even its closest OEM allies.

205. In August 1995, Compaq entered into a "Promotion and Distribution Agreement" with AOL whereby Compaq agreed to "position AOL Services above all other Online Services within the user interface of its Products." An addendum to the agreement provided that Compaq would place an AOL icon—and no OLS icons not controlled by AOL—on the desktop of its PCs. Pursuant to its obligations, Compaq began in late 1995 or early 1996 to ship its Presario PCs with the MSN icon removed and the AOL icon added to the Windows desktop. At the same time, Compaq removed the Internet Explorer icon from the desktop of its Presarios and replaced it with a single icon representing both the Spry ISP and the browser product that Spry bundled, i.e., Navigator. Compaq added this icon in part because it recognized Navigator to be the most popular browser product with its consumers; it removed the Internet Explorer icon because it did not want its PCs desktops to confuse novice users with a clutter of Internet-related icons.

206. When Microsoft learned of Compaq's plans for the Presario, it informed Compaq that it considered the removal of the MSN and Internet Explorer icons to be a violation of the OPK process by which Compaq had previously agreed to abide. For its part, AOL informed Compaq that it viewed the addition of an icon for Spry as a violation of their 1995 agreement. AOL did not object to the presence of a Navigator icon; what concerned AOL was the fact that clicking on this icon brought the user to the Spry ISP. Despite the protests from Microsoft and AOL, Compaq refused to reconfigure the Presario desktop. Finally, after months of unsuccessful importunity, Microsoft sent Compaq a letter on May 31, 1996, stating its intention to terminate Compaq's license for Windows 95 if Compaq did not restore the MSN and Internet Explorer icons to their original positions. Compaq's executives opined

that their firm could not continue in business for long without a license for Windows, so in June Compaq restored the MSN and IE icons to the Presario desktop.

207. Microsoft did not further condition its withdrawal of the termination notice on the removal of the AOL and Navigator icons; AOL, however, did protest both the continued presence of a Spry icon and the reappearance of the MSN icon. After AOL sent Compaq a formal notice of its intent to terminate the Promotion and Distribution Agreement in September 1996, Compaq removed the Spry/Navigator icon. For reasons discussed below, Compaq did not then replace the Spry/Navigator icon with an icon solely for Navigator.

208. In its confrontation with Compaq, Microsoft demonstrated that it was prepared to go to the brink of losing all Windows sales through its highest-volume OEM partner in order to enforce its prohibition against removing Microsoft's Internet-related icons from the Windows desktop.

209. If the only prohibition had been against removing Microsoft icons and program entries, OEMs partial to Navigator still would have been able to recruit users to Navigator by configuring their PCs to promote it before the Windows desktop first presented itself. This is true because the average user, having chosen a browser product, is indisposed to undergo the trouble of switching to a different one. With the release of Windows 95, some of the high-volume OEMs began to customize the Windows boot sequence so that, the first time users turned on their new PCs, certain OEM-designed tutorials and registration programs, as well as "splash" screens that simply displayed the OEM's brand, would run before the users were presented with the Windows desktop.

210. Promoting non-Microsoft software and services was not the only, or even the primary, purpose of the OEM introductory

programs. The primary purpose, rather, was to make the experience of setting up and learning to use a new PC system easier and less confusing for users, especially novices. By doing so, the OEMs believed, they would increase the value of their systems and minimize both product returns and costly support calls. Since just three calls from a consumer can erase the entire profit that an OEM earned selling a PC system to that consumer, OEMs have an acute interest in making their systems self-explanatory and simple to use. A secondary purpose motivating OEMs to insert programs into the boot sequence was to differentiate their products from those of their competitors. Finally, OEMs perceived an opportunity to collect bounties from IAPs and ISVs in exchange for the promotion of their services and software in the boot sequence. Thus, among the programs that many OEMs inserted into the boot sequence were Internet sign-up procedures that encouraged users to choose from a list of IAPs assembled by the OEM. In many cases, a consumer signing up for an IAP through an OEM program would automatically become a user of whichever browser that IAP bundled with its proprietary software. In other cases, the IAP would present the user with a choice of browsers in the course of collecting from the user the information necessary to start a subscription.

211. In addition to tutorials, sign-up programs, and splash screens, a few large OEMs developed programs that ran automatically at the conclusion of a new PC system's first boot sequence. These programs replaced the Windows desktop either with a user interface designed by the OEM or with Navigator's user interface. The OEMs that implemented automatically loading alternative user interfaces did so out of the belief that many users, particularly novice ones, would find the alternate interfaces less complicated and confusing than the Windows desktop.

212. When Gates became aware of what the OEMs were doing, he expressed concern to Kempin, the Microsoft executive in charge of OEM sales. On January 6, 1996, Gates wrote to Kempin: "Winning Internet browser share is a very very important goal for us. Apparently a lot of OEMs are bundling non-Microsoft browsers and coming up with offerings together with Internet Service providers that get displayed on their machines in a FAR more prominent way than MSN or our Internet browser." Less than three weeks later, Kempin delivered his semi-annual report on OEM sales to his superiors. In the report, he identified "Control over start-up screens, MSN and IE placement" as one interest that Microsoft had neglected over the previous six months. The ongoing imbroglio with Compaq was prominent in Kempin's thinking, but he also recognized that establishing control over the boot process was necessary to ensure preferential positioning for MSN and Internet Explorer.

213. In an effort to thwart the practice of OEM customization, Microsoft began, in the spring of 1996, to force OEMs to accept a series of restrictions on their ability to reconfigure the Windows 95 desktop and boot sequence. There were five such restrictions, which were manifested either as amendments to existing Windows 95 licenses or as terms in new Windows 98 licenses. First, Microsoft formalized the prohibition against removing any icons, folders, or "Start" menu entries that Microsoft itself had placed on the Windows desktop. Second, Microsoft prohibited OEMs from modifying the initial Windows boot sequence. Third, Microsoft prohibited OEMs from installing programs, including alternatives to the Windows desktop user interface, which would launch automatically upon completion of the initial Windows boot sequence. Fourth, Microsoft prohibited OEMs from adding icons or folders to the Windows desktop that were not similar in size and shape to icons supplied by Microsoft. Finally, when Microsoft later released the Active Desktop as

part of Internet Explorer 4.0, it added the restriction that OEMs were not to use that feature to display third-party brands.

214. The several OEMs that in the aggregate represented over ninety percent of Intel-compatible PC sales believed that the new restrictions would make their PC systems more difficult and more confusing to use, and thus less acceptable to consumers. They also anticipated that the restrictions would increase product returns and support costs and generally lower the value of their machines. Those OEMs that had already spent millions of dollars developing and implementing tutorial and registration programs and/or automatically-loading graphical interfaces in the Windows boot sequence lamented that their investment would, as a result of Microsoft's policy, be largely wasted. Gateway, Hewlett–Packard, and IBM communicated their opposition forcefully and urged Microsoft to lift the restrictions. Emblematic of the reaction among large OEMs was a letter that the manager of research and development at Hewlett–Packard sent to Microsoft in March 1997. He wrote:

> Microsoft's mandated removal of all OEM boot-sequence and auto-start programs for OEM licensed systems has resulted in significant and costly problems for the HP–Pavilion line of retail PC's.
>
> Our data (as of 3/10/97) shows a 10% increase in W[indows]95 calls as a % of our total customer support calls. . . .
>
> Our registration rate has also dropped from the mid–80% range to the low 60% range.
>
> There is also subjective data from several channel partners that our system return rate has increased from the lowest of any OEM (even lower than Apple) to a level comparable to the other Microsoft OEM PC vendors. This is a major concern in that we are taking a step backward in meeting customer satisfaction needs.

> These three pieces of data confirm that we have been damaged by the edicts that [ ] Microsoft issued last fall.
>
> From the consumer perspective, we are hurting our industry and our customers. PC's can be frightening and quirky pieces of technology into which they invest a large sum of their money. It is vitally important that the PC suppliers dramatically improve the consumer buying experience, out of box experience as well as the longer term product usability and reliability. The channel feedback as well as our own data shows that we are going in the wrong direction. This causes consumer dissatisfaction in complex telephone support process, needless in-home repair visits and ultimately in product returns. Many times the cause is user misunderstanding of a product that presents too much complexity to the common user. . . .
>
> Our Customers hold HP accountable for their dissatisfaction with our products. We bear [ ] the cost of returns of our products. We are responsible for the cost of technical support of our customers, including the 33% of calls we get related to the lack of quality or confusion generated by your product. And finally we are responsible for our success or failure in the retail PC market. We must have more ability to decide how our system is presented to our end users.
>
> If we had a choice of another supplier, based on your actions in this area, I assure you [that you] would not be our supplier of choice.
>
> I strongly urge you to have your executives review these decisions and to change this unacceptable policy.

215. Even in the face of such strident opposition from its OEM customers, Microsoft refused to relent on the bulk of its restrictions. It did, however, grant Hewlett–Packard and other OEMs discounts off the royalty price of Windows as compensation for the work required to bring their respective alternative user interfaces

into compliance with Microsoft's requirements. Despite the high costs that Microsoft's demands imposed on them, the OEMs obeyed the restrictions because they perceived no alternative to licensing Windows for pre-installation on their PCs. Still, the restrictions lowered the value that OEMs attached to Windows by the amount of the costs that the restrictions imposed on them. Furthermore, Microsoft's intransigence damaged the goodwill between it and several of the highest-volume OEMs.

216. Microsoft was willing to sacrifice some goodwill and some of the value that OEMs attached to Windows in order to exclude Netscape from the crucial OEM distribution channel. Microsoft's restrictions succeeded in raising the costs to OEMs of pre-installing and promoting Navigator. These increased costs, in turn, were in some cases significant enough to deter OEMs from pre-installing Navigator altogether. In other cases, as is discussed in the next section, OEMs decided not to pre-install Navigator after Microsoft brought still more pressure to bear.

217. Microsoft's license agreements have never prohibited OEMs from pre-installing programs, including Navigator, on their PCs and placing icons and entries for those programs on the Windows desktop and in the "Start" menu. The icons and entries that Microsoft itself places on the desktop and in the "Start" menu have always left room for OEMs to insert more icons and program entries of their own choosing. In fact, Microsoft leaves enough space for an OEM to add more than forty icons to the Windows desktop. Still, the availability of space for added icons did not make including a Navigator icon inexpensive for OEMs. Given the unavoidable presence of the Internet Explorer and MSN icons, adding a Navigator icon would increase the amount of Internet-related clutter on the desktop. This would lead to confusion among novice users, which would in turn increase the incidence of support calls and product returns. Microsoft made this very point clear to OEMs in its attempts to persuade them not to pre-install Navigator on their PCs. Furthermore, OEMs recognized that including multiple Navigator icons in an attempt to draw users' attention away from Internet Explorer would only increase the amount of clutter on the desktop, thus adding to user confusion. Although the Windows 98 OEM license does not forbid the OEM to set Navigator as the default browsing software, doing so would fail to forestall user confusion since, as the Court found in the previous section, Windows 98 launches Internet Explorer in certain situations even if Navigator is set as the default.

218. The restrictions on modifying the Windows boot sequence, including the prohibition against automatically loading alternate user interfaces, deprived OEMs of the principal devices by which to lure users to Navigator over the high-profile presence of Internet Explorer in the Windows user interface. An OEM remained free to place an icon on the desktop that a user could click to invoke an alternate user interface. Plus, once invoked, the interface could be configured to load automatically the next time the PC was turned on. This mode of presentation proved to be much less effective than the one Microsoft foreclosed, however, for studies showed that users tended not to trouble with selecting an alternate user interface; they were content to use the interface that loaded automatically the first time they turned on their PCs. Furthermore, while Microsoft's restrictions never extended to the interval between the time when the PC was turned on and the time when Windows began loading from the hard drive into RAM, developing anything more complicated than a simple splash screen to run in that period would have involved, at a minimum, the writing of a DOS utility and, at the maximum, the pre-installation of a second operating system. Such measures were simply not worth the cost. Finally, although the Windows 98 license does not prohibit an OEM from including on the

keyboard of its PCs a button that takes users directly to an OEM-maintained site containing promotion for Navigator, such a configuration is extremely costly for an OEM to implement, and it represents a less effective form of promotion than automatically advertising Navigator in the initial boot process.

219. In the spring of 1998, Microsoft began gradually to moderate certain of the restrictions described above. The first sign of relaxation came when Microsoft permitted some fifty OEMs to include ISPs of their choice in Microsoft's Internet Connection Wizard. Then, in late May and early June 1998, Microsoft informed seven of the highest-volume OEMs that it was granting them the privilege of inserting their own registration and Internet sign-up programs into the initial Windows 98 boot sequence. If the user selected an IAP using the OEM program, Microsoft's Internet Connection Wizard would not run in the boot sequence. Microsoft subsequently extended these same privileges to several other OEMs, upon their request.

220. It is important to note that Microsoft's tractability emerged only after the restrictions had been in place for over a year, and only after Microsoft had managed to secure favorable promotion for Internet Explorer through the most important IAPs. Furthermore, while Microsoft permitted the OEMs to include in their registration and sign-up programs promotions for their own products (including OEM-branded shell browsers built upon Internet Explorer) and for ISPs (but only if and when those ISPs were selected by consumers in the sign-up process), Microsoft continued to prohibit promotions for any other non-Microsoft products, including Navigator. In a single exception, Microsoft granted Gateway's request that it be permitted to give consumers who used Gateway's sign-up process and selected Gateway.net as their ISP an opportunity to choose Navigator as their browser. Microsoft granted this permission orally,

and it did not extend similar privileges to any other OEMs.

221. Microsoft asserts that the restrictions it places on the ability of OEMs to modify the Windows desktop and boot sequence are merely intended to prevent OEMs from compromising the quality and consistency of Windows after the code leaves Microsoft's physical control, but before PC consumers first begin to experience the product. In truth, however, the OEM modifications that Microsoft prohibits would not compromise the quality or consistency of Windows any more than the modifications that Microsoft currently permits. Furthermore, to the extent that certain OEM modifications did threaten to impair the quality and consistency of Windows, Microsoft's response has been more restrictive than necessary to abate the threat. Microsoft would not have imposed prohibitions that burdened OEMs and consumers with substantial costs, lowered the value of Windows, and harmed the company's relations with major OEMs had it not felt that the measures were necessary to maximize Internet Explorer's share of browser usage at Navigator's expense.

222. Microsoft asserts that it restricts the freedom of OEMs to remove icons, folders, or "Start" menu entries that Microsoft places on the Windows desktop in order to ensure that consumers will enjoy ready access to the features that Microsoft's advertising has led them to expect. The Windows trademark would be blemished, Microsoft argues, if consumers could not easily find the features that impelled them to purchase a Windows-equipped PC. At the same time that it has put forward this justification, however, Microsoft has permitted OEMs to de-activate Microsoft's Active Desktop and its associated "channels" prior to shipment. More significant is the fact that Microsoft's license agreements require OEMs to bear product support costs. So if a consumer has difficulty locating a feature that he wants to use, he will call a customer service representative employed by the OEM that manufactured

his PC. Since only a few calls erase the profit earned from selling a PC system, OEMs are loathe to do anything that will lead to consumer questions and complaints. Therefore, if market research indicates that consumers want and expect to see a certain icon on the Windows desktop, OEMs will not remove it. Since OEMs share Microsoft's interest in ensuring that consumers can easily find the features they want on their Windows PC systems, Microsoft would not have prohibited OEMs from removing icons, folders, or "Start" menu entries if its only concern had been consumer satisfaction. In fact, by forbidding OEMs to remove the most obvious means of invoking Internet Explorer, Microsoft diminished the value of Windows PC systems to those corporate customers, for example, who did not intend for their employees to browse the Web and did not want a browser taking up hardware resources. Incidentally, there is no merit in the hypothesis that OEMs might cause problems in the functioning of the rest of Windows by removing Internet Explorer's desktop icon and program entry, because Microsoft still allows users to do exactly that.

223. According to Microsoft, its restrictions on the ability of OEMs to insert programs into the initial Windows boot sequence are meant to ensure that all Windows users experience the product the way Microsoft intended it the first time they turn on their PC systems; after all, there would be little incentive to develop a high-quality operating-system product if OEMs were free to alter it for the worse before handing it over to consumers. This argument might be availing were it not for the fact that Microsoft currently allows several of the largest-volume OEMs to make major modifications to the initial Windows 98 boot sequence. Microsoft permits each of these OEMs to configure its own splash screens, tutorials, registration wizards, Internet sign-up wizards, and utilities so that they run automatically when the consumer first turns on a new PC system. Either Microsoft stopped caring about the consis-

tency of the Windows experience in 1998, when it tempered its restrictions on modifications to the boot sequence, or preserving consistency was never Microsoft's true motivation for imposing those restrictions in the first place. With all the variety that Microsoft now tolerates in the boot sequence, including the promotion of OEM-branded browser shells, it is difficult to comprehend how allowing OEMs to promote Navigator in their tutorials and Internet sign-up programs would further compromise Microsoft's purported interest in consistency.

224. Although Microsoft has tolerated a variety of OEM modifications to the Windows boot sequence, it has never acquiesced to an alternate user interface that automatically obscures the Windows desktop after the PC system has finished booting for the first time. In demanding the removal of such automatically loading user interfaces, Microsoft has postulated that consumers who purchase Windows PCs expect to see the Windows desktop when their PC systems finish booting for the first time. If consumers instead see a different user interface, they will be confused and disappointed. What is more, Microsoft asserts, OEM shells have tended to be of lower quality than Windows. One OEM's version allegedly even disabled the ability of a Windows user to invoke functionality by clicking the right button of his mouse.

225. The alternate shells that OEMs have developed may or may not be of lower quality than Windows. One thing is clear, however: If an OEM develops a shell that users do not like as much as Windows, and if the OEM causes that shell to load as the default user interface the first time its PCs are turned on, consumer wrath will fall first upon the OEM, and demand for that OEM's PC systems will decline commensurately with the resulting user dissatisfaction. The market for Intel-compatible PCs is, by all accounts, a competitive one. Consequently, any OEM

that tries to force an unwanted, low-quality shell on consumers will do so at its own peril. Had Microsoft's sole concern been consumer satisfaction, it would have relied more on the power of the market—and less on its own market power—to prevent OEMs from making modifications that lead to consumer disappointment.

226. At times, Microsoft has argued that the limitations it imposes on the ability of OEMs to modify Windows originate in a desire to prevent its platform from becoming fragmented, like UNIX. Microsoft believes that ISVs benefit from the fact that Windows presents the same platform for applications development, irrespective of the underlying hardware. Certainly, Microsoft has a legitimate interest in ensuring that OEMs do not take Windows under license, alter its API set, and then ship the altered version. This fact does not add credibility to Microsoft's stated justification, though, for two reasons. First, Microsoft itself creates some degree of instability in its supposedly uniform platform by releasing updates to Internet Explorer more frequently than it releases new versions of Windows. As things stand, ISVs find it necessary to redistribute Microsoft's Internet-related APIs with their applications because of nonuniformity that Microsoft has created in its own installed base. More important, however, is the fact that none of the modifications that OEMs are known to have proposed making would have removed or altered any Windows APIs.

227. To the extent Microsoft is apprehensive that OEMs might, absent restrictions, change the set of APIs exposed by the software on their PCs, the concern is not that OEMs would modify the Windows API set. Rather, the worry is that OEMs would pre-install, on top of Windows, other software exposing additional APIs not controlled by Microsoft. In the case of alternate user interfaces, Microsoft is fearful that, if these programs loaded automatically the first time users turned on their PCs, the programs would attract so much usage that developers would be encouraged to take advantage of any APIs that the programs exposed. Indeed, one user interface in particular that OEMs could configure to load automatically and obscure the Windows desktop—Navigator—exposes a substantial number of APIs. Therefore, Microsoft's real concern has not been that OEM modifications would fragment the Windows platform to the detriment of developers and consumers. What has motivated Microsoft's prohibition against automatically loading shells is rather the fear—once again—that OEMs would preinstall and give prominent placement to middleware that could weaken the applications barrier to entry.

228. Like most other software products, Windows 95 and Windows 98 are covered by copyright registrations. Since they are copyrighted, Microsoft distributes these products to OEMs pursuant to license agreements. By early 1998, Microsoft had made these licenses conditional on OEMs' compliance with the restrictions described above. Notwithstanding the formal inclusion of these restrictions in the license agreements, the removal of the Internet Explorer icon and the promotion of Navigator in the boot sequence would not have compromised Microsoft's creative expression or interfered with its ability to reap the legitimate value of its ingenuity and investment in developing Windows. More generally, the contemporaneous Microsoft documents reflect concern with the promotion of Navigator rather than the infringement of a copyright. Also notable is the fact that Microsoft did not adjust its OEM pricing guidelines when it lifted certain of the restrictions in the spring of 1998.

229. Finally, it is significant that, while all vendors of PC operating systems undoubtedly share Microsoft's stated interest in maximizing consumer satisfaction, the prohibitions that Microsoft imposes on OEMs are considerably more restrictive than those imposed by other operating system vendors. For example, Apple al-

lows its retailers to remove applications that Apple has pre-installed and to reconfigure the Mac OS desktop. For its part, IBM allows its OEM licensees to override the entire OS/2 desktop in favor of a customized shell or to set an application to start automatically the first time the PC is turned on. The reason is that these firms do not share Microsoft's interest in protecting the applications barrier to entry.

### c. Pressuring OEMs to Promote Internet Explorer and to not Pre–Install or Promote Navigator

230. Microsoft's restrictions on modifications to the boot sequence and the configuration of the Windows desktop ensured that every Windows user would be presented with ready means of accessing Internet Explorer. Although the restrictions also raised the costs attendant to pre-installing and promoting Navigator, senior executives at Microsoft were not confident that those higher costs alone would induce all of the major OEMs to focus their promotional efforts on Internet Explorer to the exclusion of Navigator. Therefore, Microsoft used incentives and threats in an effort to secure the cooperation of individual OEMs.

231. First, Microsoft rewarded with valuable consideration those large-volume OEMs that took steps to promote Internet Explorer. For example, Microsoft gave reductions in the royalty price of Windows to certain OEMs, including Gateway, that set Internet Explorer as the default browser on their PC systems. In 1997, Microsoft gave still further reductions to those OEMs that displayed Internet Explorer's logo and links to Microsoft's Internet Explorer update page on their own home pages. That same year, Microsoft agreed to give OEMs millions of dollars in co-marketing funds, as well as costly in-kind assistance, in exchange for their carrying out other promotional activities for Internet Explorer.

232. Microsoft went beyond giving OEMs incentives to promote Internet Explorer. The company's dealings with Compaq in 1996 and 1997 demonstrate that Microsoft was willing to exchange valuable consideration for an OEM's commitment to curtail its distribution and promotion of Navigator. In early 1996, at around the same time that Compaq was removing the MSN and Internet Explorer icons and program entries from the Presario desktop, Compaq announced its intention to work with Netscape for its internal Internet needs and on Internet server initiatives. In response, Microsoft insisted that Compaq support Microsoft's Internet initiatives throughout its business. To make its displeasure felt, Microsoft initiated a series of cooperative ventures with some of Compaq's competitors, including DEC and Hewlett–Packard.

233. When Compaq eventually agreed to restore the MSN and Internet Explorer icons and program entries to the Presario desktop, it did so because its senior executives had decided that the firm needed to do what was necessary to restore its special relationship with Microsoft. On May 13, 1996, Compaq signed an addendum extending the firms' Frontline Partnership to the realm of network-related products. Pursuant to the addendum, Compaq agreed to ship Internet Explorer as the default browser product on all of its desktop and server systems, to adopt and promote Internet Explorer internally, and to focus the majority of Compaq's key network-oriented announcements and marketing activities on Microsoft's technologies and strategy. In September of the same year, Compaq agreed to offer Internet Explorer as the preferred browser product for its Internet products and to use two or more of Microsoft's hypertext markup language ("HTML") extensions in the home page for each of those products. Then in February 1997, Compaq committed itself to promote Internet Explorer exclusively for its PC products in exchange for Microsoft's agreement to pay Compaq a bounty for each user that signed up for Internet access using a Compaq PC. Despite the view of some within Compaq that the

firm's goal should be "to feature the brand leader Netscape," Compaq elected not to resume the preinstallation of Navigator on its Presario PCs after it removed the joint Spry/Navigator icon. In fact, Compaq stopped pre-installing Navigator on all but very small percentage of its PCs.

234. In return for Compaq's capitulation and revival of its commitment to support Microsoft's Internet strategy, Microsoft has guaranteed Compaq that the prices it pays for Windows will continue to be significantly lower than the prices paid by other OEMs. Specifically, the operating system licenses signed by Compaq and Microsoft in March 1998 gave Compaq "[g]uaranteed better" pricing than any other OEM for Windows 95, Windows 98, and Windows NT Workstation (versions 4 and 5) until April 2000. Compaq's license fee for Windows is so low that other OEMs would still pay substantially more than Compaq even if they qualified for all of the royalty reductions listed in Microsoft's Market Development Agreements ("MDAs"). What is more, while Microsoft requires other OEMs to verify actual compliance with particular milestones in order to receive Windows 98 royalty reductions, Microsoft has secretly agreed to provide the full amount of those discounts to Compaq regardless of whether it actually satisfies the specified conditions. In addition to a guaranteed most-favorable price on Windows, Compaq has enjoyed free internal use of all Windows products for PCs since March 1998.

235. Microsoft's relations with Compaq beginning in late 1996 illustrate the blandishments that Microsoft is willing to extend to OEMs that ally with it to help it capture browser share. Microsoft's relations with Gateway and the IBM PC Company, by contrast, reveal the pressure that Microsoft is willing to apply to OEMs that show reluctance to cooperate on this front.

236. In February 1997 a Microsoft account representative told his counterpart at Gateway that Gateway's use of Navigator on its own corporate network was a serious issue at Microsoft. He added that Microsoft would not do any co-marketing and sales campaigns with Gateway if the firm appeared to be anything but pro-Microsoft. If Gateway would replace Navigator with Internet Explorer, Microsoft would compensate Gateway for its investment in Netscape's product. If Gateway refused, Microsoft might be compelled to audit Gateway's internal use of Microsoft products. Gateway was separately told by Microsoft representatives that its decision to ship Navigator with its PCs could affect its business relationship with Microsoft. Despite the pressure from Microsoft, Gateway refused to switch its internal use to Internet Explorer or to stop shipping Navigator with its PCs. Although Microsoft did not implement its more specific threats, Gateway has consistently paid higher prices for Windows than its competitors. Microsoft's actions not only corroborate the evidence of its interest in suppressing the usage of Navigator, they also demonstrate its ability to threaten recalcitrant customers without losing their business.

237. Similarly, in early 1997, Microsoft tried to convince the IBM PC Company to promote and distribute the upcoming release of its new browser, Internet Explorer 4.0. At a meeting with IBM executives in March 1997, Microsoft representatives threatened that, if IBM did not pre-load and promote Internet Explorer 4.0 to the exclusion of Navigator on its PCs, it would suffer "MDA repercussions." One of the Microsoft representatives in attendance, Bengt Ackerlind, stated that in return for IBM shipping its systems without any software that competed with Microsoft, IBM would receive "soft dollars," marketing assistance, improved access to the source code of Windows 95 and Microsoft's Back-Office product, and the ability to self-certify for Microsoft's Windows Hardware Quality Lab provisions. In a follow-up meeting three weeks later, Microsoft representatives again insisted that IBM distribute and promote Internet Explorer exclusively and again offered soft dollars,

marketing assistance, and MDA reductions in return. Later that day, in a smaller meeting that Microsoft referred to as "secret discussions," Ackerlind stated Microsoft's desire that IBM promote Internet Explorer 4.0 exclusively and warned that if IBM pre-installed Navigator on its PCs, "We have a problem."

238. The IBM PC Company refused to promote Internet Explorer 4.0 exclusively, and it has continued to pre-install Navigator on its PCs. The difference in the ways that Compaq and IBM responded to Microsoft's Internet-related overtures in 1996 and 1997 contributed to the stark contrast in the treatment the two firms have since received from Microsoft.

### d. Effect of Microsoft's Actions in the OEM Channel

239. Microsoft has largely succeeded in exiling Navigator from the crucial OEM distribution channel. Even though a few OEMs continue to offer Navigator on some of their PCs, Microsoft has caused the number of OEMs offering Navigator, and the number of PCs on which they offer it, to decline dramatically. Before 1996, Navigator enjoyed a substantial and growing presence on the desktop of new PCs. Over the next two years, however, Microsoft's actions forced the number of copies of Navigator distributed through the OEM channel down to an exiguous fraction of what it had been. By January 1998, Kempin could report to his superiors at Microsoft that, of the sixty OEM sub-channels (15 major OEMs each offering corporate desktop, consumer/small business, notebook, and workstation PCs), Navigator was being shipped through only four. Furthermore, most of the PCs shipped with Navigator featured the product in a manner much less likely to lead to usage than if its icon appeared on the desktop. For example, Sony only featured Navigator in a folder rather than on the desktop, and Gateway only shipped Navigator on a separate CD–ROM rather than pre-installed on the hard drive. By the beginning of January 1999, Navigator was present on the desktop of only a tiny percentage of the PCs that OEMs were shipping.

240. To the extent Netscape is still able to distribute Navigator through the OEM channel, Microsoft has substantially increased the cost of that distribution. Although in January 1999 (in the midst of this trial), Compaq suddenly decided to resume the pre-installation of Navigator on its Presario PCs, Compaq's reversal came only after Netscape agreed to provide Compaq with approximately $700,000 worth of free advertising.

241. In sum, Microsoft successfully secured for Internet Explorer—and foreclosed to Navigator—one of the two distribution channels that leads most efficiently to the usage of browsing software. Even to the extent that Navigator retains some access to the OEM channel, Microsoft has relegated it to markedly less efficient forms of distribution than the form vouchsafed for Internet Explorer, namely, prominent placement on the Windows desktop. Microsoft achieved this feat by using a complementary set of tactics. First, it forced OEMs to take Internet Explorer with Windows and forbade them to remove or obscure it—restrictions which both ensured the prominent presence of Internet Explorer on users' PC systems and increased the costs attendant to pre-installing and promoting Navigator. Second, Microsoft imposed additional technical restrictions to increase the cost of promoting Navigator even more. Third, Microsoft offered OEMs valuable consideration in exchange for commitments to promote Internet Explorer exclusively. Finally, Microsoft threatened to penalize individual OEMs that insisted on pre-installing and promoting Navigator. Although Microsoft's campaign to capture the OEM channel succeeded, it required a massive and multifarious investment by Microsoft; it also stifled innovation by OEMs that might have made Windows PC systems easier to use and more attractive to consumers. That Microsoft was willing to pay this price demonstrates that its decision-mak-

ers believed that maximizing Internet Explorer's usage share at Navigator's expense was worth almost any cost.

### 3. Excluding Navigator from the IAP Channel

242. By late 1995, Microsoft had identified bundling with the client software of IAPs as the other of the two most efficient channels for distributing browsing software. By that time, however, several of the most popular IAPs were shipping Navigator. Recognizing that it was starting from behind, Microsoft devised an aggressive strategy to capture the IAP channel from Netscape. In February 1996, Cameron Myhrvold, the Microsoft executive in charge of the firm's relations with ISPs, outlined the strategy in a memorandum to his colleagues and superiors within the company:

> It's essential we increase the share of our browser. Network operators [(IAPs, plus the telephone and cable companies providing Internet access services)] are important distributors and we will license at no cost the Internet Explorer for distribution with their Internet access business to maximize the distribution/adoption of IE as browser of choice. We will attempt exclusive arrangements, fight for preferred status, but settle for parity with NetScape. Even offering IE for free will not win us every sale. In the U.S. we will offer IE broadly to net[work] op[erator]s and IAPs including the many hundreds of smaller IAPs.

In the first step of this strategy, Microsoft enticed ISPs with small subscriber bases to distribute Internet Explorer and to make it their default browsing software by offering for free both a license to distribute Internet Explorer and a software kit that made it easy for ISPs with limited resources to adapt Internet Explorer for bundling with their services.

243. Those who planned and implemented Microsoft's IAP campaign believed that, if IAPs gave new subscribers a choice between Internet Explorer and Navigator, most of them would pick Navigator—both because Netscape's brand had become nearly synonymous with the Web in the public consciousness and because Navigator had developed a much better reputation for quality than Internet Explorer. To compensate for Navigator's advantage, Microsoft reinforced its free distribution of Internet Explorer licenses and the access kits with three tactics designed to induce IAPs with large subscriber bases not only to distribute and promote Internet Explorer, but also to constrain severely their distribution and promotion of Navigator and to convert those of their subscribers already using Navigator to Internet Explorer.

244. Microsoft's first tactic was to develop and include with Windows an Internet sign-up program that made it simple for users to download access software from, and subscribe to, any IAP appearing on a list assembled by Microsoft. In exchange for their inclusion on this list, the leading IAPs agreed, at Microsoft's insistence, to distribute and promote Internet Explorer, to refrain from promoting non-Microsoft Web browsing software, and to ensure that they distributed non-Microsoft browsing software to only a limited percentage of their subscribers. Although the percentages varied by IAP, the most common figure was seventy-five percent.

245. In a similar tactic aimed at a more important IAP sub-channel, Microsoft created an "Online Services Folder" and placed an icon for that folder on the Windows desktop. In exchange for the pre-installation of their access software with Windows and for the inclusion of their icons in the Online Services Folder, the leading OLSs agreed, again at Microsoft's insistence, to distribute and promote Internet Explorer, to refrain from promoting non-Microsoft Web browsing software, and to distribute non-Microsoft browsing software to no more than fifteen percent of their subscribers.

246. Finally, Microsoft gave IAPs incentives to upgrade the millions of subscribers already using Navigator to proprietary access software that included Internet Explorer. To IAPs included in the Windows Internet sign-up list, Microsoft offered the incentive of reductions in the referral fees it charged for inclusion in the list. To OLSs in the Online Services Folder, Microsoft offered cash bounties.

247. In sum, Microsoft made substantial sacrifices, including the forfeiture of significant revenue opportunities, in order to induce IAPs to do four things: to distribute access software that came with Internet Explorer; to promote Internet Explorer; to upgrade existing subscribers to Internet Explorer; and to restrict their distribution and promotion of non-Microsoft browsing software. The restrictions on the freedom of IAPs to distribute and promote Navigator were far broader than they needed to be in order to achieve any economic efficiency. This is especially true given the fact that Microsoft never expected Internet Explorer to generate any revenue. Ultimately, the inducements that Microsoft offered IAPs at substantial cost to itself, together with the restrictive conditions it imposed on IAPs, did the four things they were designed to accomplish: They caused Internet Explorer's usage share to surge; they caused Navigator's usage share to plummet; they raised Netscape's own costs; and they sealed off a major portion of the IAP channel from the prospect of recapture by Navigator. As an ancillary effect, Microsoft's campaign to seize the IAP channel significantly hampered the ability of consumers to make their choice of Web browser products based on the features of those products.

### a. The Internet Explorer Access Kit Agreements

248. In September 1996, Microsoft announced the availability of the "Internet Explorer Access Kit," or "IEAK." By simply accessing the correct page on Microsoft's Web site and clicking on a box to indicate agreement with the license terms, any IAP could download the IEAK, which included a copy of Internet Explorer. With their technical knowledge, sophisticated equipment, and high-bandwidth connections, IAPs found it very convenient to download Internet Explorer and the IEAK from Microsoft's Web site.

249. Using the IEAK, an IAP could create a distinctive identity for its service in as little as a few hours by customizing the title bar, icon, start and search pages, and "favorites" in Internet Explorer. The IEAK also made the installation process easy for IAPs. With the IEAK IAPs could avoid piecemeal installation of various programs and instead create an automated, comprehensive installation package in which all settings and options were preconfigured. In addition to ease of customization and installation, the IEAK enabled each IAP to preset the default home page so that customers would be taken to the IAP's Web site whenever they logged onto the Internet. This was important to IAPs because setting the user's home page to the IAP'S Web site gave the IAPs advertising and promotional opportunities. Netscape, by contrast, refused to allow its IAP licensees to move Navigator's home page from Netscape's NetCenter portal site.

250. Many IAPs would have paid for the right to distribute Internet Explorer. Indeed, Netscape was charging IAPs between fifteen and twenty dollars per copy of Navigator they distributed. Because of the features and convenience it offered, the IEAK significantly increased the price that IAPs would have been willing to pay. Nevertheless, Microsoft licensed the IEAK including Internet Explorer, to IAPs at no charge. At the time Microsoft released the IEAK, Netscape did not offer IAPs an analogous tool. Although Netscape eventually followed Microsoft's lead by introducing a tool kit similar to the IEAK known as Mission Control, that kit was not made available to IAPs until June 1997—a full nine months after the release of the

IEAK. Whereas IAPs could obtain the IEAK for free, Netscape initially charged $1,995 for each copy of Mission Control.

251. Approximately 2,500 IAPs executed an electronic copy of a license agreement for the IEAK. Included in that number were the eighty IAPs that together accounted for ninety-five percent of all Internet access subscribers in the United States. The IAPs that executed an IEAK license agreement agreed to make Internet Explorer their "preferred" browsing software. The term "preferred" was not defined in the license, and Microsoft did not investigate the extent to which Internet Explorer was in fact enjoying "preferred" status in the client software of its IEAK licensees. In fact, other than to provide information and respond to technical questions, Microsoft made no effort to maintain regular direct contact with the vast majority of the IAPs that had executed licenses.

252. Whether or not IEAK licensees actually gave Internet Explorer preferred status, Microsoft's decision to license Internet Explorer and the IEAK to IAPs at no charge beguiled many small ISPs that otherwise would not have done so into distributing Internet Explorer to their subscribers. By giving up the opportunity to charge for Internet Explorer, and also by developing the IEAK at substantial cost and offering it at no charge, Microsoft thus increased the flow of Internet Explorer through the crucial IAP channel.

### b. The Referral Server Agreements

253. In the late summer of 1996, at around the time that it announced the availability of the IEAK, Microsoft also introduced the Internet Connection Wizard ("ICW") as a feature in Windows 95 OSR 2. If a user clicked on the ICW icon appearing on the Windows 95 desktop, the program would automatically dial into a computer maintained by Microsoft called the Windows Referral Server. The Referral Server would then transmit to the user's computer a list of IAPs that provided connections to the Internet in the user's geographic locale. Included in this list would be information about each IAP's service, including its prices. If the user then indicated a desire to sign up for one of the listed IAPs by clicking on the appropriate entry, the user would be connected to an IAP-maintained server that would automatically configure the user's PC to work properly with the IAP service.

254. For several reasons, IAPs viewed inclusion in the Windows 95 Referral Server as a valuable form of promotion. First, the ICW icon appeared prominently on the desktop of every PC running Windows 95 (from OSR 2 onwards), which, by the middle of 1996, accounted for the vast majority of all new PCs being shipped. Because Microsoft prohibited OEMs from removing any of the icons that it placed on the Windows desktop, IAPs knew that the ICW would confront all users of Windows 95 PCs the first time they turned on their systems. Second, inclusion in the Referral Server was a highly focused form of promotion, because the IAP list provided by the Referral Server presented itself to users who had already indicated some interest in signing up for Internet access. Third, the easy-to-use features of the ICW heightened the probability that a user who started using the program would complete the process of subscribing to an IAP. Finally, inclusion in the Referral Server was a relatively inexpensive means of distribution because, unlike "carpet bombing" with CD-ROMs, it did not require the production and dissemination of anything tangible.

255. Despite the value that IAPs attached to placement in the Windows 95 Referral Server, Microsoft elected to charge those that it granted placement a low bounty price that merely went to pay down the cost of maintaining the necessary server computers and leasing the network they ran on. Although it could have been exchanged for large bounties from IAPs, Microsoft decided to exchange placement in the Referral Server, along with other valuable consideration, for the agreement

of the selected IAPs to promote and distribute Internet Explorer preferentially over Navigator and to convert existing subscribers from Navigator to Internet Explorer.

256. Between July 1996 and September 1997, Microsoft entered into Referral Server agreements with fourteen IAPs. These were AOL, AT & T WorldNet, Brigadoon, Concentric, Digex, EarthLink, GTE, IDT, MCI, MindSpring, Netcom, Prodigy, Sprint, and Spry. Three of these companies did not take the technical steps necessary to appear in the Referral Server even though they had signed agreements with Microsoft. Brigadoon failed to take those steps because it filed for bankruptcy. For its part, Digex left the ISP business to focus exclusively on Web hosting. GTE, on the other hand, decided to enter promotion agreements directly with OEMs rather than abide by the conditions Microsoft attached to inclusion in the Referral Server. Although AOL eventually entered a listing into the Referral Server, it waited until November 1998, after the release of Windows 98. The remaining IAPs in the Windows 95 Referral Server represented ten of the top fifteen Internet access providers in the North America.

257. Pursuant to the terms of the agreements it signed with these ten IAPs, Microsoft provided each with a listing in the Windows 95 Referral Server and mentioned them in press releases and marketing activities relating to the ICW. Microsoft also licensed Internet Explorer to them at no charge, and assisted them in customizing Internet Explorer for use with their services. In exchange, the listed IAPs agreed to offer Internet Explorer as the "standard," "default," or "preferred" browsing software with their services. For example, Microsoft's agreement with EarthLink required it to "[o]ffer the Microsoft Internet Explorer as the standard web browser for [EarthLink's] ISP Service."

258. The agreements also imposed several restrictions on the ability of the IAPs in the Referral Server to promote and distribute non-Microsoft browsing software. First, the agreements required the IAPs to limit their promotion of browser products other than Internet Explorer. For example, the agreements prohibited the IAPs from providing any links or other promotions for Netscape on their services' home pages. In fact, an IAP listed in the Referral Server was not permitted, either in its Referral Server entry or elsewhere, to express or imply to its subscribers that they could use a browser other than Internet Explorer with the IAP's service. Second, the agreements prohibited the ten IAPs from providing non-Microsoft browsing software to their customers unless a subscriber specifically requested it. Third, the agreements gave Microsoft the right to remove from the Referral Server any IAP, that in two consecutive calendar quarters, allowed non-Microsoft browsing software to climb above a specific percentage of all browsing software distributed by that IAP. Thus, even if the IAP ensured that all users subscribing to its service through the Internet Connection Wizard received only Internet Explorer with their subscriptions, Microsoft could nevertheless remove the ISP from the Referral Server if copies of Navigator made up more than the specified percentage of the browsing software that the IAP distributed through all subchannels. Twenty-five percent was the figure specified in most of the agreements. For Netcom and Sprint, the figure was fifty percent, while for IDT it was fifteen.

259. In addition to conditioning placement in the Referral Server on an IAP's undertaking to limit its promotion and distribution of non-Microsoft browsing software, Microsoft through its Referral Server agreements exchanged valuable consideration for the commitment of the ten IAPs to convert existing subscribers from Navigator to Internet Explorer. Microsoft also compensated them for employing Internet Explorer-specific technologies whose dissemination would encourage the developers of network-centric

applications to focus on APIs controlled by Microsoft, as opposed to Netscape or Sun. For example, in exchange for Netcom's commitment to offer deals to its customers encouraging them to upgrade their software to the newest version that bundled Internet Explorer, Microsoft subtracted nine dollars from the referral fee. Microsoft also deposited one dollar into a co-marketing fund for each Netcom subscriber who actually upgraded to client software that bundled Internet Explorer.

260. Where the agreement with Microsoft required the IAP to abandon a distribution agreement already entered with Netscape, Microsoft compensated the IAP with additional consideration. For instance, in response to a representation from MCI that it had already committed to pay Netscape between five and ten million dollars for Web browsing software, Microsoft agreed to grant MCI a credit of five dollars toward a co-marketing fund (not to exceed five million dollars) for each copy of Internet Explorer that MCI distributed to an MCI Internet access customer who had not already received a copy. Finally, Microsoft offered yet further reductions in referral fees to the IAPs using Microsoft-controlled technologies likely to stimulate developers to focus their attention on Windows-specific software interfaces rather than the cross-platform ones provided by Netscape and Sun. For example, Microsoft offered to reduce EarthLink's per-copy referral fee by ten dollars in exchange for EarthLink's use of at least two ActiveX controls in the design of its home page and the use of Microsoft FrontPage server extensions on its Web hosting servers.

261. Microsoft could have covered the cost of developing and maintaining the ICW and the Windows Referral Server, and even made a profit, by charging higher referral fees than it did to the favored IAPs. Instead, Microsoft bartered away so much of the referral fees it otherwise could have charged that the costs of running the Windows Referral Server have thus far exceeded the payments Microsoft has received from the favored IAPs. Microsoft readily made this sacrifice in order to induce the important IAPs to take actions that aided Microsoft's effort to exclude Navigator from the IAP channel.

262. Microsoft's motivation for the limits it placed on the distribution of non-Microsoft browsing software by IAPs in the Windows 95 Referral Server could not have been simply a desire to ensure that IAPs did not promote competing browsing software to subscribers acquired with Microsoft's help. The agreements gave Microsoft the right to dismiss an IAP that either told its subscribers they could choose Navigator or distributed too many copies of non-Microsoft browser products. This was true even if the IAP never mentioned Navigator in its Referral Server entry and distributed nothing but Internet Explorer to the new subscribers it garnered from the ICW. In light of that fact, the Windows 95 Referral Server agreements emerge as something very different from typical cross-marketing arrangements. Furthermore, while facilitating for consumers the process of connecting to the Internet may have been one motivation for developing the Internet Connection Wizard, that motivation cannot explain the exclusionary terms in the Referral Server agreements. After all, contractually limiting the distribution of non-Microsoft browsing software by IAPs did nothing to help consumers gain easy access to the Internet. The real motivation behind the exclusionary terms in the Referral Server agreements was Microsoft's conviction that even if IAPs were compelled to promote and distribute Internet Explorer, the majority of their subscribers would nevertheless elect to use Navigator if the IAPs made it readily available to them. Microsoft therefore paid a high price to induce the most popular IAPs to encourage their customers to use Internet Explorer and discourage them from using Navigator.

263. Absent the conditions Microsoft placed on inclusion in the Referral Server, the IAPs would have had no reason to

limit the percentage of subscribers that used one particular browser or another. As Cameron Myhrvold explained to colleagues within Microsoft in April 1997, "ISPs are agnostic on the browser. It is against their nature to favor a browser or even a platform. This has been damn hard for us to influence." In fact, Myhrvold told the same colleagues that he "had a hard time guiding the ISPs to IE loyalty even when I make them sign explicit terms and conditions in a legal contract."

264. Microsoft monitored the extent of compliance of IAPs in the Referral Server with the shipment restrictions contained in their agreements. It did this by periodically asking each of the ten IAPs to send Microsoft estimates of the number of copies of Internet Explorer—and non-Microsoft browsing software—they were shipping. When, from time to time, various IAPs in the Windows 95 Referral Server (specifically Netcom, Concentric, and EarthLink) fell below the shipment quotas specified in their agreements with Microsoft, executives at Microsoft reacted by contacting the derelict companies and urging them to meet their obligations. Concentric and Earthlink eventually (by May 1998, if not sooner) reduced their Navigator shipments enough to bring them below the required percentage. Microsoft never formally removed an IAP from the Referral Server. For a time after the release of Internet Explorer 4.0, however, no entry for Netcom appeared in the new version of Referral Server. This was at least in part due to Netcom's failure to ensure that Internet Explorer accounted for fifty percent of the browsing software it shipped.

265. In addition to failing, for a time, to meet the required shipment quotas, Concentric and EarthLink occasionally promoted Navigator in ways that were arguably prohibited by the Referral Server agreements. Despite their delinquency, Microsoft never removed Concentric and EarthLink from the Referral Server. Of much less concern to Microsoft than the shipment and promotion of Navigator by

IAPs having signed Referral Server agreements was the fact that Concentric and EarthLink, along with Netcom and three of the other IAPs in the Windows 95 Referral Server, also appeared in Netscape's referral server. This did not violate either the letter or the spirit of their agreements with Microsoft, for while the agreements prohibited the IAPs in the Windows 95 Referral Server from promoting Navigator, they did not purport to hinder Netscape in promoting those IAPs. At any rate, Microsoft did not have reason to be concerned with the appearance of its IAP partners in Netscape's referral server, whose main exposure was to existing Navigator users interested in switching their IAPs. A listing in Netscape's referral server did not help Netscape get its software on users' systems, and pursuant to their agreements with Microsoft, the six ISPs in both Microsoft's and Netscape's referral servers were actually placing Navigator on far fewer users' systems than they would have in the absence of their agreements with Microsoft.

266. In reaction to Microsoft's Referral Server agreements, Netscape entered into agreements of its own with five of the Regional Bell Operating Companies (RBOCs). Under the Netscape agreements, the RBOCs agreed to make Navigator their default Web browsing software in all cases, except those in which subscribers affirmatively requested other browsing software. In exchange, Netscape agreed to list the RBOCs first among the IAPs included in Netscape's referral server. In contrast to Microsoft's agreements, Netscape's agreements with the RBOCs imposed no restrictions on their ability to distribute other browsing software, such as Internet Explorer, whether in response to customer requests or otherwise. Furthermore, Netscape's contracts with the RBOCs required them to set Navigator as the default only so long as AT & T and MCI were both restricted by their agreements with Microsoft from providing Navigator to their customers on par with Inter-

net Explorer. In any event, the RBOCs currently deliver Internet access to less than five percent of the Internet access subscribers in North America.

267. Microsoft's Windows 95 Referral Server agreements were of relatively short duration. For example, Microsoft's agreement with EarthLink provided that it would expire two years from its signing in August 1996 unless either party elected to terminate it sooner, and both Microsoft and EarthLink were free to terminate the agreement for any reason on thirty days' written notice. The other Referral Server agreements were similarly short in term.

268. In April 1998, coincident with rising public criticism, the impending appearance of Bill Gates before a Congressional panel on competition in the computer industry, and the imminent filing of these lawsuits, Microsoft unilaterally waived the most restrictive provisions in the Windows 95 Referral Server agreements. Specifically, Microsoft waived the provisions that restricted the IAPs' ability to distribute non-Microsoft Web browsing software. With respect to promotion, the revised agreements merely required the IAPs to promote Internet Explorer at least as prominently as they promoted non-Microsoft browsers. Notably, however, the agreements still required the IAPs to make Internet Explorer their default browser.

269. By the end of September 1998, all of the Windows 95 Referral Server agreements had expired by their own terms. Microsoft's Windows 98 Referral Server agreements do not contain any provisions requiring that Internet Explorer make up any particular percentage of the IAPs' shipments. Furthermore, the Windows 98 Referral Server agreements offer no discounts on the referral fees predicated on the IAPs' adoption of any particular Microsoft technology or licensing any Microsoft product. With regard to promotion, the agreements require only that the IAPs promote Internet Explorer no less favorably than non-Microsoft Web browsing

software. Still, for those IAPs concerned with the costs associated with supporting two browser products, this parity requirement is enough to compel them not to not make Navigator readily available to their subscribers. The new agreements have a one-year term and are terminable at will by the IAP on ninety days' notice.

270. IAPs no longer value placement in the Windows Referral Server as much as they did in 1996. For one reason, the ICW has apparently not been responsible for as many new IAP subscriptions as either Microsoft or the IAPs anticipated. In fact, from the third quarter of 1996 through the third quarter of 1998, only 2.1% of new users of the Internet became IAP subscribers through the Windows Referral Server. Partially on account of this realization, Microsoft began in the spring of 1998 to surrender significant control over the Internet sign-up process to OEMs. As described above, Microsoft gave the top fifty OEMs in the world the right to select both the IAPs (up to five) that appear in the Windows 98 Referral Server on the PC systems they sell and to determine the order in which those IAPs appear. Microsoft also permits the fifty OEMs to keep any bounties that the IAPs pay them for inclusion in the Referral Server. The OEMs simply pay Microsoft a nominal fee (a flat fee of approximately $10,000 plus thirty cents per subscriber) to defray the costs of operating the Referral Server program. Furthermore (as is also discussed above), Microsoft has allowed seven of the highest-volume OEMs to supplant the ICW altogether.

271. By both lifting restrictions in its agreements and ceding control over the IAP sign-up process to OEMs, in the spring of 1998, Microsoft relaxed the strictures that it had imposed in the fall of 1996 on the distribution and promotion of Web browsing software by the most popular IAPs. In the year-and-a-half that they were in full force, however, the restrictive terms in the Referral Server agreements induced the major IAPs to customize their

client software for Internet Explorer, gear their promotional and marketing activities to Microsoft's technologies, and convert substantial portions of their installed bases from Navigator to Internet Explorer. They may have welcomed more flexibility to distribute Navigator to those subscribers that expressed demand for it, but they had no incentive to launch an expensive campaign to reverse the tide that Microsoft's restrictions had already generated. Consequently, few ISPs have responded to Microsoft's contractual dispensations by increasing significantly their distribution and promotion of Navigator. Furthermore, one of the reasons Microsoft felt comfortable relaxing the controls on IAPs in the spring of 1998 was that it had achieved—and planned to maintain—control over the distribution and promotion of Web browsing software by AOL and the other major OLSs, whose combined subscriber base comprised most of North America's Internet users.

### c. The Online Services Folder Agreements

272. In late 1995 and early 1996, senior executives at Microsoft recognized that AOL accounted for a substantial portion of all existing Internet access subscriptions and that it attracted a very large percentage of new IAP subscribers. Indeed, AOL was and is the largest and most important IAP. The Microsoft executives thus realized that if they could convince AOL to distribute Internet Explorer with its client software instead of Navigator, Microsoft would—in a single coup—capture a large part of the IAP channel for Internet Explorer. In the early spring of 1996, therefore, Microsoft exchanged favorable placement on the Windows desktop, as well as other valuable consideration, for AOL's commitment to distribute and promote Internet Explorer to the near exclusion of Navigator. AOL's acceptance of this arrangement has caused an enormous surge in Internet Explorer's usage share and a concomitant decline in Navigator's share. To supplement the effects of the AOL deal,

Microsoft entered similar agreements with other OLSs. The importance of these arrangements to Microsoft is evident in the fact that, in contrast to the restrictive terms in the Windows Referral Server agreements, Microsoft has never waived the terms that require the OLSs to distribute and promote Internet Explorer to the near exclusion of Navigator.

### i. AOL

273. Prior to 1995, OLS subscribers used proprietary access software to view only their OLS's specialized content. Beginning in 1994, however, the public became increasingly interested in accessing information on the Web. So to keep from losing subscribers and to attract new ones, OLSs upgraded their services to provide access to the Web. In November 1994, for example, AOL purchased BookLink and incorporated its Web browsing software into AOL's proprietary access software to enable AOL's subscribers to access and view Web content.

274. While public awareness of the Web was taking hold, companies like Netscape and Microsoft were hard at work developing Web browsing software. By the fall of 1995, a number of OLSs, including AOL, had decided not to devote the considerable resources that would have been required to keep up with this rapid pace of innovation. They chose instead to license state-of-the-art Web browsing technology from a separate supplier. Microsoft saw AOL, with its subscriber base then approaching five million, as a potential breakthrough opportunity—a way for Microsoft quickly to obtain credibility in Web browsing technology as well as usage share for the current version of its browsing software, Internet Explorer 3.0.

275. In November 1995, David Cole of AOL advised Pete Higgins of Microsoft that AOL was looking for Web browsing software to license and incorporate into future versions of its proprietary access software. Bill Gates and AOL's Chairman, Steve Case, subsequently spoke several times on the telephone. In those

conversations, Gates urged that AOL representatives meet with Microsoft technical personnel in order to get a better sense of the quality and features of Internet Explorer 3.0. For his part, Case told Gates that he wanted Microsoft to include AOL's client software with Windows such that AOL received the same desktop promotion that MSN enjoyed. Gates insisted that such favorable treatment of AOL within Windows was out of the question.

276. Lower down in Microsoft's chain of command, executives took issue with Gates' reluctance to grant AOL favorable placement in Windows. In October 1995, before Gates and Case began talking, a group of Microsoft executives prepared for Gates a memorandum on the company's Internet Explorer efforts entitled, "How to Get to 30% Share in 12 Months." The executives wrote that

> we need to remove barriers to browser adoption by Online Services and Internet Access Providers. Today MSN is an access service . . ., an online service . . ., and an Internet site . . .; in other words, it competes with everyone. By bundling MSN in the Windows box, we are threatening ISV's in each of these areas, who in turn have no incentive to promote our Internet Browser.

277. One of the proposals the executives put forward was that Microsoft "Open Up the Windows Box." In other words, the executives believed that, in exchange for favorable treatment of Internet Explorer, Microsoft should include the client software of IAPs in Windows and give those services prominent placement on the desktop, even if such placement drew attention away from MSN. Over the months that followed, senior Microsoft executives came to the conclusion that opening up the Windows box to MSN's competitors was a necessary price to pay for increasing Internet Explorer's share of browser usage.

278. Case ultimately agreed to visit Microsoft's Redmond campus in January 1996. In preparation for that meeting, Microsoft purchased PC systems from five different OEMs (Compaq, Hewlett–Packard, IBM, Packard Bell, and NEC) at retail outlet stores. When they turned these systems on, employees at Microsoft discovered that the OEMs were already shipping AOL's software pre-installed on their PCs and giving the AOL service more prominent placement than MSN on the Windows desktop. From the fact that AOL was already enjoying broad distribution and promotion on the Windows desktop through agreements with OEMs, several senior Microsoft executives, in particular Paul Maritz and Brad Chase, concluded that Microsoft would not be giving up all that much if it traded placement on the Windows desktop for AOL's commitment to promote and distribute Internet Explorer. At least initially, Gates took a different lesson from the experiment with the five PC systems. He seems to have felt that Microsoft should react not by 'opening up the Windows box,' but rather by clamping down on the ability of OEMs to configure the Windows desktop. Indeed, the discovery that OEMs were promoting AOL on the Windows desktop was one of the things that led him to complain to Joachim Kempin on January 6, 1996 about OEMs that were bundling non-Microsoft Internet services and software and displaying it on their PCs "in a FAR more prominent way than MSN or our Internet browser."

279. Case's insistence that Microsoft promote AOL on the Windows desktop stemmed partly from factors other than the additional subscriptions expected to come from the OLS folder. After all, AOL already enjoyed distribution agreements with major OEMs that placed an AOL icon on the desktop of millions of new PC systems. But given that its OEM agreements tended to be short-term and somewhat tenuous, and considering how sensitive the OEMs were to Microsoft's will, AOL executives realized that AOL's position on the Windows desktop would be more secure if it met with some degree of contractual

acquiescence from Microsoft. After all, whereas Microsoft retaliated in subtle and not-so-subtle ways against OEMs, such as IBM, that pre-installed software on their PCs that Microsoft found minatory, it pronounced more extreme sanctions against OEMs, such as Compaq, that had the temerity to remove icons and program entries from the Windows desktop that Microsoft had placed there. Case had reason to see value, then, in shifting AOL from being a source of software at whose promotion Microsoft took umbrage to the dispenser of software whose placement on the Windows desktop Microsoft guaranteed. Moreover, obtaining Microsoft's commitment to include the AOL client software and prominent promotion for AOL in every copy of Windows would place AOL on all Windows 95 PC systems, including those sold by the multitude of OEMs whose shipment volumes were too low to warrant the negotiation of separate distribution deals. Furthermore, placement on the desktop in some fashion would improve AOL's negotiating position when it asked individual large OEMs to place an AOL icon directly on the desktop of their PC systems. Whatever the reason, and irrespective of the considerable value that Microsoft offered AOL apart from desktop placement, Case made clear to Gates his sincere conviction that AOL would not recruit its subscribers to Internet Explorer unless Microsoft included AOL's client software in Windows and promoted AOL in some form on the Windows desktop.

280. Four days before Case was due to arrive at Microsoft's campus, Gates sent an E-mail outlining Microsoft's goals in negotiating a deal with AOL to the responsible Microsoft executives. He wrote:

> What we want from AOL is that for a period of time—say 2 years—the browser that they give out to their customers and the one they mention and put on their pages and the one they exploit is ours and not Netscape[']s. We need for them to make our browser available as the browser to existing and new custom-

ers. We have to be sure that we don't allow them to promote Netscape as well. We want all the hits that come off of AOL to register on servers as our browser so people can start seeing us as having measurable browser share.

Gates understood that if AOL gave assurance that its subscribers used Internet Explorer when browsing the Web, the measure of browser usage share data to which application developers paid most attention—i.e., server "hit" data—would show a significant rise in Internet Explorer's usage share. Gates also realized that such a commitment by AOL was worth seeking even if it lasted for only a couple of years.

281. On January 18, 1996, Case arrived at Microsoft's campus with three other AOL executives. During the first meeting, Microsoft described the componentized architecture of Internet Explorer 3.0 that would allow AOL to embed the browsing software into AOL's access software. The AOL executives viewed componentization as a highly attractive feature, because AOL wanted its subscribers to feel they were using an AOL service whether they were viewing proprietary AOL content or browsing content on the Web. In fact, Case and the other AOL representatives told their Microsoft hosts that AOL wanted total control over the "browser frame" (the windows in which Web content is displayed) to make it distinctive to AOL. In other words, AOL wanted no menus, dialog boxes, or other visible signs that would alert AOL users to the fact that they were using Web browsing software supplied by a company other than AOL.

282. At the end of the meeting, Case expressly acknowledged the attractiveness of Microsoft's componentized approach. Notably, Netscape had not yet developed a componentized version of Navigator. Netscape had assured AOL that it would do so, and AOL believed that Netscape was capable of eventually making good on its pledge, but the fact remained that Microsoft had already completed a componen-

tized version of Internet Explorer. Case was impressed enough with Internet Explorer 3.0 that when he returned to AOL he told a number of fellow executives that, when it came to AOL's technical considerations, Microsoft perhaps enjoyed an edge over Netscape. Still, the AOL executives saw Navigator as enjoying better brand recognition and demonstrated success in the marketplace.

283. Later in the day on January 18, Case and his team also met with Gates, Chase, and Chase's direct superior, Brad Silverberg, to discuss the business aspects of a potential AOL–Microsoft alliance. At one point during the meeting, Case again told Gates that AOL needed inclusion of its client software in Windows and prominent placement on the Windows desktop if there was to be a closer relationship between the two companies. Gates expressed frustration that Case continued to insist on getting an AOL icon on the Windows desktop in addition to the technology, engineering assistance, and technical support Microsoft was offering AOL. Despite the obvious importance that Case attached to desktop placement, Gates said he would not agree to that condition.

284. A week after the January 18 meeting, Chase and Silverberg met with Gates. They reiterated that, whether Gates liked it or not, an AOL icon already appeared on the desktop of the major OEMs' PCs. Given that fait accompli, they argued, Microsoft would gain much more than it would lose by agreeing to place AOL on the Windows desktop in exchange for AOL's commitment to promote and distribute Internet Explorer. This time, Gates agreed to give AOL some sort of promotion in Windows. He continued to insist, however, that Microsoft not place an AOL icon directly on the Windows desktop. Rather, Gates agreed to include AOL, along with other OLSs, in a generic "Online Services Folder," an icon for which would reside on the desktop. Since MSN enjoyed a branded icon directly on the desktop, including AOL in the OLS folder would maintain its inferior status to Microsoft's service.

285. Still, Gates viewed the concession as a significant one; he understood that it meant undermining MSN's success in the pursuit of browser share. As he told an interviewer in the spring of 1996:

We have had three options for how to use the "Windows Box": First, we can use it for the browser battle, recognizing that our core assets are at risk. Second, we could monetize the box, and sell the real estate to the highest bidder. Or third, we could use the box to sell and promote internally content assets. I recognize that, by choosing to do the first, we have leveled the playing field and reduced our opportunities for competitive advantage with MSN.

286. In light of AOL's success in having gained access to the Windows desktop through the expedient of OEM pre-installation without Microsoft's acquiescence, Gates' abiding reluctance to grant AOL access through Microsoft's front door may have stemmed from a preoccupation with the message such a move would send— both to other firms in the computer industry and to consumers deciding which Internet service to use. Although Gates viewed it as a significant concession, he acquiesced in granting AOL a place in Windows because he believed that Microsoft could not pass up the opportunity AOL presented to drive Internet Explorer's usage share dramatically upward and to exclude Navigator from a substantial part of the IAP distribution channel.

287. The negotiations between Microsoft and AOL proceeded throughout February and early March 1996. On March 11, 1996, AOL announced that it had selected Navigator as the primary Web browsing software for GNN, which was AOL's basic ISP service at the time and had a subscriber base only two to three percent the size of the subscriber base of AOL's flagship online service. The GNN arrangement was thus eclipsed the following day when AOL announced that it had

chosen Internet Explorer as the primary Web browsing software for its flagship service.

288. Under the March 12 agreement, Microsoft gave AOL access to, and the right to modify, Internet Explorer source code in order to customize it for use with AOL's proprietary access software. This concession went far beyond the freedom that the IEAK granted IAPs to place their own branding on Internet Explorer. Microsoft also agreed to provide AOL with significant engineering assistance and technical support to enable AOL to integrate Internet Explorer into AOL's proprietary access software. Further, Microsoft agreed to provide AOL with certain specific features of Internet Explorer 3.0 by precise target dates and to ensure that future versions of its Web browsing software would possess the latest available Internet-related technology features, capabilities, and standards. Finally, Microsoft granted AOL free world-wide distribution rights to Internet Explorer and agreed to distribute AOL's proprietary access software in Windows and to place an AOL icon in the OLS folder on the Windows desktop.

289. In return for Microsoft's commitments, AOL agreed to base the proprietary access software of its flagship online service for Windows and the Mac OS on Internet Explorer 3.0 and to update that software as newer versions of Internet Explorer were released. Another provision in the agreement provided that "AOL and AOL Affiliates will, with respect to Third Party Browsers, exclusively promote, market and distribute, and have promoted, marketed and distributed, Internet Explorer on or for use by subscribers to the AOL Flagship Service." Specifically, AOL agreed to ensure that in successive six-month periods, neither the number of copies of non-Microsoft Web browsing software it shipped (through any sub-channel, including GNN), nor the number of new subscribers accessing AOL (including GNN) with non-Microsoft Web browsing

software, would exceed fifteen percent of the total number of copies of proprietary access software that AOL distributed through any channel (i.e., through the Windows desktop or otherwise). AOL retained the right to distribute non-Microsoft Web browsing software to subscribers who affirmatively requested it, as long as doing so did not did not raise the relevant shipment quotients above fifteen percent. AOL also retained the right to provide a link within its service through which its subscribers could reach a Web site from which they could download a version of Navigator customized for the AOL service. At the same time, however, the agreement prohibited AOL from expressing or implying to subscribers or prospective subscribers that they could use Navigator with AOL. Nor did it allow AOL to include, on its default page or anywhere else, instructions telling subscribers how to reach the Navigator download site. In any event, as the Court has found above, downloading large programs over the Internet involves considerable time, and frequently some frustration, for the average user with average hardware and an analog connection. The prospects were slim that many AOL users (who tend to be novice users with average equipment) would expend the effort to download Navigator when they already had browsing software that worked well with the AOL service. Finally, while the agreement permitted AOL (subject again to the fifteen-percent shipment quotas) to distribute non-Microsoft Web browsing software when requested by third-party providers, distributors, and corporate accounts, it obligated AOL to use all reasonable efforts to cause the third party to distribute that software on its own and to minimize the use of AOL's brand name with the distribution.

290. The Microsoft executives responsible for closing the deal with AOL recognized that AOL had agreed to distribute and promote Internet Explorer to the virtual exclusion of Navigator. Two days after Microsoft signed the agreement with

AOL, Chase sent to Microsoft's executive staff a memorandum answering questions he thought the executives might have about the agreement. One such question was, "I find it hard to believe that AOL is using Internet Explorer as its browser. Are there exceptions?" Chase responded: "Yes the [re] are some but they are pretty remote. An AOL customer could choose to use Navigator and it will be available to be downloaded from the AOL site, though not in a prominent way. There are some circumstances with 3rd party distribution deals where AOL has some limited flexibility. On its GNN service, AOL can do what it wants. But for all intents and purposes it is true, AOL will be moving its 5M customers to a new client integrated with Internet Explorer 3 starting this summer/fall."

291. As with the restrictive provisions in the Referral Server agreements, the provisions in the March 1996 agreement constraining AOL's distribution and promotion of Navigator had no purpose other than maximizing Internet Explorer's usage share at Navigator's expense. Considering that the restrictions applied to AOL's proprietary access software regardless of the sub-channel through which it was distributed, and that Microsoft collected no revenue from Internet Explorer, the restrictions accomplished no efficiency. They affected consumers only by encumbering their ability to choose between competing browsing technologies. In order to gain AOL's acceptance of these restrictions, Microsoft accorded AOL free desktop placement that undermined its own MSN, in which Microsoft had invested hundreds of millions of dollars. Significantly, Microsoft did not waive any of the terms of its agreement with AOL (nor of its agreements with other OLSs) when it waived some of the restrictive provisions in its Referral Server agreements in April 1998. The reason was Microsoft's recognition that holding OLSs, particularly AOL, to exclusive distribution and promotion terms was more important to maximizing

Internet Explorer's usage share than holding ISPs to similar terms.

292. Microsoft closely monitored AOL's compliance with the restrictive provisions in the March 1996 agreement. Microsoft employees periodically inspected AOL's service for any sign of promotions for Netscape. The scrutiny was close enough to prompt an AOL executive to write Microsoft's Chase: "We are not selling NS advertising around its browser or otherwise—let's move on. . . . [I]t is not time to be paranoid. . . ."

293. Ever since the negotiations with Microsoft intensified in early 1996, it had been AOL's intention to select one firm's Web browsing software and then to work closely with that firm to incorporate its browsing technology seamlessly into the AOL flagship client software. Regardless of which software it chose as its primary offering, though, AOL still wanted the ability to satisfy consumer demand for competing Web browsing software. AOL did not want users who preferred a certain brand of Web browsing software to have to go to a competing OLS in order to obtain it. Therefore, even once it selected Internet Explorer as the software that it would integrate seamlessly into its client, AOL would have preferred to make an AOL-configured version of Navigator readily available to subscribers and potential subscribers.

294. Despite its preference, however, AOL did not make Navigator readily available to subscribers after the agreement with Microsoft took effect. To the contrary, AOL made it relatively difficult for new subscribers to obtain a version of Navigator that would work with its client software, and it pressured existing subscribers who used Navigator to abandon it in favor of client software that included Internet Explorer. In essence, AOL contravened its natural inclination to respond to consumer demand in order to obtain the free technology, close technical support, and desktop placement offered by Microsoft.

295. On October 28, 1996, Microsoft and AOL entered into an additional agreement called the Promotional Services Agreement, whereby AOL agreed to promote its new proprietary access software that included Internet Explorer to existing AOL subscribers, and Microsoft agreed to pay AOL for such promotion based on results. Specifically, Microsoft agreed to pay AOL $500,000, plus twenty-five cents (up to one million dollars) for each subscriber who upgraded from older versions of AOL's proprietary access software to the version that included Internet Explorer, plus $600,000 if AOL succeeded in upgrading 5.25 million subscribers by April 1997. In addition, AOL's Referral Server agreement with Microsoft provided that AOL would receive a two-dollar credit on referral fees for each new subscriber who used Internet Explorer. So while the March 12, 1996 agreement ensured that nearly all new AOL subscribers would use Internet Explorer, the Promotional Services and Referral Server agreements enlisted AOL in the effort to convert the OLS's millions of existing subscribers to Internet Explorer. In fulfillment of these agreements, AOL began to prompt its subscribers to download the latest version of its client access software, complete with Internet Explorer, every time they logged off the service.

296. It is not surprising, given the terms of the 1996 agreements between Microsoft and AOL, that the percentage of AOL subscribers using a version of the client software that included Internet Explorer climbed steeply throughout 1997. By January 1998, Cameron Myhrvold was able to report to Gates and the rest of Microsoft's executive committee that ninety-two percent of AOL's subscribers (who by then numbered over ten million) were using client access software that included Internet Explorer. A year earlier, the same type of data had shown that only thirty-four percent of AOL subscribers were using AOL client software that included Internet Explorer. The marked increase resulted in no small part from AOL's efforts to convert its existing subscribers to the newest version of its client software.

297. Even if an AOL subscriber obtains the new client software that includes Internet Explorer, he can still browse the Web using any browsing software, including Navigator, that happened to be installed on his hard drive. It is unlikely that many users will go to this effort, however, given the ease of browsing with the software that comes with AOL's client software. The average AOL user, being perhaps less technically sophisticated than the average IAP subscriber, is particularly unlikely to expend any effort to use browsing software other than that which comes included with the AOL software. AOL, acting pursuant to the provisions of the March 1996 agreement, has not made it easy for its subscribers to locate, download, and install a version of Navigator configured for its service. Consequently, those AOL subscribers who did not already have Navigator on their systems by the time that agreement took effect were even less likely to use Navigator.

298. So when Microsoft executives learned that ninety-two percent of AOL subscribers were using client software that included Internet Explorer, they could rest assured that virtually the same percentage of AOL's subscribers were using Internet Explorer whenever they connected to the Internet with AOL. In fact, an examination of the "hit" data collected by AdKnowledge indicates that as of early 1999, only twelve percent of AOL subscribers were using Navigator when they browsed the Web (see Section V.H. 1., infra, for a description of the method by which AdKnowledge collects data). AOL (and its CompuServe subsidiary), in turn, accounted for a very large percentage of all IAP subscribers. In fact, according to data Microsoft collected and used internally, AOL and CompuServe accounted for sixty-five percent of the combined subscriber base of the top eighty IAPs in late 1997. It is thus a

reasonable deduction that the restrictive terms Microsoft induced AOL to accept in 1996 pre-empted a substantial part of the IAP channel for Internet Explorer.

299. On November 24, 1998, AOL and Netscape agreed that AOL would acquire Netscape for 4.3 billion dollars' worth of AOL stock. In a related transaction, AOL entered into a three-year strategic alliance with Sun, pursuant to which Sun would develop and market both its and Netscape's server software and would manage the companies' joint efforts in the area of electronic commerce. AOL purchased Netscape not just for its browsing technology, but also for its electronic commerce business, its portal site, its brand recognition, and its talented work force. To the extent AOL was paying for Netscape's browser business, its primary goal was not to compete for user share against Internet Explorer. Rather, AOL was interested in Navigator to the extent that it drove Web traffic to Netscape's popular portal site, NetCenter. AOL was also interested in ensuring that an alternative to Internet Explorer remained viable; it wanted the option of dropping Internet Explorer to retain enough vitality so that it would not be at the mercy of Microsoft for software upon which the success of its online service largely depended. Finally, AOL was interested in keeping Navigator alive in order to ensure that Microsoft did not gain total control over Internet standards.

300. AOL had the right under its agreement with Microsoft to terminate the distribution and promotion provisions relating to Internet Explorer on December 31, 1998. If AOL had decided to terminate those provisions, the March 1996 agreement would otherwise have remained in effect, and AOL could have continued to base its proprietary access software on Internet Explorer, taking advantage of Microsoft's engineering and technical support. Microsoft, however, would have had the option of removing AOL from the OLS folder. What is more, Chase informed AOL that Microsoft might react to AOL's termination of the restrictive provisions by discontinuing the OLS folder altogether, which would have disadvantaged the AOL's subsidiary OLS, CompuServe, which also enjoyed a place in the OLS folder.

301. Despite its acquisition of Netscape, AOL did not exercise its right to terminate the exclusivity provisions of its agreement with Microsoft at the end of 1998. AOL executives made the reasons clear to AOL's board of directors on November 17, 1998, when they presented the Netscape/Sun transactions for the board's approval. They wrote:

> In exchange for using IE as our primary browser component, Microsoft bundles [AOL] in the "Online Services Folder" on the Windows desktop. This is an important, valued source of new customers for us, and therefore something we are inclined to continue. Microsoft has made it clear that they will not continue to include us in Windows if we don't agree to continue our "virtual exclusivity" provisions for use of IE within [AOL].... There are benefits to [Netscape] of replacing IE with the [Netscape] browser—it would dramatically shift browser market share (from about 50/50 today to 65/35 in favor of [Netscape]). However, our present intent is to continue with IE, partly to get the continued marketing benefits of Windows bundling, and partly to maximize the likelihood of continued "detente" with Microsoft.

By not exercising its right to terminate the "virtual exclusivity" provisions in the agreement with Microsoft, AOL commited itself to abide by those restrictions until January 1, 2001.

302. AOL does not believe that it must make every possible use of Netscape's browsing software, and maximize Navigator's usage share, in order to justify its purchase of Netscape. Now that AOL has the capability to produce its own state-of-the-art componentized browsing software, however, the fact remains that, of the vari-

ous advantages Microsoft currently offers AOL in exchange for its agreement to distribute and promote Internet Explorer with near exclusivity, the only one likely to still be of great value to AOL at the beginning of the new millennium is the inclusion of AOL's client software, and the promotion of its service, within Windows. Assuming Microsoft continues to offer that placement to AOL after January 1, 2001, the extent to which AOL continues to distribute and promote Internet Explorer to the exclusion of other browsing software will depend largely on the value that AOL assigns to that placement and to any new forms of consideration Microsoft offers. With respect to the value of placement in the OLS folder, AOL registered approximately 970,000 new subscribers through the OLS folder in the fiscal year ending in June 1998. This represented eleven percent of the new subscriptions AOL gained that year, and it was enough to prompt AOL executives in November 1998 to describe the OLS folder to the AOL board as an "important, valued source of new customers for us."

303. If AOL were to halt its distribution and promotion of Internet Explorer, the effect on Internet Explorer's usage share would be significant, for AOL's subscribers currently account for over one third of Internet Explorer's installed base. But even if AOL stops distributing Internet Explorer after January 1, 2001 and updates its entire subscriber base to client software that includes its own or some other proprietary browsing software, Microsoft will still have ensured that, over the preceding four years (AOL subscribers began using proprietary access software based on Internet Explorer in November 1996), a very large majority of AOL subscribers used Internet Explorer whenever they browsed the Web through the AOL service. This period is significantly longer than the two years Gates thought AOL's obligations would have to last in order for the deal to be worthwhile to Microsoft.

304. AOL's subscribers now number sixteen million, and a substantial part of all Web browsing is done through AOL's service. By granting AOL valuable desktop real estate (to MSN's detriment) and other valuable consideration, Microsoft succeeded in capturing for Internet Explorer, and holding for a minimum of four years, one of the single most important channels for the distribution of browsing software. Starting the day Microsoft announced the March 1996 agreement with AOL, and lasting at least until AOL announced its acquisition of Netscape in November 1998, developers had reason to look into the foreseeable future and see that non-Microsoft software would not attain stature as the standard platform for network-centric applications. Microsoft exploited that interval to enhance dependence among developers on Microsoft's proprietary interfaces for network-centric applications—dependence that will continue to inure to Microsoft's benefit even if AOL stops distributing Internet Explorer in the future. The AOL coup, which Microsoft accomplished only at tremendous expense to itself and considerable deprivation of consumers' freedom of choice, thus contributed to extinguishing the threat that Navigator posed to the applications barrier to entry.

#### ii. Other Online Services

305. In the summer and fall of 1996, Microsoft entered into agreements with three other OLSs, namely, AT & T WorldNet, Prodigy, and AOL's subsidiary, CompuServe. The provisions of these agreements were substantially the same as those contained in the March 1996 agreement between Microsoft and AOL. As with the AOL agreement, Microsoft did not deign to waive the restrictive terms in these OLS agreements when it waived similar terms in the Referral Server agreements in the spring of 1998. The OLSs were discontented with the provisions that limited their ability to distribute and promote non-Microsoft browsing software. Prodigy, for one, found those provi-

sions objectionable and tried, unsuccessfully, to convince Microsoft to make the terms less restrictive. AT & T World-Net's negotiator also told his Microsoft counterpart, Brad Silverberg, that AT & T wanted to remain neutral as to browsing software. Despite their reservations, the OLSs accepted Microsoft's terms because they saw placement in the OLS folder as crucial, and Microsoft made clear that it would only accord such placement to OLSs that agreed to give Internet Explorer exclusive, or at least extremely preferential, treatment. As one Microsoft negotiator reported to Chase about AT & T World-Net, "It's very clear that they really really want to be in the Windows box." The OLSs became even more desperate for inclusion in the OLS folder once it was announced that their largest competitor, AOL, had already won placement there. One Prodigy executive wrote to another two weeks after his company signed the agreement with Microsoft, "it was absolutely critical to Prodigy's business" and "essential in order to remain competitive" that Prodigy obtain Microsoft's agreement to include the Prodigy Internet service icon in the OLS folder.

306. Although none of these OLSs possessed subscriber bases approaching AOL's, they comprised, along with MSN, the most significant OLSs other than AOL. By making arrangements with them similar to the one it enjoyed with AOL, Microsoft ensured that, for as long as the agreements remained in effect, the overwhelming majority of OLS subscribers would use Internet Explorer whenever they accessed the Internet. Since AOL owns CompuServe, the acquisition of Netscape may affect CompuServe's arrangement with Microsoft in the future; however, the acquisition does not alter the incentives for the other OLSs to enter new agreements with Microsoft similar to the ones signed in 1996.

#### d. Effect of Microsoft's Actions in the IAP Channel

307. As described above, Microsoft gave valuable consideration at no charge to IAPs that agreed to distribute and promote a product that brought no revenue to Microsoft. By tendering additional valuable perquisites (at the cost of lost revenue), Microsoft induced IAPs to restrict drastically their distribution and promotion of Navigator. With the offer of still other concessions, Microsoft induced IAPs to turn subscribers already using Navigator into Internet Explorer users.

308. As Microsoft hoped and anticipated, the inducements it gave out gratis, as well as the restrictive conditions it tied to those inducements, had, and continue to have, a substantial exclusionary impact. First, many more copies of Internet Explorer have been distributed, and many more IAPs have standardized on Internet Explorer, than would have been the case if Microsoft had not invested great sums, and sacrificed potential sources of revenue, with the sole purpose of protecting the applications barrier to entry. Second, the restrictive terms in the agreements have prevented IAPs from meeting consumer demand for copies of non-Microsoft browsing software pre-configured for those services. The IAPs subject to the most severe restrictions comprise fourteen of the top fifteen access providers in North America and account for a large majority of all Internet access subscriptions in this part of the world.

309. Not surprisingly, the inducements that Microsoft gave out and the restrictions it conditioned them upon have resulted in a substantial increase in Internet Explorer's usage share. A study Microsoft conducted shows that at the end of 1997, Internet Explorer enjoyed a ninety-four percent weighted average share of shipments of browsing software by ISPs that had agreed to make Internet Explorer their default browser. By contrast, the study shows that Internet Explorer had only a fourteen percent weighted average share of shipments of browsing software by ISPs that had not agreed to make Internet Explorer their default browser.

The same study shows that Microsoft's weighted average share of browser usage by subscribers to ISPs that had made Internet Explorer their default browser was over sixty percent at the end of 1997, whereas its weighted average share of browser usage by subscribers to ISPs that did not make Internet Explorer their default browser was less than twenty percent.

310. An appropriate use of the Ad-Knowledge hit data shows the difference in Internet Explorer's success among categories of IAPs subject to different levels of distribution and promotion restrictions (see Section V.H. 1., infra, for a description of the method by which AdKnowledge collects data). One category was hits originating from subscribers to IAPs that, according to a chart prepared by Microsoft for its internal use, were not subject to any distribution or promotion restrictions. Another category was hits originating from subscribers to any IAP. A third category was hits originating from subscribers to AOL and CompuServe. The hit data show that, from January 1997 to August 1998, Internet Explorer's usage share among subscribers to IAPs that were uninhibited by restrictions rose ten points, from about twenty to about thirty percent. Over the same period, Internet Explorer's usage share among all IAP subscribers, including those subject to restrictions, rose twenty-seven points, from twenty-two to forty-nine percent. Finally, Internet's Explorer's usage share among subscribers to two IAPs subject to the most severe restrictions, AOL and CompuServe, rose sixty-five points, from twenty-two to eighty-seven percent. The differences in the degree of Internet Explorer's success in the three categories reveal the exclusionary effect of Microsoft's interdiction of Navigator in the IAP channel.

### 4. Inducing ICPs to Enhance Internet Explorer's Usage Share at Navigator's Expense

311. ICPs create the content that fills the pages that make up the Web. Because this content can include advertisements and links to download sites, ICPs also provide a channel for the promotion and distribution of Web browsing software. Executives at Microsoft recognized that ICPs were not nearly as important a distribution channel for browsing software as OEMs and IAPs. Nevertheless, protecting the applications barrier to entry was of such high priority at Microsoft that its senior executives were willing to invest significant resources to enlist even ICPs in the effort. Executives at Microsoft determined that ICPs could aid Microsoft's browser campaign in three ways. First, ICPs could help build Internet Explorer's usage share by featuring advertisements and links for Internet Explorer, to the exclusion of non-Microsoft browsing software, on their Web pages. Second, those ICPs that distributed software as well as content could bundle Internet Explorer, instead of Navigator, with those distributions. Finally, ICPs could increase demand for Internet Explorer, and decrease demand for Navigator, by creating their content with Microsoft technologies, such as ActiveX, that would make the content more appealing in appearance when accessed with Internet Explorer.

312. As early as the fall of 1995, Microsoft executives saw that they could help reinforce the applications barrier to entry by inducing the leading ICPs to focus on Microsoft's browsing technologies. In the October 1995 memorandum that Microsoft executives sent to Gates on Microsoft's browser campaign, one of the suggestions was, "Get 80% of Top Web Sites to Target Our Client." Specifically, the executives wrote:

> Content drives browser adoption, and we need to go to the top five sites and ask them, "What can we do to get you to adopt IE?" We should be prepared to write a check, buy sites, or add features—basically do whatever it takes to drive adoption.

313. By the middle of 1996, this proposal had become corporate policy. Senior

executives at Microsoft believed that inducing the ICPs responsible for the most popular Web sites to concentrate their distributional, promotional, and technical efforts on Internet Explorer to the exclusion of Navigator would contribute significantly to maximizing Internet Explorer's usage share at Navigator's expense. When Microsoft began, in late 1996, to enlist the aid of the most popular ICPs, it used an inducement that it had already successfully employed with the top IAPs: Microsoft created an area on the ubiquitous Windows billboard for the promotion of ICPs and then exchanged placement in that area at no charge for the commitment of important ICPs to promote and distribute Internet Explorer exclusively and to create their content with technologies that would make it appear optimally when viewed with Internet Explorer. Microsoft executives referred to this tactic as "strategic barter." As was the case with the IAPs, neither the sacrifice that Microsoft made to enlist the aid of the top ICPs nor the restrictions it placed on them can be explained except as components of a campaign to protect the applications barrier to entry against Navigator.

314. The Active Desktop was a Microsoft feature that, if enabled, allowed the Windows user to position Web pages as open windows that appear on the background, or "wallpaper" of the Windows desktop. If the Web pages featured "push" technology, they would automatically update themselves by downloading information from their respective servers at times scheduled by the user. Thus, a user could position on his desktop wallpaper Web pages that displayed periodically updated stock prices, sports scores, and news headlines. The Channel Bar was a feature of the Active Desktop. If enabled, the Channel Bar appeared as a rectangular graphic on the desktop wallpaper. It was divided into pre-configured links to the Web sites of certain ICPs that implemented push technology. Microsoft introduced the Active Desktop, including the Channel Bar, as a feature of Internet Explorer 4.0, which it released on September 30, 1997.

315. As pre-configured by Microsoft, the top channel on the Channel Bar linked to a Microsoft Web site, called the "Active Channel Guide," that provided a list of sites enabled with push technology. The next five channels were each labeled with a generic category such as "News & Technology" or "Business." Clicking on one of these five channels brought up a display of icons for specific Web sites. For example, clicking on the "Sports" channel brought up a display including icons for sports-related Web sites such as ESPN SportsZone and CNN SI. Below the five generic category channels were branded ones, each of which would link the user directly to a specific ICP's Web site.

316. Considering how ICPs generate revenue, it is not surprising that they attached great value to placement on the Channel Bar. Most ICPs charge fees for placing advertisements on their Web pages. In addition, some ICPs display certain of their content only to users who pay a fee. The higher the volume of user traffic an ICP's site attracts, the higher the rates it can charge for the placement of advertising on its sites. Higher volume also brings increased revenue to ICPs that charge users for content. Microsoft pre-configured Internet Explorer 4.0 so that the Active desktop and the Channel Bar would appear by default on a user's Windows 95 PC system, and Microsoft forbade OEMs to disable either feature. Microsoft and the ICPs consequently surmised that a very high volume of user traffic would be driven to the Web sites for which channels appeared on the Channel Bar. Intuit, for one, believed that placement on the Windows desktop would provide it with unparalleled promotional and distributional advantages. As a result, the company was prepared to pay a substantial fee for placement on the Channel Bar. The managers of ZDNet felt the same way, as did the executives responsible for Disney's Inter-

net content. Some ICPs, including Intuit, even admitted to Microsoft that inclusion on the Channel Bar was critical to them and asked what they would be obliged to pay to be included.

317. Based on the interest ICPs expressed, as well as Microsoft's own assessment of the value of placement on the Channel Bar, executives at Microsoft considered charging ICPs for inclusion on the Channel Bar. They estimated that ICPs appearing directly on the Channel Bar would pay as much as $10 million per year, and that even ICPs appearing under the generic channels would pay a couple of million dollars each annually. These estimates proved to comport well with the value that ICPs themselves actually attached to inclusion in the Channel Bar, at least before the feature had been tested in the marketplace. For example, in December 1996, more than nine months before the Active Desktop made its debut, Microsoft signed an agreement with PointCast pursuant to which PointCast agreed to pay $ 10 million for the first year that its channel would appear directly on the Channel Bar.

318. Following the signing of its agreement with PointCast, Microsoft proceeded to enter similar "Top Tier" or "Platinum" agreements with twenty-three other ICPs, all in the summer and early fall of 1997. Microsoft used the term "Top Tier" to refer to the four non-Microsoft ICPs (including PointCast) given placement directly on the Channel Bar and the term "Platinum" to describe the twenty ICPs included in the five generic categories accessible from the Channel Bar. Although the agreements were individually negotiated and their terms varied to some extent, the typical agreement obligated Microsoft to promote the ICP's business in three ways. First, Microsoft agreed to include on the Channel Bar (or in one of the lists accessible directly from the Channel Bar) a link that would send a user directly to the ICP's "push" site. Second, Microsoft agreed to promote the ICP's content in national public-relations and computer-industry events, as well as on Microsoft Web sites. Finally, Microsoft agreed to include introductory content from the ICP with certain distributions of Windows and Internet Explorer.

319. The agreements did not obligate the Top Tier and Platinum ICPs to pay money to Microsoft in exchange for any of the benefits, including placement on the Windows desktop, that Microsoft extended to them. Rather, the agreements obligated the ICPs to compensate Microsoft in other ways. Although the agreement that PointCast signed purported to call for a payment of ten million dollars to Microsoft, it entitled PointCast to a discount on the full amount if it behaved as other ICPs undertook to do in their own Top Tier and Platinum agreements with Microsoft.

320. The first obligation that the ICPs undertook was to distribute Internet Explorer and no "Other Browser" in connection with any custom Web browsing software or CD–ROM content that they might offer. The term "Other Browser" was defined in the agreements as Web browsing software that ranked first or second by organizations in the business of measuring the usage of browsing software. This obligation was pertinent only to the six Top Tier and Platinum ICPs that distributed Web browsing software during the term of the agreements: PointCast, CNet, Intuit, AOL, Disney, and National Geographic.

321. The Top Tier and Platinum agreements also required the signatory ICPs to promote Internet Explorer and no "Other Browser" as their "browser of choice." In particular, the ICPs were required to display a logo for Internet Explorer and no "Other Browser" on the home page of the sites specified in the agreements and on any other pages on which the ICP typically displayed such links. The ICPs were also required to place Internet Explorer download links on their Web sites and to remove any links to Navigator's download site. Aggregating the Web sites offered by the twenty-four Top Tier and Platinum

ICPs, the number of Web sites affected by this provision was thirty-one.

322. A third provision that the ICPs accepted in return for placement on the Channel Bar was a prohibition against their entering agreements with a vendor of an "Other Browser" whereby the ICPs would pay money or provide other consideration to the vendor in exchange for the vendor's promotion of the ICP's branded content. Finally, the agreements required the ICPs, in designing their Web sites, to employ certain Microsoft technologies such as Dynamic HTML and ActiveX. Some of the agreements actually required the ICPs to create "differentiated content" that was either available only to Internet Explorer users or would be more attractive when viewed with Internet Explorer than with any "Other Browser." For example, the agreement with Intuit provided: "Some differentiated content may be available only to IE users, some may simply be 'best when used with IE,' with acceptable degradation when used with other browsers."

323. The ICPs were so intent on gaining placement on the Channel Bar that they even complied, albeit reluctantly, when Microsoft imposed restrictions not contained in the Top Tier and Platinum agreements. For example, Microsoft demanded that Disney remove its distinctive branding from its link on Navigator's user interface and threatened to remove Disney from the Channel Bar if it did not accede. Executives at Disney believed that such a requirement went beyond the language of the Top Tier agreement that Disney had signed with Microsoft, but they saw no recourse in making an issue of the matter, for Microsoft could keep the Disney icon off the Channel Bar during the pendency of the dispute, and Microsoft would be less amenable to promotional opportunities for Disney in the future. Therefore, Disney capitulated. In a similar fashion, a Microsoft employee told a counterpart at Wired Digital that even if the agreement between the companies did not technically prohibit it, Wired Digital would be violating the spirit of its agreement if it placed a link to any of its subsidiary sites on Navigator's user interface. What Microsoft wanted to avoid were announcements suggesting that any of Microsoft's ICP partners were also cooperating with Netscape.

324. Intuit is a leading developer of software designed to help individuals and small businesses manage their finances. A consumer can use one of Intuit's popular products by purchasing a copy of the software, but Intuit makes additional features available through its Quicken.com Web site. Thus, Intuit is both an ISV and an ICP. Beginning in late 1995, Intuit distributed Navigator with its products in order to ensure that its users could access the features provided through Quicken.com. In 1996, Microsoft commenced the process of converting Intuit from a Netscape partner to a distributor of Internet Explorer. In July of that year, Gates reported to other Microsoft executives on his attempt to convince Intuit's CEO to distribute Internet Explorer instead of Navigator:

> I made it clear to him that beyond giving him the best browser technology for no cost that we were only will[ing] to do some very modest favors in addition to that.... I was quite frank with him that if he had a favor we could do for him that would cost us something like $1M to do that in return for switching browsers in the next few months I would be open to doing that.

325. Intuit did not accept Gates' offer immediately, but less than a year later, in June 1997, Intuit became one of the ICPs to sign a Platinum agreement with Microsoft. This allowed Intuit to place a link to Quicken.com under the "Business" heading on Microsoft's Channel Bar. In return, however, the agreement required Intuit to distribute Internet Explorer, and no "Other Browser," with its software products, including those not distributed through the Channel Bar. Intuit also agreed to the other terms, relating to the promotion of browsing technologies, business relationships with Netscape, and the adoption of

Internet Explorer technologies, that applied to the other Top Tier and Platinum ICPs.

326. Microsoft would have granted Intuit a license to distribute the componentized version of Internet Explorer at no charge even if Intuit had not entered a Platinum Agreement. In the absence of the agreement's restrictive terms, in fact, Intuit likely would have distributed the componentized version of Internet Explorer with its products while simultaneously promoting Navigator and distributing to consumers who requested it a version of Navigator specially-configured for Intuit's products. The only way Intuit could gain a place on the Channel Bar, however, was by agreeing to the provisions that required it to limit its promotion of Navigator, to cease distributing that browser altogether, and to refuse to pay Netscape to promote Intuit products on Netscape's Web sites. Intuit accepted these terms reluctantly, for Navigator remained a popular product with consumers, and Netscape's Web sites still attracted a great deal of traffic.

327. In addition to the Top Tier and Platinum agreements, Microsoft entered into two other types of agreements with ICPs. First, Microsoft signed so-called "Gold" agreements with between thirty and fifty ICPs. Pursuant to these agreements, Microsoft included ICPs in the "Active Channel Guide" Web site, which appeared whenever a Windows user clicked on the top link on the Channel Bar. In exchange for this promotion, the Gold-agreement ICPs agreed to promote Internet Explorer on at least equal footing with other browsing technology, including Navigator.

328. Second, Microsoft entered into IEAK agreements with between eight and twelve ICPs devoted to business-related content. Under the typical IEAK agreement, Microsoft agreed to include functionality in the IEAK that would facilitate the inclusion of a link to the ICP's Web site under the "Business" category of the Channel Bar. In exchange, the ICPs committed to distributing Internet Explorer exclusively (to the extent they distributed any browsing software), to promote Internet Explorer as their "browser software of choice," to refrain from promoting any "Other Browser" (defined as in the other ICP agreements) on their Web sites, and to create content that could be accessed optimally only with Internet Explorer.

329. Cross-marketing arrangements in competitive markets do not necessarily make those markets less competitive; however, four characteristics distinguish this case from situations in which such agreements are benign. First, Microsoft was able to offer ICPs an asset whose value competitors could not hope, on account of Microsoft's monopoly power, to match. Second, Microsoft bartered that asset not to increase demand for a revenue-generating product, but rather to suppress the distribution and diminish the attractiveness of technology that Microsoft saw as a potential threat to its monopoly power. Third, and more specifically, Microsoft prohibited the ICPs from compensating Netscape for promotion of their products even while not attempting to prohibit the promotion itself. This reveals that Microsoft's motivation was not simply a desire to generate brand associations with Internet Explorer. Finally, Microsoft went beyond encouraging ICPs to take advantage of innovations in Microsoft's technology, explicitly requiring them to ensure that their content appeared degraded when viewed with Navigator rather than Internet Explorer. Microsoft's desire to lower demand for Navigator was thus independent of, and far more malevolent than, a simple desire to increase demand for Internet Explorer.

330. The terms of Microsoft's agreements with ICPs cannot be explained in customary economic parlance absent Microsoft's obsession with obliterating the threat that Navigator posed to the applications barrier to entry. Absent that obsession, Microsoft would not have given ICPs at no charge licenses to distribute Internet

Explorer. What is more, Microsoft would not have incurred the cost of componentizing Internet Explorer and then licensed that version to Intuit at no charge. By sacrificing opportunities to cover its costs and even make a profit, Microsoft advanced its strategic goal of maximizing Internet Explorer's usage share at Navigator's expense. Whereas Microsoft might have developed the Channel Bar without ulterior motive as a matter of product improvement, it would not have exchanged placement on the Channel Bar for terms as highly and broadly restrictive as the ones it actually extracted from ICPs. Nevertheless, and to Microsoft's dismay, circumstances prevented these restrictions from having a large impact on the relative usage shares of Internet Explorer and Navigator.

331. Despite Microsoft's and the ICPs' expectations to the contrary, consumers showed little interest in the Channel Bar, or in the Active Desktop in general, when the features debuted in the fall of 1997. Moreover, reviews of the Channel Bar in computer-related publications were generally unfavorable. The Channel Bar may not have attracted consumer interest, but the ICP agreements relating to the Channel Bar did attract controversy. Indeed, Gates faced pointed questions about them when he appeared before the Senate Judiciary Committee in March 1998. Microsoft took several measures to quell the public criticism in early April 1998. First, it waived the most restrictive terms in the Top Tier and Platinum agreements; thereafter, the agreements required ICPs merely to promote Internet Explorer in a manner at least equal to their promotion of Navigator. Second, Microsoft made no attempt to renew the Gold and IEAK agreements, which had expired by their own terms in March 1998. Third, Microsoft authorized its OEM licensees to configure the Windows 98 desktop so that the Channel Bar would not appear by default, and nearly every major OEM availed itself of the permission. Deeming the Channel Bar more trouble than it was worth, Mi-

crosoft decided to eliminate the feature entirely from future versions of Windows, including Windows 98 updates. Therefore, the provisions requiring ICPs to exclusively distribute and promote Internet Explorer had all expired within seven months of the Channel Bar's release. All of the Top Tier and Platinum agreements had expired by their own terms by December 31, 1998. In light of its decision to discontinue the Channel Bar, Microsoft did not seek to renew any of them.

332. For a period of about eight months, however, agreements with Microsoft had prohibited approximately thirty-four ICPs from distributing Navigator and from promoting Navigator in all but a few ways. For an overlapping period of between a year and a year-and-a-half, those thirty-four ICPs, plus between thirty and fifty more, were required to promote Internet Explorer at least as prominently as they promoted Navigator. Although the affected Web sites made up only a tiny percentage of those existing on the Web, they comprised the offerings of all but a few of the most popular ICPs. If the estimation of one Microsoft employee in June 1996 can be considered accurate, the affected ICPs accounted for a significant percentage of the Web traffic in North America. Still, there is not sufficient evidence to support a finding that Microsoft's promotional restrictions actually had a substantial, deleterious impact on Navigator's usage share. For one thing, only six of the affected ICPs distributed any Web browsing software bundled with their products during the period in which Microsoft's distributional restrictions remained in effect. AOL obviously distributed a substantial volume of Web browsing software during this period, but since AOL was separately precluded under its Online Services Folder agreement from distributing virtually any non-Microsoft browsing software, AOL would not have distributed a significant number of Navigator copies even if it had not entered a Top Tier agreement with Microsoft.

333. Pursuant to its agreement with Microsoft, Intuit distributed over five million copies of Internet Explorer with the 1998 versions of its products. Microsoft had offered Intuit a componentized browser while Netscape had not, and it stands to reason that Intuit would in all probability have distributed close to the same number of Internet Explorer copies even absent the distributional restrictions imposed by its contract. Still, Intuit had distributed over five million copies of Navigator with the 1997 versions of its products. Unconstrained by its agreement with Microsoft, Intuit might have distributed with its 1998 products a sum approaching that number of Navigator copies along with the componentized version of Internet Explorer (particularly if the CD–ROM represented its primary distribution vehicle). Of the affected ICPs (excluding AOL), Intuit almost certainly distributed the most Web browsing software bundled with its products.

334. All of the Top Tier, Platinum, and IEAK ICPs were capable of including download links on their Web pages. While many of these ICPs had included such links for Navigator prior to entering agreements with Microsoft, only Internet Explorer download links were allowed while the restrictive terms were in effect. On the whole, it is reasonable to deduce from the evidence that the restrictions Microsoft imposed on ICPs prevented the distribution and installation of a significant quantity, but certainly less than ten million, copies of Navigator.

335. The terms Microsoft imposed did prevent a number of the ICPs otherwise inclined to do so from compensating Netscape for its promotion of the ICPs' content in Navigator or on Netscape's Web sites. While they were in effect, Microsoft's restrictions probably deprived Netscape of revenue measured in millions of dollars, but nowhere near $100 million.

336. It appears that, at the time the obligation expired, Microsoft had not yet begun to enforce its requirement that the Top Tier, Platinum, and IEAK ICPs develop content that would appear more attractive when viewed with Internet Explorer than when viewed with Navigator. Moreover, there is no evidence that any ICP other than Disney developed any "differentiated content" in response to its agreement with Microsoft. Therefore, there is insufficient evidence to find that the requirements that Microsoft sought to impose with respect to the use of Microsoft-specific browsing technologies had any discernible, deleterious impact on Navigator's usage share.

## 5. Directly Inducing ISVs to Rely on Microsoft's Browsing Technologies Rather than APIs Exposed by Navigator

337. Since 1995, more and more ISVs have, like Intuit, enhanced the features of their applications by designing them to take advantage of the type of content and functionality accessible through browsing software. An increasing number of these applications actually rely on browsing software to function. Microsoft's efforts to maximize Internet Explorer's share of browser usage at Navigator's expense were intended to encourage developers to use Windows-specific technologies when they wrote their applications to rely on a browser. In addition to creating this incentive indirectly, by disadvantaging Navigator, Microsoft also targeted individual ISVs directly, extracting from them commitments to make their Web-centric applications reliant on technology specific to Internet Explorer.

338. Because of the importance of "time-to-market" in the software industry, ISVs developing software to run on Windows products seek to obtain beta releases and other technical information relating to Windows as early and as consistently as possible. Since Microsoft decides which ISVs receive betas and other technical support, and when they will receive it, the ability of an ISV to compete in the marketplace for software running on Windows products is highly dependent on Micro-

soft's cooperation. Netscape learned this lesson in 1995.

339. In dozens of "First Wave" agreements signed between the fall of 1997 and the spring of 1998, Microsoft has promised to give preferential support, in the form of early Windows 98 and Windows NT betas, other technical information, and the right to use certain Microsoft seals of approval, to important ISVs that agree to certain conditions. One of these conditions is that the ISVs use Internet Explorer as the default browsing software for any software they develop with a hypertext-based user interface. Another condition is that the ISVs use Microsoft's "HTML Help," which is accessible only with Internet Explorer, to implement their applications' help systems.

340. By exchanging its vital support for the agreement of leading ISVs to make Internet Explorer the default browsing software on which their products rely, Microsoft has ensured that many of the most popular Web-centric applications will rely on browsing technologies found only in Windows and has increased the likelihood that the millions of consumers using these products will use Internet Explorer rather than Navigator. Microsoft's relations with ISVs thus represent another area in which it has applied its monopoly power to the task of protecting the applications barrier to entry.

### 6. Foreclosing Apple as a Distribution Channel for Navigator

341. In the summer of 1995, Microsoft had been willing to cede to Netscape the development of browsing software for the Mac OS, provided that Netscape would stop competing with the platform-level browsing technologies that Microsoft was developing for its 32–bit Windows products. The genesis of this offer had been Microsoft's belief that Netscape could never become the leading platform for network-centric software development if it did not distribute a middleware layer for the soon-to-be dominant 32–bit Windows platform. But once Netscape confirmed its determination to offer a middleware layer that would expose the same set of APIs on Windows, the Mac OS, and other platforms, Microsoft recognized that it needed to stifle the attention that developers would be inclined to devote to those APIs, even when the they rested on top of a non-Windows platform like the Mac OS. After all, if Navigator became so popular on the Mac OS that developers made extensive use of the APIs exposed by that version of Navigator, those developers would be disposed to take advantage of identical APIs exposed by the version of Navigator written for the dominant platform, Windows. Microsoft therefore set out to convince developers that applications relying on APIs exposed by Navigator would not reach as many Mac OS users as applications that invoked platform technologies found exclusively in Windows. Therefore, Microsoft set out to recruit Mac OS users to Internet Explorer, and to minimize Navigator's usage share among Mac OS users.

342. Just as pre-installation and promotion by OEMs is one of the most effective means of raising the usage share of browsing software among users of Intel-compatible PC systems, pre-installation and promotion by Apple is one of the most effective means of raising the usage share of browsing software among the users of Apple PC systems. Recognizing this, Bill Gates consistently urged Microsoft executives to persuade Apple to pre-install the Mac OS version of Internet Explorer on its PC systems and to feature it more prominently than the Mac OS version of Navigator.

343. By the summer of 1996, Apple was already shipping Internet Explorer with the Mac OS, but it was pre-installing Navigator as the default browsing software. After a meeting with Apple in June 1996, Gates wrote to some of his top executives: "I have 2 key goals in investing in the Apple relationship—1) Maintain our applications share on the platform and 2) See if we can get them to embrace Internet Ex-

plorer in some way." Later in the same message, Gates expressed his desire that Apple "agree to immediately ship IE on all their systems as the standard browser."

344. One point of leverage that Microsoft held over Apple was the fact that ninety percent of Mac OS users running a suite of office productivity applications had adopted Microsoft's Mac Office. In 1997, Apple's business was in steep decline, and many doubted that the company would survive much longer. Observing Apple's poor performance in the marketplace and its dismal prospects for the future, many ISVs questioned the wisdom of continuing to spend time and money developing applications for the Mac OS. Had Microsoft announced in the midst of this atmosphere that it was ceasing to develop new versions of Mac Office, a great number of ISVs, customers, developers, and investors would have interpreted the announcement as Apple's death notice.

345. Recognizing the importance of Mac Office to Apple's survival, Microsoft threatened to cancel the product unless Apple compromised on a number of outstanding issues between the companies. One of these issues was the extent to which Apple distributed and promoted Internet Explorer, as opposed to Navigator, with the Mac OS.

346. At the end of June 1997, the Microsoft executive in charge of Mac Office, Ben Waldman, sent a message to Gates and Microsoft's Chief Financial Officer, Greg Maffei. The message reflected Waldman's understanding that Microsoft was threatening to cancel Mac Office:

The pace of our discussions with Apple as well as their recent unsatisfactory response have certainly frustrated a lot of people at Microsoft. The threat to cancel Mac Office 97 is certainly the strongest bargaining point we have, as doing so will do a great deal of harm to Apple immediately. I also believe that Apple is taking this threat pretty seriously.... 347. Waldman was actually an advocate for releasing Mac Office 97

promptly, and he pressed for that outcome in his message to Gates and Maffei. Although they applauded Waldman's devotion to the product, Gates and Maffei made clear that the threat of canceling Mac Office was too valuable a source of leverage to give up before Microsoft had extracted acceptable concessions from Apple. Maffei wrote Waldman, "Ben—great mail, but [we] need a way to push these guys and this is the only one that seems to make them move." In his response to Waldman, Gates asked whether Microsoft could conceal from Apple in the coming month the fact that Microsoft was almost finished developing of Mac Office 97.

348. In order to assure his superiors that he was pursuing corporate policy despite his personal convictions, Waldman reported to Maffei in his June 1997 message that he had recently told his counterpart at Apple that Maffei "would be recommending to Bill [Gates] that we cancel Mac Office 97." Waldman believed that his counterpart "got the message that we would, in fact, cancel." Waldman went on to write that when his counterpart had asked what specific problems Microsoft had with Apple's recent response to Microsoft's proposals, Waldman had replied by mentioning four issues, including "IE equal access." By that, Waldman meant Microsoft's demand that the Mac OS make Internet Explorer just as available to its users as it made Navigator. According to Waldman, the Apple employee had responded that Apple would not be able to change the Mac OS's default browser from Navigator until it released the next version of the operating system product in the summer of 1998.

349. A few days after the exchange with Waldman, Gates informed those Microsoft executives most closely involved in the negotiations with Apple that the discussions "have not been going well at all." One of the several reasons for this, Gates wrote, was that "Apple let us down on the browser by making Netscape the standard

install." Gates then reported that he had already called Apple's CEO (who at the time was Gil Amelio) to ask "how we should announce the cancellation of Mac Office...."

350. Within a month of Gates' call to Amelio, Steve Jobs was once again Apple's CEO, and the two companies had settled all outstanding issues between them in three agreements, all of which were signed on August 7, 1997. Under the agreement titled "Technology Agreement," which remains in force today, Microsoft's primary obligation is to continue releasing up-to-date versions of Mac Office for at least five years. Among the obligations that the Technology Agreement places on Apple are several relating to browsing software.

351. First, Apple has agreed, for as long as Microsoft remains in compliance with its obligation to support Mac Office, to "bundle the most current version of Microsoft's Internet Explorer for Macintosh ... with all system software releases for Macintosh Computers ('MacOS') sold by Apple." The Technology Agreement also provides: "While Apple may bundle browsers other than Internet Explorer with such Mac OS system software releases, Apple will make Internet Explorer for Macintosh the default selection in the choice of all included internet browsers (i.e., when the user invokes the 'Browse the Internet' or equivalent icon, the Mac OS will launch Internet Explorer for Macintosh)." In fulfillment of this requirement, Apple did not include Navigator in the default installation of the Mac OS 8.5 upgrade product. In other words, Navigator is not installed on the computer hard drive during the default installation, which is the type of installation most users elect to employ. Therefore, most users who upgraded their Macintosh systems to Mac OS 8.5 were unable to access Navigator without doing a customized installation. Having already installed an altogether adequate browser (Internet Explorer) when the Mac OS 8.5 upgrade completed its default installation process, however, most users are unlikely to trouble to install Navigator as well.

352. The Technology Agreement further provides that "[a]ny other internet browsers bundled in the Mac OS system software sold by Apple shall be placed in folders in the software as released." In other words, Apple may not position icons for non-Microsoft browsing software on the desktop of new Macintosh PC systems or Mac OS upgrades. Moreover, the agreement states that "Apple will not be proactive or initiate actions to encourage users to swap out Internet Explorer for Macintosh." Both Apple and Microsoft read this term to prohibit Apple from promoting non-Microsoft browsing software. The agreement even states that Apple will "encourage its employees to use Microsoft Internet Explorer for Macintosh for all Apple-sponsored events and will not promote another browser to its employees." Pursuant to this provision, Apple's management has instructed the firm's employees to not use Navigator in demonstrations at trade shows and other public events. Also with regard to the promotion of browser technology, the agreement requires Apple to display the Internet Explorer logo on "all Apple-controlled web pages where any browser logo is displayed." Finally, the agreement grants Microsoft the right of first refusal to supply the default browsing software for any new operating system product that Apple develops during the term of the agreement.

353. At the same time that it entered the Technology Agreement, Microsoft concluded a "Preferred Stock Purchase Agreement" and a "Patent Cross License Agreement" with Apple. These latter two agreements place obligations on Microsoft that are unrelated to Mac Office, and they bind Apple in areas other than browsing software. The fact that Microsoft and Apple entered two other agreements at the same time that they entered the Technology Agreement does not change the fact that Microsoft's commitment to continue developing Mac Office was at least partial

consideration for Apple's commitment to distribute and promote Internet Explorer more favorably than Navigator. Indeed, the language of the agreements themselves demonstrates that Microsoft and Apple saw the Mac Office and Internet Explorer obligations as more closely linked to each other than to any other obligations the parties simultaneously undertook: Whereas the provision in the Technology Agreement setting forth Apple's obligations relating to browsing software explicitly states that those obligations will last as long as Microsoft complies with its obligation to continue supporting Mac Office, the provisions in the other two agreements describing the patent cross-license and Microsoft's purchase of Apple stock mention neither browsing software nor Mac Office.

354. That the Mac Office and browsing software obligations are tied to each other is highlighted by the fact that the Microsoft executives who negotiated the agreement believe that Microsoft's remedy, were Apple to fail to meet its obligations with respect to browsing software, would be to discontinue Mac Office. When, in February 1998, a Microsoft employee proposed giving Apple an HTML control in exchange for Apple's agreement to use Internet Explorer as its standard browser internally, Waldman informed the employee that Apple was already obligated to use Internet Explorer as its standard browser internally and that Microsoft would revive the threat to discontinue Mac Office if Apple failed to comply with its obligation. In Waldman's words:

> Sounds like we give them the HTML control for nothing except making IE the "standard browser for Apple?" I think they should be doing this anyway. Though the language of the agreement uses the word "encourage," I think that the spirit is that Apple should be using it everywhere and if they don't do it, then we can use Office as a club.

For at least a year after the Technology Agreement went into effect, Waldman and other Microsoft employees continued to use the threat of reduced commitment to Mac Office in holding Apple to its commitments to support Internet Explorer.

355. Apple increased its distribution and promotion of Internet Explorer not because of a conviction that the quality of Microsoft's product was superior to Navigator's, or that consumer demand for it was greater, but rather because of the in terrorem effect of the prospect of the loss of Mac Office. To be blunt, Microsoft threatened to refuse to sell a profitable product to Apple, a product in whose development Microsoft had invested substantial resources, and which was virtually ready for shipment. Not only would this ploy have wasted sunk costs and sacrificed substantial profit, it also would have damaged Microsoft's goodwill among Apple's customers, whom Microsoft had led to expect a new version of Mac Office. The predominant reason Microsoft was prepared to make this sacrifice, and the sole reason that it required Apple to make Internet Explorer its default browser and restricted Apple's freedom to feature and promote non-Microsoft browsing software, was to protect the applications barrier to entry. More specifically, the requirements and restrictions relating to browsing software were intended to raise Internet Explorer's usage share, to lower Navigator's share, and more broadly to demonstrate to important observers (including consumer, developers, industry participants, and investors) that Navigator's success had crested. Had Microsoft's only interest in developing the Mac OS version of Internet Explorer been to enable organizational customers using multiple PC operating-system products to standardize on one user interface for Web browsing, Microsoft would not have extracted from Apple the commitment to make Internet Explorer the default browser or imposed restrictions on its use and promotion of Navigator.

356. Microsoft understands that PC users tend to use the browsing software

that comes pre-installed on their machines, particularly when conspicuous means of easy access appear on the PC desktop. By guaranteeing that Internet Explorer is the default browsing software on the Mac OS, by relegating Navigator to less favorable placement, by requiring Navigator's exclusion from the default installation for the Mac OS 8.5 upgrade, and by otherwise limiting Apple's promotion of Navigator, Microsoft has ensured that most users of the Mac OS will use Internet Explorer and not Navigator. Although the number of Mac OS users is very small compared to the Windows installed base, the Mac OS is nevertheless the most important consumer-oriented operating system product next to Windows. Navigator needed high usage share among Mac OS users if it was ever to enable the development of a substantial body of cross-platform software not dependent on Windows. By extracting from Apple terms that significantly diminished the usage of Navigator on the Mac OS, Microsoft severely sabotaged Navigator's potential to weaken the applications barrier to entry.

### G. Microsoft's Success in Excluding Navigator from the Channels that Lead Most Efficiently to Browser Usage

357. The cumulative effect of the stratagems described above was to ensure that the easiest and most intuitive paths that users could take to the Web would lead to Internet Explorer, the gate controlled by Microsoft. Microsoft did not actually prevent users from obtaining and using Navigator (although it tried to do as much in June 1995), but Microsoft did make it significantly less convenient for them to do so. Once Internet Explorer was seen as providing roughly the same browsing experience as Navigator, relatively few PC users showed any inclination to expend the effort required to obtain and install Navigator. Netscape could still carpet bomb the population with CD–ROMs and make Navigator available for downloading. In reality, however, few new users (i.e., ones not merely upgrading from an old version of Navigator to a new one) had any incentive to install—much less download and install—software to replicate a function for which OEMs and IAPs were already placing perfectly adequate browsing software at their disposal. The fact that Netscape was forced to distribute tens of millions of copies of Navigator through high-cost carpet-bombing in order to obtain a relatively small number of new users only discloses the extent of Microsoft's success in excluding Navigator from the channels that lead most effectively to browser usage.

### H. The Success of Microsoft's Effort to Maximize Internet Explorer's Usage Share at Navigator's Expense

358. Microsoft's efforts to maximize Internet Explorer's share of browser usage at Navigator's expense have done just that. The period since 1996 has witnessed a large increase in the usage of Microsoft's browsing technologies and a concomitant decline in Navigator's share. This reversal of fortune might not have occurred had Microsoft not improved the quality of Internet Explorer, and some part of the reversal is undoubtedly attributable to Microsoft's decision to distribute Internet Explorer with Windows at no additional charge. The relative shares would not have changed nearly as much as they did, however, had Microsoft not devoted its monopoly power and monopoly profits to precisely that end.

### 1. The Change in the Usage Shares of Internet Explorer and Navigator

359. A developer of network-centric applications wants as many consumers as possible to acquire and use its products. It knows that only consumers running a browser that exposes the requisite APIs will be able to use network-centric applications that rely on those APIs. So in deciding whether to concentrate its development work on APIs exposed by Netscape's Web browsing software or Microsoft's, one

of the questions a developer will ask is how much Navigator is being used in relation to Internet Explorer. Dividing the total usage of each browser product by the total usage of all browsing software (i.e., usage of the installed base) answers this question, for it reveals the proportion of total usage accounted for by each product. The relative attractiveness to developers of Navigator and Internet Explorer thus depends to a large extent on their relative shares of all browser usage.

360. According to estimates that Microsoft executives cited to support their testimony in this trial, and those on which Microsoft relied in the course of its business planning, the shares of all browser usage enjoyed by Navigator and Internet Explorer changed dramatically in favor of Internet Explorer after Microsoft began its campaign to protect the applications barrier to entry. These estimates show that Navigator's share fell from above eighty percent in January 1996 to fifty-five percent in November 1997, and that Internet Explorer's share rose from around five percent to thirty-six percent over the same period. In April 1998, Microsoft relied on measurements for internal planning purposes that placed Internet Explorer's share of all browser usage above forty-five percent. These figures are broadly consistent with ones AOL relied on in evaluating its acquisition of Netscape: AOL determined that Navigator's share had fallen from around eighty percent at the end of 1996 to the "mid 50% range" in July 1998 and that Internet Explorer's share had climbed to between forty-five and fifty percent of the domestic market by late 1998.

361. Before a developer sinks costs into writing applications that rely on APIs exposed by Navigator or Internet Explorer, the developer will also want to know what share of browser usage each of the competing platforms will enjoy in the future, when the developer's applications will reach the marketplace, and even farther into the future, when the developer will try to sell updated versions of those applica-

tions. Dividing the new usage of each browser product by the new usage of all browsing software (i.e., incremental usage) helps to formulate a prediction. If a browser product's current share of all browser usage is fifty percent, and its share of incremental browser usage is thirty percent, the product's share of all browser usage will, assuming the share of incremental usage does not rise, gradually approach thirty percent, as the size of the population of browser users grows and current users update their PC systems. So Navigator's and Internet Explorer's relative attractiveness as platforms also depends greatly on their relative shares of incremental browser usage. Microsoft's tactics were focused on channels for the distribution of new browsing software. Moreover, excluding the installed base from the calculation heightens the sensitivity with which share of incremental browser usage reacts to contemporaneous forces. Microsoft was thus particularly interested in share of incremental browser usage, not only as an indication of Navigator's and Internet Explorer's relative attractiveness as platforms, but also as a sensitive reading of the impact that its actions were having.

362. According to data on which Microsoft relied in the course of its business, Internet Explorer was, by late 1997, capturing a larger share of incremental browser usage than Navigator. Specifically, data that the company then deemed reliable showed that fifty-seven percent of the new users of browsing software in the last six months of 1997 used Internet Explorer, while only thirty-nine percent used Navigator. By February 1998, Microsoft's data showed that sixty-two percent of the new Internet connections over the previous six months were using Internet Explorer, versus thirty-eight percent for Navigator. Since there is no indication that Navigator users as a group employ their browsers more than Internet Explorer users, these data indicate that Internet Explorer's share of incremental usage had exceeded

Navigator's by late 1997. This meant that Internet Explorer's share of all browser usage was moving to surpass Navigator's. To Microsoft, these numbers not only marked a significant decline in Navigator's attractiveness as a platform, they also reflected the substantial impact of Microsoft's actions.

363. The "hit" data collected by Ad-Knowledge comport with the share estimates on which Microsoft and AOL relied internally. AdKnowledge is a company that markets Web advertising services. Once the proprietor of a Web site sells space on its pages to an advertiser, Ad-Knowledge stores the advertisements on its servers and delivers them to the appropriate pages when they are accessed by users. One day every month, AdKnowledge monitors the number of times that each of the advertisements appears on users' screens. Each appearance of an advertisement on a user's screen is called a "hit." As part of the hit data it collects, AdKnowledge logs the type of Web browsing software used to access the pages on which the particular advertisements appear. Thus, the AdKnowledge data can be used to calculate monthly snapshots of the shares of usage that particular types of Web browsing software attract from the population of users accessing the Web pages that AdKnowledge monitors. To the extent AdKnowledge can detect the IAPs through which individual users access the monitored sites, the data can also be used to calculate estimates of the usage shares that particular types of browsing software attract from the subscriber bases of particular IAPs.

364. The AdKnowledge data show that Internet Explorer's share of hits to the monitored Web sites rose from twenty percent in January 1997 to forty-nine percent in August 1998 and that Navigator's share fell from seventy-seven to forty-eight percent over the same period. Dividing the change in the respective numbers of Internet Explorer and Navigator hits from the first quarter of 1998 to the third quarter of 1998 by the change in the number of total hits over that same period yields a fifty-seven percent share of incremental browser usage for Internet Explorer and a forty percent share for Navigator. These figures are again consistent with the estimates on which Microsoft and AOL relied internally.

365. When a user accessing the Internet through AOL moves from one Web page to another, AOL temporarily stores, or "caches," the first Web page on a local server. When the subscriber seeks to return to the first page, AOL delivers it from the local server rather than returning to the Web for a refreshed version of the page. AdKnowledge only counts a hit when one of the monitored advertisements is served to a users' computer from the Web. Thus, AdKnowledge undercounts hits by AOL users. AdKnowledge's attempt to implement "cache-fooling" measures has not eliminated the effects of caching. Largely as a result of the restrictive terms Microsoft prevailed upon AOL to accept, Internet Explorer enjoys a very high share of browser usage by AOL subscribers. Consequently, Internet Explorer's share of all hits detected by Ad-Knowledge is lower than its actual share of all usage. Correcting for the effects of caching results in virtually no change to the AdKnowledge-based calculation of relative browser usage shares in early 1997; however, it raises by approximately five percent the figure representing Internet Explorer's share of browser usage in the third quarter of 1998.

366. Although AdKnowledge only monitors hits to commercial Web pages, there is no indication that certain types of Web browsing software are used more than others to access commercial, versus non-commercial Web sites. Furthermore, the same share trends reflected in the Ad-Knowledge data appear in data collected from a prominent academic site. The University of Illinois at Urbana–Champlain monitors, on a weekly basis, the browsing software accessing its popular engineering

Web site. The resulting data, which AOL found important enough to rely on in evaluating the purchase of Netscape, yield virtually the same usage share figures as do the AdKnowledge data.

367. AdKnowledge does not undertake to collect data on the use of browsing software to navigate proprietary OLS content or intra-enterprise networks ("intranets"). This does not detract from the value of the AdKnowledge data as a measure of usage share for developers' purposes, however, for most developers of network-centric applications look to write applications that will run through Web sites, not through OLS proprietary content or pages on an intranet. Most developers will therefore pay most attention to estimates of the extent to which a particular type of browsing software is being used to browse the Web. Moreover, only a very small percentage of the copies of Web browsing software in operation are used exclusively to navigate intranets.

368. The advertisement banners on some Web sites alternate between different advertisements. Assuming that Ad-Knowledge delivers these advertisements, a single visit to a Web site could register with AdKnowledge as multiple hits as the advertisements "rotate" on the user's screen. This phenomenon does not spoil the essential reliability of the AdKnlowledge data as a reporter of browser usage share, though. In order for there to be a bias of significant proportions, users of either Internet Explorer or Navigator would have to exhibit a special propensity to keep pages open as the advertisements rotate. There is no reason to believe that this is the case.

369. Thus none of the characteristics of the AdKnowledge data invalidate it as a useful measure of browser usage share. It is understandable, therefore, that in evaluating the purchase of Netscape, AOL viewed AdKnowledge's hit data as one of the more reliable indicators of trends in the relative shares of all browser usage enjoyed by Navigator and Internet Explorer.

370. Microsoft's economic witness, Richard Schmalensee, testified survey data collected by Market Decisions Corporation ("MDC") provide a more accurate measure of the usage shares enjoyed by different brands of Web browsing software than AdKnowledge's hit data. The calculations that Schmalensee made using the MDC data lead to results that differ, in one main respect, from the results generated with hit data. Whereas the AdKnowledge data show Navigator's share falling from seventy-five to fifty-six percent from the first to the third quarter of 1997, the MDC data show Navigator's share holding steady at fifty-five or fifty-six percent over the same period. Although both sources show Internet Explorer's share gaining steadily throughout that period, the MDC data indicate that Internet Explorer's rise was coming not at Navigator's expense, but rather at the expense of other browser products, which, according to the MDC data, collectively enjoyed a substantial share into 1997. The AdKnowledge data, by contrast, indicate that the share of usage attributable to browsers other than Internet Explorer and Navigator has never been substantial and that Internet Explorer's rise has always been at Navigator's expense.

371. The MDC estimates of the shares attributable to Navigator and other non-Microsoft browser products in 1996 differ markedly from those on which Microsoft and AOL relied in the course of making business judgments. Notably, in August 1996, four months after it commissioned the first MDC survey, Microsoft continued to estimate Navigator's share as exceeding eighty percent. In fact, the senior Microsoft executives who testified in this trial still believed at the time of their testimony that Navigator's usage share in late 1995 and early 1996 had exceeded eighty percent. To the extent the MDC estimates differ from those which Microsoft and AOL used internally, and which senior Mi-

crosoft executives still embrace, the Court is inclined to trust the latter estimates. More broadly, the sets of questions contained in the MDC surveys and the internally inconsistent responses they evoked reveal that a substantial percentage of the respondents misunderstood some of the patently ambiguous questions they were asked, and that a large number responded to questions when they were unsure of, or even clearly misinformed regarding, the answers. The Court accordingly gives no weight to any of the conclusions that Microsoft draws from MDC survey data.

372. In summary, the estimates on which Microsoft and AOL relied and the measurements made by AdKnowledge and the University of Illinois provide an adequate basis for two findings: First, from early 1996 to the late summer of 1998, Navigator's share of all browser usage fell from above seventy percent to around fifty percent, while Internet Explorer's share rose from about five percent to around fifty percent; second, by 1998, Navigator's share of incremental browser usage had fallen below forty percent while Internet Explorer's share had risen above sixty percent. All signs point to the fact that Internet Explorer's share has continued to rise—and Navigator's has continued to decline—since the late summer of 1998. It is safe to conclude, then, that Internet Explorer's share of all browser usage now exceeds fifty percent, and that Navigator's share has fallen below that mark.

373. These trends will continue. In February 1998, Kumar Mehta, the Microsoft employee responsible for tracking browser share, told Brad Chase that Microsoft's best model projected that Internet Explorer's usage share in early 2001 would stand between sixty and sixty-eight percent. This comports with the forecast on which AOL relied in deciding to purchase Netscape: The report presented to AOL's board of directors prior to their vote on the transaction predicted that Navigator's usage share would fall to between thirty-five and forty percent by late 2000. The most reasonable prediction, then, is that by January 2001, Internet Explorer's usage share will exceed sixty percent while Navigator's share will have fallen below forty percent.

374. Navigator's large and continuing decline in usage share has demonstrated to developers the product's failure to mature as the standard software used to browse the Web. Internet Explorer's success in gaining usage share, together with the lack of contenders other than Navigator, has simultaneously sent the clear message to developers that no platform for network-centric applications can compete for ubiquity with the 32–bit Windows API set.

### 2. The Cause of the Change in Usage Shares

375. The changes in usage share described above would likely not have occurred had Microsoft not improved its browsing software to the point that, by late 1996, the average user could not discern a significant difference in quality and features between the latest versions of Internet Explorer and Navigator. As Microsoft's top executives predicted, however, Internet Explorer's quality and features have never surpassed Navigator's to such a degree as to compel a significant part of Navigator's installed base to switch to Internet Explorer. An internal Microsoft presentation concluded in February 1998 that "[m]any customers see MS and NS as parity products; no strong reason to switch," and another internal review three months later reported, "IE4 is fundamentally not compelling" and "[n]ot differentiated from Netscape v[ersion]4—seen as a commodity." For a time, even among new users, Navigator was likely to win most choices between comparable browser software, because most people associated the Internet and cutting-edge browsing technology with Netscape rather than with Microsoft. So, if Microsoft had taken no action other than improving the quality and features of its browser, Internet Explorer's share of usage would have risen

far less and far more slowly than it actually did. While Internet Explorer's increase in usage share accelerated and began to cut deeply into Navigator's share after Microsoft released the first version of Internet . Explorer (3.0) to offer quality and features approaching those of Navigator, the acceleration occurred months before Microsoft released the first version of Internet Explorer (4.0) to win a significant number of head-to-head product reviews against Navigator. This indicates that superior quality was not responsible for the dramatic rise Internet Explorer's usage share.

376. Including Internet Explorer with Windows at no additional charge likely helped the usage share of Microsoft's browsing software. It did not, however, prevent OEMs from meeting demand for Navigator, which remained higher than demand for Internet Explorer well into 1998. Moreover, bundling Internet Explorer with Windows had no effect on the distribution and promotion of browsing software by IAPs or through any of the other channels that Microsoft sought to pre-empt by other means. Had Microsoft not offered distribution licenses for Internet Explorer—and other things of great value—to other firms at no charge; had it not prevented OEMs from removing the prominent means of accessing Internet Explorer and limited their ability to feature Navigator; and had Microsoft not taken all the other measures it used to maximize Internet Explorer's usage share at Navigator's expense, its browsing software would not have weaned such a large amount of usage share from Navigator, much less overtaken Navigator in three years.

## I. The Success of Microsoft's Effort to Protect the Applications Barrier to Entry from the Threat Posed by Navigator

377. In late 1995 and early 1996, Navigator seemed well on its way to becoming the standard software for browsing the Web. Within three years, however, Microsoft had successfully denied Navigator that status, and had thereby forestalled a serious potential threat to the applications barrier to entry. Indeed, Microsoft's Kumar Mehta felt comfortable expressing to Brad Chase in February 1998 his "PERSONAL opinion" that "the browser battle is close to over." Mehta continued: "We set out on this mission 2 years ago to not let netscape dictate standards and control the browser api's [sic]. All evidence today says they don't."

378. The population of browser users is expanding so quickly that Navigator's installed base has grown even as its usage share has fallen. In fact, AOL credited an estimate stating that Navigator's installed base in the United States alone grew from fifteen million in 1996 to thirty-three million in December 1998. By all indications, Navigator's installed base will continue to grow. This does not mean, however, that Navigator is—or will be—an attractive enough platform for the development of network-centric applications to weaken the applications barrier to entry. As discussed above, the APIs that Navigator exposes could only attract enough developer attention to threaten the applications barrier to entry if Navigator became—or appeared destined to become—the standard software used to browse the Web. Navigator's installed base may continue to grow, but Internet Explorer's installed base is now larger and growing faster. Consequently, the APIs that Navigator exposes will not attract enough developer attention to spawn a body of cross-platform, network-centric applications large enough to dismantle the applications barrier to entry.

379. Not only did Microsoft prevent Navigator from undermining the applications barrier to entry, it inflicted considerable harm on Netscape's business in the process. By ensuring that the firms comprising the channels that lead most efficiently to browser usage distributed and promoted Internet Explorer to the virtual exclusion of Navigator, Microsoft relegated Netscape to more costly and less effective

methods of distributing and promoting its browsing software. After Microsoft started licensing Internet Explorer at no charge, not only to OEMs and consumers, but also to IAPs, ISVs, ICPs, and even Apple, Netscape was forced to follow suit. Despite the fact that it did not charge for Internet Explorer, Microsoft could still defray the massive costs it was undertaking to maximize usage share with the vast profits earned licensing Windows. Because Netscape did not have that luxury, it could ill afford the dramatic drop in revenues from Navigator, much less to pay for the inefficient modes of distribution to which Microsoft had consigned it. The financial constraints also deterred Netscape from undertaking technical innovations that it might otherwise have implemented in Navigator. Microsoft was not altogether surprised, then, when it learned in November 1998 that Netscape had surrendered itself to acquisition by another company.

380. Were AOL ever to attempt to revive Navigator's usage share with the intention of building it into a significant platform for the development of network-centric applications, that effort would not make any headway before January 1, 2001, when AOL's obligation to distribute Internet Explorer on a preferential basis expires. In fact, there is presently no indication that AOL will try even after that date to raise Navigator's usage share substantially. First of all, as explained above, AOL need not revive Navigator's usage share in order to achieve an adequate return on its investment in Netscape. Secondly, while the due-diligence summary and board-of-directors presentation that preceded the Netscape acquisition discuss AOL's commitment to invest marketing resources in an effort to stem the slide in Navigator's share, neither report indicates any intention on AOL's part to invest in actually raising Navigator's share.

381. Also detracting from the notion that AOL is committed to reviving the middleware threat through Navigator is the fact that AOL included in the November 1998 agreement with Sun a provision making clear that the new partnership with Sun in no way obligated AOL to drop Internet Explorer from its client software in favor of Navigator. The provision states that "AOL has no present intention to make any such replacement or use and shall have no obligation to make any such replacement or use, and that it is AOL's present expectation that it . . . may seek to renew and/or extend and expand its present agreement with Microsoft Corporation to continue to distribute Internet Explorer."

382. Bill Gates himself, who is not one to underestimate threats to Microsoft's business, apparently concluded after reviewing the November 1998 transactions that AOL would not seek to develop a platform that would compete with Microsoft's network-centric interfaces. In December 1998, during a meeting convened to analyze the implications of the AOL/netscape/Sun transactions, Gates declared to the assembled Microsoft executives, "AOL doesn't have it in their genes to attack us in the platform space."

383. Finally, if its coveted placement in the Online Services Folder fails to entice AOL into extending its agreement with Microsoft past January 2001, Microsoft assuredly has the wherewithal to offer AOL additional inducements in exchange for yet more commitments that will preclude a resurgence of Navigator's usage share. Even if, despite the absence of signs to that effect, AOL drops Internet Explorer and adopts Navigator with a mind to reviving Navigator's usage share after January 1, 2001, Navigator's transformation into a platform attractive enough to threaten the applications barrier would be a chimerical aspiration, especially considering Microsoft's increasing influence over network-centric standards. In any event, nothing that happens after January 1, 2001 will change the fact that Microsoft has succeeded in forestalling for several years Navigator's evolution in that direction.

384. Although the suspicion lingers, the evidence is insufficient to find that Microsoft's ambition is a future in which most or all of the content available on the Web would be accessible only through its own browsing software. The evidence does, however, reveal an intent to ensure that if and when full-featured, server-based applications begin appearing in large numbers on the Web, the number of them relying solely on middleware APIs (such as those exposed by Navigator) will be too few to attenuate the applications barrier to entry.

385. At least partly because of Navigator's substantial usage share, most developers continue to insist that their Web content be more-or-less as attractive when accessed with Navigator as it is when accessed with Internet Explorer. Navigator will retain an appreciable usage share through the end of 2000. After that point, AOL may be able and willing to prevent Internet Explorer's share from achieving such dominance that a critical mass of developers will cease to concern themselves with ensuring that their Web content at least be accessible through non-Microsoft browsing software. So, as matters stand at present, while Microsoft has succeeded in forestalling the development of enough full-featured, cross-platform, network-centric applications to render the applications barrier penetrable, it is not likely to drive non-Microsoft PC Web browsing software from the marketplace altogether.

## VI. MICROSOFT'S RESPONSE TO THE THREAT POSED BY SUN'S IMPLEMENTATION OF JAVA

386. For Microsoft, a key to maintaining and reinforcing the applications barrier to entry has been preserving the difficulty of porting applications from Windows to other platforms, and vice versa. In 1996, senior executives at Microsoft became aware that the number of developers writing network-centric applications in the Java programming language had become significant, and that Java was likely to increase in popularity among developers. Microsoft therefore became interested in maximizing the difficulty with which applications written in Java could be ported from Windows to other platforms, and vice versa.

### A. Creating a Java Implementation for Windows that Undermined Portability and Was Incompatible with Other Implementations

387. Although Sun intended Java technologies eventually to allow developers to write applications that would run on multiple operating systems without any porting, the Java class libraries have never exposed enough APIs to support full-featured applications. Java developers have thus always needed to rely on platform-specific APIs in order to write applications with advanced functionality. Recognizing this, Sun sponsored a process for the creation of a software method that would allow developers writing in Java to rely directly upon APIs exposed by a particular operating system in a way that would nevertheless allow them to port their applications with relative ease to JVMs running on different operating systems.

388. On March 12, 1996, Sun signed an agreement granting Microsoft the right to distribute and make certain modifications to Sun's Java technologies. Microsoft used this license to create its own Java development tools and its own Windows-compatible Java runtime environment. Because the motivation behind the Sun-sponsored effort ran counter to Microsoft's interest in preserving the difficulty of porting, Microsoft independently developed methods for enabling "calls" to "native" Windows code that made porting more difficult than the method that Sun was striving to make standard. Microsoft implemented these different methods in its developer tools and in its JVM. Microsoft also discouraged its business allies from aiding Sun's effort. For example, Gates told Intel's CEO in June 1996 that he did not want the Intel Architecture Labs coop-

erating with Sun to develop methods for calling upon multimedia interfaces in Windows.

389. Since they were custom-built for enabling native calls to Windows, and because they were developed by the firm with the most intimate knowledge of Windows, the native methods that Microsoft produced were slightly easier for developers to use than the method that derived from the Sun-sponsored effort, and Java applications using Microsoft's methods tended to run faster than ones calling upon Windows APIs with Sun's method. If a developer relied on Microsoft's methods rather than Sun's, however, his Java application would be much more difficult to port from the Windows-compatible JVM to JVMs designed to run on different operating systems.

390. Microsoft easily could have implemented Sun's native method along with its own in its developer tools and its JVM, thereby allowing Java developers to choose between speed and portability; however, it elected instead to implement only the Microsoft methods. The result was that if a Java developer used the Sun method for making native calls, his application would not run on Microsoft's version of the Windows JVM, and if he used Microsoft's native methods, his application would not run on any JVM other than Microsoft's version. Far from being the unintended consequence of an attempt to help Java developers more easily develop high-performing applications, incompatibility was the intended result of Microsoft's efforts. In fact, Microsoft would subsequently threaten to use the same tactic against Apple's QuickTime. Microsoft continued to refuse to implement Sun's native method until November 1998, when a court ordered it to do so. It then took Microsoft only a few weeks to implement Sun's native method in its developer tools and JVM.

391. Although the Java class libraries have yet to provide enough functionality to support full-featured applications, they have gradually expanded toward that goal.

In 1997, Sun added a class library called Remote Method Invocation, or "RMI," which allowed Java applications written to call upon it to communicate with each other in certain useful ways. Microsoft was not willing to stand by and allow Java developers to rely on new Java class libraries unimpeded. The more that Java developers were able to satisfy their need for functionality by calling upon the Java class libraries, the more portable their applications would become. Microsoft had developed a set of Windows-specific interfaces to provide functionality analogous to the functionality RMI offered; it wanted Java developers to rely on this Windows-specific technology rather than Sun's cross-platform interface. Microsoft thus refused to include RMI as a standard component of the Java runtime environment for Windows that it shipped with Internet Explorer 4.0.

392. The license agreement it had signed with Sun the previous year obligated Microsoft to offer RMI, at a minimum, on its developer Web site. Microsoft did so, but with respect to the RMI beta release, it buried the link in an obscure location and neglected to include an entry for it in the site's index. Referring to RMI and any Java developers who might access Microsoft's site looking for it, a Microsoft employee wrote to his approving manager, "They'll have to stumble across it to know it's there. . . . I'd say it's pretty buried."

393. It is unclear whether Microsoft ultimately placed RMI in a more prominent place on its developer Web site. Even if it did, the fact that RMI was not shipped with Microsoft's Java runtime environment for Windows meant that Java developers could not rely on its being installed on consumers' PC systems. If developers wanted their Java applications to call upon communications interfaces guaranteed to be present on Windows users' systems, they had no choice but to rely on the Microsoft-specific interfaces instead of RMI. Microsoft undertook the effort to

remove RMI from the rest of the Java class libraries, instead of simply leaving it in place and allowing developers to choose between it and Windows-specific interfaces, for the sole purpose of making it more difficult for Java developers to write easily portable applications.

394. In a further effort intended to increase the incompatibility between Java applications written for its Windows JVM and other Windows JVMs, and to increase the difficulty of porting Java applications from the Windows environment to other platforms, Microsoft designed its Java developer tools to encourage developers to write their Java applications using certain "keywords" and "compiler directives" that could only be executed properly by Microsoft's version of the Java runtime environment for Windows. Microsoft encouraged developers to use these extensions by shipping its developer tools with the extensions enabled by default and by failing to warn developers that their use would result in applications that might not run properly with any runtime environment other than Microsoft's and that would be difficult, and perhaps impossible, to port to JVMs running on other platforms. This action comported with the suggestion that Microsoft's Thomas Reardon made to his colleagues in November 1996: "[W]e should just quietly grow j++ [Microsoft's developer tools] share and assume that people will take more advantage of our classes without ever realizing they are building win32-only java apps." Microsoft refused to alter its developer tools until November 1998, when a court ordered it to disable its keywords and compiler directives by default and to warn developers that using Microsoft's Java extensions would likely cause incompatibilities with non-Microsoft runtime environments.

**B. Inducing Developers to Use the Microsoft Implementation of Java Rather than Sun–Compliant Implementations**

395. If all Microsoft had done to combat the growth of easily portable Java applications had been to increase the incompatibility between its Java implementation and ones complying with Sun's standards, the effect might have been limited. For if Sun could have assured developers that a Windows-compatible Java runtime environment that complied with Sun's standards would be installed on as many Windows PCs as Microsoft's version, and that it would run Java applications as well as Microsoft's, developers might have considered the cost in portability associated with relying on Microsoft-specific technologies and instead written their Java applications using Sun's developer tools. When Netscape announced in May 1995 that it would include with every copy of Navigator a copy of a Windows JVM that complied with Sun's standards, it appeared that Sun's Java implementation would achieve the necessary ubiquity on Windows.

396. Determined to induce developers to write Java applications that relied on its version of the runtime environment for Windows rather than on Sun-compliant ones, Microsoft made a large investment of engineering resources to develop a high-performance Windows JVM. This made Microsoft's version of the runtime environment attractive on its technical merits. To hinder Sun and Netscape from improving the quality of the Windows JVM shipped with Navigator, Microsoft pressured Intel, which was developing a high-performance Windows-compatible JVM, to not share its work with either Sun or Netscape, much less allow Netscape to bundle the Intel JVM with Navigator. Gates was himself involved in this effort. During the August 2, 1995 meeting at which he urged Intel to halt IAL's development of platform-level software, Gates also announced that Intel's cooperation with Sun and Netscape to develop a Java runtime environment for systems running on Intel's microprocessors was one of the issues threatening to undermine cooperation between Intel and Microsoft. By the spring of 1996, Intel had

developed a JVM designed to run well on Intel-based systems while complying with Sun's cross-platform standards. Microsoft executives approached Intel in April of that year and urged that Intel not take any steps toward allowing Netscape to ship this JVM with Navigator.

397. By bundling its version of the Windows JVM with every copy of Internet Explorer and expending some of its surplus monopoly power to maximize the usage of Internet Explorer at Navigator's expense, Microsoft endowed its Java runtime environment with the unique attribute of guaranteed, enduring ubiquity across the enormous Windows installed base. As one internal Microsoft presentation from January 1997 put it, the company's response to cross-platform Java entailed "[i]ncreased IE share—integrat[ion] with Windows." Partly as a result of the damage that Microsoft's efforts against Navigator inflicted on Netscape's business, Netscape decided in 1998 that it could no longer afford to do the engineering work necessary to continue bundling up-to-date JVMs with Navigator. Consequently, it announced that, starting with version 5.0, Navigator would cease to be a distribution vehicle for JVMs compliant with Sun's standards.

398. The guaranteed presence of Microsoft's runtime environment on every Windows PC and the decreasing likelihood that the primary host of the Sun-compliant runtime environment (Navigator) would be present, induced many Java developers to write their applications using Microsoft's developer tools, for doing so guaranteed that those applications would run in the Java environment most likely to be installed on a Windows user's PC. Owing to Microsoft's deliberate design decisions, more developers using Microsoft's Java developer tools meant that more Java applications would rely on the Windows-specific technologies in Microsoft's runtime environment and thus would not be portable.

399. Microsoft was not content to rely solely on its anti-Navigator efforts to ensure that its Java runtime environment would be the only one guaranteed to be present on Windows PC systems. After all, Netscape was not the only ISV capable of placing copies of a runtime environment on users' systems. Many developers of network-centric applications were just as capable of bundling compatible runtime environments with their applications as they were of bundling browsing software. If the right runtime environment already came bundled with the right browsing software, all the more convenient for the ISV. If not (as would increasingly be the case after Netscape stopped bundling a runtime environment with Navigator), though, the ISV could still separately obtain the desired runtime environment and bundle it with every copy of its product.

400. Recognizing ISVs as a channel through which Java runtime environments that complied with Sun's standards could find their way onto Windows PC systems, Microsoft induced ISVs to distribute Microsoft's version instead of a Sun-compliant one. First, Microsoft made its JVM available to ISVs separately from Internet Explorer so that those uninterested in bundling browsing software could nevertheless bundle Microsoft's JVM. Microsoft's David Cole revealed the motivation for this step in a message he wrote to Jim Allchin in July 1997: "[W]e've agreed that we must allow ISVs to redistribute the Java VM standalone, without IE. ISVs that do this are bound into Windows because that's the only place the VM works, and it keeps them away from Sun's APIs."

401. Microsoft took the further step of offering valuable things to ISVs that agreed to use Microsoft's Java implementation. Specifically, in the First Wave agreements that it signed with dozens of ISVs in 1997 and 1998, Microsoft conditioned early Windows 98 and Windows NT betas, other technical information, and the right to use certain Microsoft seals of approval on the agreement of those ISVs to

use Microsoft's version of the Windows JVM as the "default." Microsoft and the ISVs all read this requirement to obligate the ISVs to ensure that their Java applications were compatible with Microsoft's version of the Windows JVM. The only effective way to ensure compatibility with Microsoft's JVM was to use Microsoft's Java developer tools, which in turn meant using Microsoft's methods for making native calls and (unless the developers were especially wary and sophisticated) Microsoft's other Java extensions. Thus, a very large percentage of the Java applications that the First Wave ISVs wrote would run only on Microsoft's version of the Windows JVM. With that in mind, the First Wave ISVs would not have any reason to distribute with their Java applications any JVM other than Microsoft's. So, in exchange for costly technical support and other blandishments, Microsoft induced dozens of important ISVs to make their Java applications reliant on Windows-specific technologies and to refrain from distributing to Windows users JVMs that complied with Sun's standards. The record contains no evidence that the relevant provision in the First Wave agreements had any purpose other than to maximize the difficulty of porting Java applications between Windows and other platforms. Microsoft remained free to hold the First Wave ISVs to this provision until a court enjoined its enforcement in November 1998.

402. In addition to the First Wave agreements, Microsoft entered an agreement with at least one ISV that explicitly required it to redistribute Microsoft's JVM to the exclusion of any other and to rely upon Microsoft's native methods to the exclusion of any other methods. Such agreements were also prohibited by the November 1998 injunction.

403. Microsoft anticipated that the Java language would become a popular medium in the multimedia arena. It thus wanted to ensure that the Java software created to deliver multimedia content would not rely on Java implementations that fostered portability. RealNetworks developed the most popular software for the creation and play-back of streaming multimedia content. Therefore, Microsoft sought to ensure that, to the extent Java developers relied on RealNetworks' technologies, they would not be relying on a Java implementation that complied with Sun's standards. So, in the July 18, 1997 agreement that it entered with RealNetworks, Microsoft conditioned its agreement to distribute RealNetworks' media player with Internet Explorer on RealNetworks' agreement to exert its best efforts to ensure that its player primarily use Windows-specific technology, rather than any analogous interfaces that Sun or Netscape might develop, to display multimedia content. Absent this obligation, there would have been no technical reason why RealNetworks could not have designed its media player to support both Microsoft's technologies and ones developed by Sun or Netscape. Although RealNetworks subsequently announced that it planned to continue developing its own fundamental streaming software, the July 18 agreement limited the extent to which that software would include Java technologies that complied with Sun's standards.

## C. Thwarting the Expansion of the Java Class Libraries

404. As discussed above, Microsoft's effort to lock developers into its Windows-specific Java implementation included actions designed to discourage developers from taking advantage of Java class libraries such as RMI. Microsoft went further than that, however. In pursuit of its goal of minimizing the portability of Java applications, Microsoft took steps to thwart the very creation of cross-platform Java interfaces. The incorporation of greater functionality into the Java class libraries would have increased the portability of the applications that relied on them, while simultaneously encouraging developers to use Sun-com-

pliant implementations of Java. In one instance of this effort to stunt the growth of the Java class libraries, Microsoft used threats to withhold Windows operating-system support from Intel's microprocessors and offers to include Intel technology in Windows in order to induce Intel to stop aiding Sun in the development of Java classes that would support innovative multimedia functionality.

405. In November 1995, Microsoft's Paul Maritz told a senior Intel executive that Intel's optimization of its multimedia software for Sun's Java standards was as inimical to Microsoft as Microsoft's support for non-Intel microprocessors would be to Intel. It was not until 1997, though, that Microsoft prevailed upon Intel to not support Sun's development of Java classes that would have allowed developers to include certain multimedia features in their Java applications without sacrificing portability.

406. In February 1997, one of Intel's competitors, called AMD, solicited support from Microsoft for its "3DX" technology, which provided sophisticated multimedia support for games. Microsoft's Allchin asked Gates whether Microsoft should support 3DX, despite the fact that Intel would oppose it. Gates responded: "If Intel has a real problem with us supporting this then they will have to stop supporting Java Multimedia the way they are. I would gladly give up supporting this if they would back off from their work on JAVA which is terrible for Intel." Near the end of March, Allchin sent another message to Gates and Maritz. In it he wrote, "I am positive that we must do a direct attack on Sun (and probably Oracle).... Between ourselves and our partners, we can certainly hurt their (certainly Sun's) revenue base.... We need to get Intel to help us. Today, they are not." Two months later, Eric Engstrom, a Microsoft executive with responsibility for multimedia development, wrote to his superiors that one of Microsoft's goals was getting "Intel to stop helping Sun create Java Multimedia APIs, especially ones that run well (ie native implementations) on Windows." Engstrom proposed achieving this goal by offering Intel the following deal: Microsoft would incorporate into the Windows API set any multimedia interfaces that Intel agreed to not help Sun incorporate into the Java class libraries. Engstrom's efforts apparently bore fruit, for he testified at trial that Intel's IAL subsequently stopped helping Sun to develop class libraries that offered cutting-edge multimedia support.

### D. The Effect of Microsoft's Efforts to Prevent Java from Diminishing the Applications Barrier to Entry

407. Had Microsoft not been committed to protecting and enhancing the applications barrier to entry, it might still have developed a high-performance JVM and enabled Java developers to call upon Windows APIs. Absent this commitment, though, Microsoft would not have taken efforts to maximize the difficulty of porting Java applications written to its implementation and to drastically limit the ability of developers to write Java applications that would run in both Microsoft's version of the Windows runtime environment and versions complying with Sun's standards. Nor would Microsoft have endeavored to limit Navigator's usage share, to induce ISVs to neither use nor distribute non-Microsoft Java technologies, and to impede the expansion of the Java class libraries, had it not been determined to discourage developers from writing applications that would be easy to port between Windows and other platforms. Microsoft's dedication to the goal of protecting the applications barrier to entry is highlighted by the fact that its efforts to create incompatibility between its JVM and others resulted in fewer applications being able to run on Windows than otherwise would have. Microsoft felt it was worth obstructing the development of Windows-compatible applications where those applications would have been easy to port to other platforms.

It is not clear whether, absent Microsoft's interference, Sun's Java efforts would by now have facilitated porting between Windows and other platforms enough to weaken the applications barrier to entry. What is clear, however, is that Microsoft has succeeded in greatly impeding Java's progress to that end with a series of actions whose sole purpose and effect were to do precisely that.

## VII. THE EFFECT ON CONSUMERS OF MICROSOFT'S EFFORTS TO PROTECT THE APPLICATIONS BARRIER TO ENTRY

408. The debut of Internet Explorer and its rapid improvement gave Netscape an incentive to improve Navigator's quality at a competitive rate. The inclusion of Internet Explorer with Windows at no separate charge increased general familiarity with the Internet and reduced the cost to the public of gaining access to it, at least in part because it compelled Netscape to stop charging for Navigator. These actions thus contributed to improving the quality of Web browsing software, lowering its cost, and increasing its availability, thereby benefitting consumers.

409. To the detriment of consumers, however, Microsoft has done much more than develop innovative browsing software of commendable quality and offer it bundled with Windows at no additional charge. As has been shown, Microsoft also engaged in a concerted series of actions designed to protect the applications barrier to entry, and hence its monopoly power, from a variety of middleware threats, including Netscape's Web browser and Sun's implementation of Java. Many of these actions have harmed consumers in ways that are immediate and easily discernible. They have also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition.

410. By refusing to offer those OEMs who requested it a version of Windows without Web browsing software, and by preventing OEMs from removing Internet Explorer—or even the most obvious means of invoking it—prior to shipment, Microsoft forced OEMs to ignore consumer demand for a browserless version of Windows. The same actions forced OEMs either to ignore consumer preferences for Navigator or to give them a Hobson's choice of both browser products at the cost of increased confusion, degraded system performance, and restricted memory. By ensuring that Internet Explorer would launch in certain circumstances in Windows 98 even if Navigator were set as the default, and even if the consumer had removed all conspicuous means of invoking Internet Explorer, Microsoft created confusion and frustration for consumers, and increased technical support costs for business customers. Those Windows purchasers who did not want browsing software—businesses, or parents and teachers, for example, concerned with the potential for irresponsible Web browsing on PC systems—not only had to undertake the effort necessary to remove the visible means of invoking Internet Explorer and then contend with the fact that Internet Explorer would nevertheless launch in certain cases; they also had to (assuming they needed new, non-browsing features not available in earlier versions of Windows) content themselves with a PC system that ran slower and provided less available memory than if the newest version of Windows came without browsing software. By constraining the freedom of OEMs to implement certain software programs in the Windows boot sequence, Microsoft foreclosed an opportunity for OEMs to make Windows PC systems less confusing and more user-friendly, as consumers desired. By taking the actions listed above, and by enticing firms into exclusivity arrangements with valuable inducements that only Microsoft could offer and that the firms reasonably believed they could not do without, Microsoft forced those consumers who otherwise would have elected Navigator as their browser to either pay a substantial price (in the forms of downloading,

installation, confusion, degraded system performance, and diminished memory capacity) or content themselves with Internet Explorer. Finally, by pressuring Intel to drop the development of platform-level NSP software, and otherwise to cut back on its software development efforts, Microsoft deprived consumers of software innovation that they very well may have found valuable, had the innovation been allowed to reach the marketplace. None of these actions had pro-competitive justifications.

411. Many of the tactics that Microsoft has employed have also harmed consumers indirectly by unjustifiably distorting competition. The actions that Microsoft took against Navigator hobbled a form of innovation that had shown the potential to depress the applications barrier to entry sufficiently to enable other firms to compete effectively against Microsoft in the market for Intel-compatible PC operating systems. That competition would have conduced to consumer choice and nurtured innovation. The campaign against Navigator also retarded widespread acceptance of Sun's Java implementation. This campaign, together with actions that Microsoft took with the sole purpose of making it difficult for developers to write Java applications with technologies that would allow them to be ported between Windows and other platforms, impeded another form of innovation that bore the potential to diminish the applications barrier to entry. There is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems. It is clear, however, that Microsoft has retarded, and perhaps altogether extinguished, the process by which these two middleware technologies could have facilitated the introduction of competition into an important market.

412. Most harmful of all is the message that Microsoft's actions have conveyed to every enterprise with the potential to innovate in the computer industry. Through its conduct toward Netscape, IBM, Compaq, Intel, and others, Microsoft has demonstrated that it will use its prodigious market power and immense profits to harm any firm that insists on pursuing initiatives that could intensify competition against one of Microsoft's core products. Microsoft's past success in hurting such companies and stifling innovation deters investment in technologies and businesses that exhibit the potential to threaten Microsoft. The ultimate result is that some innovations that would truly benefit consumers never occur for the sole reason that they do not coincide with Microsoft's self-interest.